**Scott F. Kocher, OSB #015088**
scott@forumlawgroup.com
FORUM LAW GROUP LLC
811 SW Naito Parkway, Suite 420
Portland, Oregon 97204
Tel: 503.445.2102
Fax: 503.445.2120

Rafey S. Balabanian*
rbalabanian@edelson.com
Eve-Lynn Rapp*
erapp@edelson.com
Stewart R. Pollock*
spollock@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

Attorneys for Plaintiffs

*Admitted Pro Hac Vice

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| **LORI WAKEFIELD**, individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>    v.<br><br>**VISALUS, INC.**, a Nevada corporation,<br><br>      Defendant. | **Case No.: 3:15-cv-01857-BR**<br><br>**PLAINTIFF'S RENEWED MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>**Request for Oral Argument** |

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................1

RELEVANT STATUTORY PROVISIONS ........................................................4

RELEVANT FACTUAL BACKGROUND ........................................................5

ARGUMENT ....................................................................................................12

I.  Although the Ninth Circuit Recently Established that Plaintiff Need Not Demonstrate that the Classes are Ascertainable, Plaintiff Could Easily Do So ...........................................................................................13

II.  The Proposed Classes Meet the Requirements of Rule 23(a)................17

    A.  The Numerosity Requirement is Satisfied ................................17

    B.  Members of Proposed Class Share Common Issues of Law and Fact ...........19

    C.  Plaintiff's Claims are Typical of the Classes ............................24

    D.  Both Wakefield and Her Counsel Will Adequately Represent the Class ........26

III.  The Proposed Satisfy Rule 23(b)(3)'s Requirements ..........................28

    A.  Common Questions of Law and Fact Predominate ...................28

    B.  A Class Action is the Superior Way to Handle This Lawsuit ...........31

CONCLUSION .................................................................................................33

## <u>TABLE OF AUTHORITIES</u>

**UNITED STATES SUPREME COURT CASES:**

*Amchem Products, Inc. v. Windsor*,
    521 U.S. 591 (1997)............................................................................32, 33

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*,
    133 S. Ct. 1184 (2013)..................................................................13, 29, 30

*First Am. Fin. Corp. v. Edwards*, 136 S. Ct. 1533 (2016)............................................19

*Gen. Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982)..............................................................................25

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016)..........................................................................29

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011)......................................................................13, 19

**UNITED STATES CIRCUIT COURT OF APPEALS CASES:**

*Bateman v. Am. Multi-Cinema, Inc.*,
    623 F.3d 708 (9th Cir. 2010) .................................................................13

*Briseno v. ConAgra Foods, Inc.*,
    844 F.3d 1121 (9th Cir. 2017) ...............................................................14

*Cummings v. Connell*,
    316 F.3d 886 (9th Cir. 2003) .................................................................26

*Edwards v. First Am. Corp.*,
    798 F.3d 1172 (9th Cir. 2015) ...............................................................19

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) .................................................................13

*Grant v. Capital Mgmt. Servs., L.P.*,
    449 Fed. App'x 598 (9th Cir. 2011) ........................................................22

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ...................................................19, 25, 26

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
    691 F.2d 1335 (9th Cir. 1982) ...............................................................13

*In re Mego Fin. Corp. Sec. Litig.*,
    213 F.3d 454 (9th Cir. 2000) .................................................................26

*Ira Holtzman, C.P.A. v. Turza,*
    728 F.3d 682 (7th Cir.2013) ..................................................................3

*Meyer v. Portfolio Recovery Assocs.,* LLC,
    707 F.3d 1036 (9th Cir. 2012) ..........................................................23, 30

*Parra v. Bashas', Inc.,*
    536 F.3d 975 (9th Cir. 2008) ................................................................19

*Rannis v. Recchia,*
    380 F. App'x 646 (9th Cir. 2010) ..........................................................17

*Satterfield v. Simon & Schuster, Inc.,*
    569 F.3d 946 (9th Cir. 2009) ..........................................................27, 28

*Vinole v. Countrywide Home Loans, Inc.,*
    571 F.3d 935 (9th Cir. 2009) ................................................................29

*Wolin v. Jaguar Land Rover N. Am., LLC,*
    617 F.3d 1168 (9th Cir. 2010) ..............................................................32

**UNITED STATES DISTRICT COURT CASES:**

*Abdeljalil v. Gen. Elec. Capital Corp.,*
    306 F.R.D. 303 (S.D. Cal. 2015) ..........................................................22

*Agne v. Papa John's Int'l, Inc.,*
    286 F.R.D. 559 (W.D. Wash. 2012) ..........................................*passim*

*Aranda v. Caribbean Cruise Line, Inc.,*
    No. 12 C 4069, 2016 WL 1555576 (N.D. Ill. Apr. 18, 2016)..........................28

*Bee, Denning, Inc. v. Capital All. Grp.,*
    310 F.R.D. 614 (S.D. Cal. 2015) ..........................................................27

*Bellows v. NCO Fin. Sys., Inc.,*
    No. 3:07–CV–01413–W–AJB, 2008 WL 4155361 (S.D. Cal. Sept. 5, 2008) .................33

*Birchmeier v. Caribbean Cruise Line, Inc.,*
    302 F.R.D. 240 (N.D. Ill. 2014)....................................................22, 24, 28

*Booth v. Appstack, Inc.,*
    No. C13-1533JLR, 2015 WL 1466247 (W.D. Wash. Mar. 30, 2015)..................14, 20

*Chastain v. Cam,*
    No. 3:13-CV-01802-SI, 2016 WL 1572542 (D. Or. Apr. 19, 2016) ..............................17

*Giles v. St. Charles Health Sys., Inc.,*
    294 F.R.D. 585 (D. Or. 2013)................................................................26

*G.M. Sign, Inc. v. Finish Thompson, Inc.,*
    No. 07-cv-5953, 2009 WL 2581324 (N.D. Ill. Aug. 20, 2009) ..........................30

*Guenther v. Pac. Telecom*, Inc.,
    123 F.R.D. 333 (D. Or. 1988) ...................................................................................17, 18

*Hinman v. M & M Rental Ctr., Inc.*,
    545 F. Supp. 2d 802 (N.D. Ill. 2008) .........................................................................23

*Holloway v. Full Spectrum Lending*,
    CV 06-5975 DOC RNBX, 2007 WL 7698843 (C.D. Cal. June 26, 2007) .....................32

*Hopwood v. Nuance Communc'ns, Inc.*, No. 13-cv-2132 (N.D. Cal.) ...........................28

*Ikuseghan v. MultiCare Health Sys.*,
    No. C14-5539 BHS, 2015 WL 4600818 (W.D. Wash. July 29, 2015) .............................3

*In re High-Tech Employee Antitrust Litig.*,
    985 F. Supp. 2d 1167 (N.D. Cal. 2013) .......................................................................29

*Kavu, Inc. v. Omnipak Corp.*,
    246 F.R.D. 642 (W.D. Wash. 2007) .............................................................................21

*Kolinek v. Walgreen Co.*, No. 13-cv-4086 (N.D. Ill.) .........................................................28

*Krakauer v. Dish Network L.L.C.*,
    311 F.R.D. 384 (M.D.N.C. 2015) .................................................................... *passim*

*Kramer v. Autobytel, Inc.*,
    759 F. Supp. 2d 1165 (N.D. Cal. 2010) .......................................................................28

*Kristensen v. Credit Payment Servs.*,
    12 F. Supp. 3d 1292 (D. Nev. 2014) ...............................................................14, 28, 30

*Lee v. Stonebridge Life Ins. Co.*,
    289 F.R.D. 292 (N.D. Cal. 2013) ...........................................................................3, 23

*Lozano v. Twentieth Century Fox Film Corp.*,
    702 F. Supp. 2d 999 (N.D. Ill. 2010) ...........................................................................28

*Magallon v. Robert Half Int'l, Inc.*,
    311 F.R.D. 625 (D. Or. 2015) .......................................................................25, 26, 33

*Malta v. Fed. Home Loan Mortg. Corp.*,
    2013 WL 444619 (S.D. Cal. Feb. 5, 2013) ..................................................................20

*Manno v. Healthcare Revenue Recovery Group, LLC*,
    289 F.R.D. 674 (S.D. Fla. 2013) .................................................................................23

*Manouchehri v. Styles for Less, Inc.*,
    No. 14CV2521 NLS, 2016 WL 3387473 (S.D. Cal. June 20, 2016) ...............................27

*Medrano v. WCG Holdings, Inc.*,
    No. SACV 07–0506, 2007 WL 4592113 (C.D. Cal. Oct. 15, 2007) ...............................24

*Ott v. Mortgage Inv'rs Corp. of Ohio*,
    65 F. Supp. 3d 1046 (D. Or. 2014) ...............................................................................11

PLTF'S RENEWED MOT. AND MEMO
IN SUPP. OF MOTION FOR CLASS CERT.

iv

*Panacci v. A1 Solar Power, Inc.*,
   No. 15-CV-00532-JCS, 2015 WL 3750112 (N.D. Cal. June 15, 2015) ..........................15

*Patten v. Vertical Fitness Grp., LLC*,
   No. 12CV1614-LAB (MDD), 2013 WL 12069031 (S.D. Cal. Nov. 8, 2013) ................30

*Phelps v. 3PD, Inc.*,
   261 F.R.D. 548 (D. Or. 2009) ......................................................................................13

*Reliable Money Order, Inc. v. McKnight Sales Co.*,
   281 F.R.D. 327, 337 (E.D.Wis.2012) ..........................................................................31

*Reynoso v. S. Cnty. Concepts*,
   No. SACV07-373-JVSRCX, 2007 WL 4592119
   (C.D. Cal. Oct. 15, 2007) .....................................................................................23, 24

*Ries v. Arizona Beverages USA LLC*,
   287 F.R.D. 523, 529 (N.D. Cal. 2012) .........................................................................14

*Robinson v. Paramount Equity Mortg., LLC*,
   No. 214CV02359TLNCKD, 2017 WL 117941 (E.D. Cal. Jan. 10, 2017).....................20

*Saf-T-Gard Int'l, Inc. v. Vanguard Energy Services, LLC*,
   No. 12 C 3671, 2012 WL 6106714 (N.D. Ill. Dec. 6, 2012) ...........................................31

*Saulsberry v. Meridian Fin. Servs., Inc.*,
   No. CV146256JGBJPRX, 2016 WL 3456939 (C.D. Cal. Apr. 14, 2016) ......................31

*Simon v. Healthways, Inc.*,
   No. CV1408022BROJCX, 2015 WL 10015953 (C.D. Cal. Dec. 17, 2015) .....................3

*Smith v. Cardinal Logistics Mgmt. Corp.*,
   No. 07-2104 SC, 2008 WL 4156364 (N.D. Cal. Sept. 5, 2008) ......................................29

*St. Louis Heart Ctr., Inc. v. Vein Centers For Excellence, Inc.*,
   No. 4:12 CV 174 CDP, 2013 WL 6498245 (E.D. Mo. Dec. 11, 2013) ...........................31

*Targin Sign Sys., Inc. v. Preferred Chiropractic Ctr.,* Ltd.,
   679 F. Supp. 2d 894 (N.D. Ill. 2010) ...........................................................................24

*Whitaker v. Bennett Law, PLLC*,
   No. 13-CV-3145-L NLS, 2014 WL 5454398 (S.D. Cal. Oct. 27, 2014)..........................29

**RULES & STATUTES:**

105 Stat. 2394 § 2(10)............................................................................................................4

47 U.S.C. § 227 ........................................................................................................ *passim*

Fed. R. Civ. P. 23 ..................................................................................................... *passim*

Or. Rev. Stat. § 646................................................................................................... *passim*

**OTHER AUTHORITIES:**

2009 ECONOMIC REPORT OF THE PRESIDENT ...............................................................18

47 C.F.R. § 64.1200 ......................................................................................................4

Alba Conte & Herbert Newberg,
 *Newberg on Class Actions* § 7:20 (4th ed. 2002)............................................17

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,
 27 F.C.C. Rcd. 1830 (Feb. 15, 2012)..........................................................4, 31

Federal Trade Commission, NATIONAL DO NOT CALL REGISTRY DATA BOOK FY 2016 .............18

Pursuant to Federal Rule of Civil Procedure 23, Plaintiff Lori Wakefield, by and through her undersigned counsel, hereby respectfully moves this Court for an order (i) certifying three classes of individuals as defined below, (ii) appointing Plaintiff as the class representative and appointing Rafey Balabanian and Eve-Lynn J. Rapp of Edelson PC as class counsel, and (iii) granting such further relief as this Court deems reasonable and just. In support of this Motion, Plaintiff states as follows:

## INTRODUCTION

Defendant ViSalus, Inc. ("ViSalus" or "Defendant") is a multi-level marketing company which sells weight-loss products and dietary supplements. ViSalus's business model, similar to more familiar names like Mary Kay and Amway, is a questionable one, resembling a pyramid scheme of sorts. Indeed, ViSalus recruits and trains its sales representatives to aggressively push its weight-loss shakes and dietary supplements products, and to get their friends and family to do the same. While ViSalus promises hefty incomes, the reality is that its sales representatives and customers often find themselves in debt as a result of being duped into buying and/or selling its products. The focus of this lawsuit, however, while related to ViSalus's sales tactics, is not the alleged pyramid scheme described above. Rather, it's the thousands of illegal telemarketing calls ViSalus made to individuals across the country, including in Oregon, in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 (the "TCPA") and Or. Rev. Stat. § 646.563 (the "Oregon Stop Calling Statute") in an effort to sell its products.

The specifics of ViSalus's illegal telemarketing scheme are common and straightforward: after inducing individuals to sign up to sell or buy their products through uniform applications, ViSalus uploads individuals' contact information into a massive database. Armed with telephone numbers, ViSalus then employs hundreds of agents at its internal call center to place thousands

of telemarketing calls—many of which feature prerecorded or artificial voices—in the hopes that it will convince its promoters and past purchasers—many whom have long since ended their relationship with ViSalus—to reengage. The problem with these calls, however, is that ViSalus never obtains consent to call people in such a manner and it totally disregards the do-not-call requirements.

Plaintiff Lori Wakefield was among those impacted by ViSalus's indiscriminate telemarketing efforts. In March 2012, she signed up to become a ViSalus promoter but quickly became dissatisfied with the company's products and cancelled her account. More than three years later, in April 2015, ViSalus placed at least five calls to Plaintiff Wakefield as part of its telemarketing campaign, including at least two robocalls, despite that her number was listed on the National Do Not Call Registry (the "DNC Registry") and that she repeatedly demanded that the calls cease. Because Wakefield never expressly consented to receive these calls, Wakefield brought the instant lawsuit on behalf of all individuals who suffered identical injuries from ViSalus's telemarketing campaign, and now seeks to certify three classes of similarly situated individuals:

> **Robocall Class**: All individuals in the United States who received a telephone call made by or on behalf of ViSalus: (1) promoting ViSalus's products or services; (2) where such call featured an artificial or prerecorded voice; and (3) where neither ViSalus nor its agents had any current record of prior express written consent to place such call at the time such call was made.

> **Do Not Call Class**: All individuals in the United States who received more than one telephone call made by or on behalf of ViSalus within a 12-month period: (1) promoting ViSalus's products or services; (2) at a telephone number that had been registered with the National Do Not Call Registry for at least 30 days at the time of each call; (3) where such individual had not entered into any purchase or transaction with ViSalus within the 18 months immediately preceding such calls; and (4) where neither ViSalus nor its agents had any current record of express written consent to place such calls at the times such calls were made.

PLTF'S RENEWED MOT. AND MEMO
IN SUPP. OF MOTION FOR CLASS CERT.

2

**Oregon Stop Calling Class**: All residents of the State of Oregon who (1) received a telephone call made by or on behalf of ViSalus; (2) promoting ViSalus's products or services; (3) where ViSalus or its agents had a "stop calling" request on record for the telephone number called at the time such call was made.

(the "Proposed Classes" or the "Classes"). (FAC, Dkt. 36 ¶ 28.)

Each of the Proposed Classes presents a textbook case for certification. ViSalus's calls were all placed in a similar—and within each class, identical—way, for the same purpose: to increase ViSalus's sales and expand its customer base. Plaintiff's and the Classes' claims likewise all rise or fall together based on the same core questions of liability and harm. And, the proof of Plaintiff's claims——which includes Defendant's own records documenting its robocalls and the do not call requests of individuals, as well as ViSalus's lack of any records of the requisite consent—will be common to the members of all three Classes.

The policy behind Rule 23 is to aggregate these types of claims into a class action, and so numerous courts have certified similar TCPA class actions under Rule 23(b)(3). *See, e.g.*, *Ikuseghan v. MultiCare Health Sys.*, No. C14-5539 BHS, 2015 WL 4600818, at *8 (W.D. Wash. July 29, 2015) (certifying nationwide class of individuals under the TCPA who received unsolicited automated phone calls made on behalf of the same company); *Lee v. Stonebridge Life Ins. Co.*, 289 F.R.D. 292 (N.D. Cal. 2013) (certifying nationwide class of individuals under the TCPA who received unsolicited text message calls); *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559 (W.D. Wash. 2012) (same); *see also Simon v. Healthways, Inc.*, No. CV1408022BROJCX, 2015 WL 10015953, at *5 n.1 (C.D. Cal. Dec. 17, 2015) ("Class certification is normal in litigation under § 227, because the main questions, such as whether a given fax is an advertisement, are common to all recipients.") (quoting *Ira Holtzman, C.P.A. v. Turza,* 728 F.3d 682, 684 (7th Cir.2013)); *Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384, 391 (M.D.N.C.

2015) (certifying nationwide classes of individuals on national DNC Registry and defendant's internal DNC list).

Consistent with those rulings, Plaintiff's Proposed Classes are ideal for class treatment. Accordingly, Plaintiff respectfully requests that the Court certify the Classes under Rule 23(b)(3), appoint her as Class Representative for the Classes, and appoint her lawyers as class counsel under Rule 23(g).

## RELEVANT STATUTORY PROVISIONS

Congress enacted the TCPA after finding that robocalls had become a serious problem, posing a nuisance and invading the privacy of telephone subscribers nationwide. *See* TCPA, 47 U.S.C. § 227; *see also* 105 Stat. 2394 § 2(10). To protect consumers from unwanted and harassing calls, the TCPA restricts the number of calls that can be placed within a certain time period, the persons who can be called, and the content of those calls. *See* 47 U.S.C. § 227(b).

Specifically, the TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using…an artificial or prerecorded voice… to any telephone number assigned to a cellular telephone service," as well as to "any residential telephone line." 47 U.S.C. § 227(b)(1)(A)(iii), (B), respectively. 47 U.S.C. § 227(b)(1)(B); *see also In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 1830, 1838 (Feb. 15, 2012). Additionally, the TCPA prohibits telemarketers from making "more than one telephone call within any twelve-month period" to any number listed on the DNC Registry and requires telemarketers to have in place procedures to ensure calls are not made to consumers who have affirmatively requested not to receive them. *See* 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c), (d). For either of the above-mentioned violations, the TCPA sets statutory damages in the

amount of $500 per call, which can be trebled where the violation is willful or knowing. 47 U.S.C. 227(b)(3)(A)–(C).

Much like the TCPA, the Oregon Stop Calling Statute safeguards consumer privacy by making it unlawful to place telephone solicitations to a party that, during a previous solicitation, "state[d] a desire not to be called again." Or. Rev. Stat. § 646.563. Telemarketers who violate the Oregon Stop Calling Statute are liable for actual damages or statutory damages of $200, whichever is greater, as well as punitive damages. Or. Rev. Stat. § 646.638.

## RELEVANT FACTUAL BACKGROUND

### *Defendant ViSalus and its Illegal Telemarketing Campaign*

Defendant ViSalus is a "multi-level marketing" company best known for selling weight-loss shakes, self claimed as "the shake mix that tastes like a cake mix," and other nutritional supplements (the "Products"). (*See* Ex. 1, Excerpts of Nov. 16, 2016 Deposition of John Laun ("Laun Dep.") at 26:13-25.) To increase its sales, ViSalus employs a legion of highly motivated salespersons—often referred to by ViSalus as "Promoters"—who are trained, monitored, and paid directly by ViSalus to sell its Products. (Ex. 3, Excerpts of December 12, 2016 30(b)(6) Deposition of Scott Gidley ("Gidley Dep.") at 69:9-70:14 (describing training materials and compensation).) In order to ensure that these individuals stay motivated (and sales remain high), ViSalus entices its Promoters with long-shot (and, for the most part, wholly unobtainable) opportunities—such as free BMWs and million-dollar ambassador checks. (*See* Ex. 2, Composite of Outbound Call Scripts (offering promoters awards such as BMWs and other bonuses if they met sales and recruitment goals); Ex. 3, Gidley Dep. at 141:10-142:1 (explaining conditions of "Beemer Bonus.").)

Another way ViSalus sought to boost sales was through making illegal telemarketing calls. That is, using the information provided by its Promoters, starting in June 2012, ViSalus launched a telemarketing campaign in which it employed hundreds of individuals to make thousands, if not millions, of outbound telemarketing calls to consumers across the nation without their consent. (*Id.* at 24:24-25 (explaining that ViSalus's call center employed 380 total people); (Ex. 4, Composite Excerpts of Contact Lists (excerpts of spreadsheets showing ██████ calls).)  As described in detail below, ViSalus's telemarketing campaign was made for a common purpose, effectuated in a systematic fashion, and—because ViSalus never obtained the requisite consent and failed to adhere to the required do-not-call procedures—blatantly violated the law.

### *ViSalus Effectuated a Mass Telemarketing Campaign for a Common Purpose: To Increase Sales of its Products*

As noted above, beginning in ██ 2012, and in effort to increase sales, ViSalus initiated a massive telemarketing campaign to consumers across the nation. In an effort to obtain potential people to contact, ViSalus relied on Promoters to contact their "friends [and] family members" to either buy the Products or "becom[e] a [P]romoter." (Ex. 3, Gidley Dep. at 68:22-25.) The Promoters would then complete and "submit an order form on behalf of" consumers interested in trying ViSalus's Products. (*Id.* at 75:13-16.) Individuals could similarly place orders without the assistance of ViSalus's Promoters through ViSalus's website. (*Id.* at 75:17-21; *see also* Ex. 5, Excerpts of Defendant's Supplemental Responses to Plaintiff's First Set of Interrogatories ("Def's Supp. Int. Resp.") at No. 11 (ViSalus obtained purchasers' phone numbers from paper and online forms).) The online and print forms—whether to hire Promoters or to order Products—collected "the same information, [had the] same steps, [and the] same terms and conditions." (Ex. 1, Laun Dep. at 33:23-24; Ex. 6, Composite of Promoter and Purchaser Forms,

Ex. 3, Gidley Dep. at 154:25-155:1-6 (stating the Promoter and purchaser forms were

"essentially" identical).) Once Promoters or purchasers input the information into the form—

whether paper or online—ViSalus would then transfer the data to its online database, Exigo,

which it used to control and log all transactions between Promoters, purchasers, and the

company. (Ex. 3, Gidley Dep. at 146:18-147:14, 149:10-16.) Notably, and discussed in further

detail below, in obtaining Promoters' and purchasers' contact information, none of the forms

allowed for the provision of prior express written consent to receive telemarketing calls. (Ex. 6.,

Composite of Promoter and Purchaser Forms.)

ViSalus also established an internal call center—commonly referred to as ViSalus's

"outreach" or "outbound" support team—to enhance its marketing efforts. (Ex. 3, Gidley Dep. at

47:4-15 (describing responsibilities of internal call center employees); *see also* Ex. 7, Excerpts of

January 20, 2017 Deposition of Justin Call ("Call Dep.") at 107:4-7 (referencing the creation

date of ███████ for ViSalus's Outreach Support Team).) ████████████████

████████████████████████████████████████. (Ex. 8, Outreach

Support Team Guidelines and Expectations (████████████████████████

████████████████████████); Ex. 9, Vi Support

Team Manual (████████████████████); Ex. 7, Call Dep.

at 38:16-39:10 (indicating that the outreach team was created to make ViSalus's outreach efforts

systematic and uniformly structured).) Each team member was employed directly by ViSalus.

(Ex. 3, Gidley Dep. at 47:4-15 (describing call center agents as hourly employees of ViSalus).)

Although in the past ViSalus's agents manually dialed the numbers called, sometime in

around 2013 or 2104—and with ViSalus now employing hundreds of people in its outbound call

centers (*id.* 24:22-25 (estimating 380 employees); Ex. 1, Laun Dep. at 107:18-108:2 (stating the

call center had "over 200" agents "at its peak[.]"), ViSalus began using its Avaya telephone system to exclusively place autodialed calls utilizing its Proactive Outreach Manager ("POM") functionality. (Ex. 7, Call Dep. at 70:18-23 (stating that ViSalus stopped conducting manually dialed campaigns once it had POM).) Each of those calls were placed using a common and systematic process that remained consistent until ViSalus became aware of this lawsuit. (Ex. 10, Composite of POM Instructions (compiling uniform POM instructions used to place calls); Ex. 3, Gidley Dep. at 91:4-12 (confirming that the process for placing calls remained the same until October 2015 when ViSalus "received a lawsuit notification"). Specifically, using the information uploaded by ViSalus's Promoters, ViSalus first constructed contact lists—referred to as the "POM Contact Lists"—which were then uploaded into the Avaya system. (*Id.* at 118:14-119:3, 120:23-121:1 (testifying that "all of the contact lists used for POM [would] be saved within" a folder named "POM Contact Lists"); *see also id.* at 113:19-24 (confirming that the process for uploading the contact lists "would not have changed").) Once the contact lists were uploaded, ViSalus would begin placing calls with just the click of a button. (Ex. 10, Composite of POM Instructions (explaining that once you, "[c]lick on the play button" all the caller would have to do is "verify Campaign in running.").)

Also through the Avaya phone system, ViSalus could—and did—upload prerecorded messages to similarly be distributed through ViSalus's automated system. (Ex. 3, Gidley Dep. at 176:22-178:5 (transcribing audio clip of sample pre-recorded message), 178:12-22 (explaining how ViSalus would place calls using promoters' pre-recorded messages), 179:11-16 (confirming that Plaintiff received the pre-recorded message), 180:7-22 (explaining how spreadsheets could determine phone numbers receiving the pre-recorded message)). In the instances where a prerecorded message was used, the call recipients would hear materially identical artificial or

prerecorded messages either leaving a callback message (*see, e.g., id.* at 176:22-177:24, 181:1-23 (transcribing materially identical prerecorded messages)), or "introduc[ing] the call" to keep the recipient on the line before being connected to live operators who would use common scripts. (*Id.* at 103:11-18 (testifying that call recipients would hear an artificial voice or prerecorded message before being connected to live operator); *id.* at 137:4-8; 182:5-183:6; 184:1-4 (describing use of common scripts); Ex. 11, Excerpts of "Press One" Campaign Call Scripts.)

Importantly, although there were various campaigns,[1] all calls shared a "common message" (Ex. 3, Gidley Dep. at 184:10; *see also id.* at 30:2-7 (stating common purpose of calls was to promote products and retain customers) and were made for the same purpose: to retain customers and generate revenue for ViSalus. (*Id.* at 109:13 (referring to various campaigns and associated phone numbers as "the same means to an end."); *id.* at 176:22-178:5, 181:1-23 (transcribing materially identical prerecorded messages).)

Once the calls were made, ViSalus similarly tracked the results of and maintained records of each call's "disposition" in a systematic way. (*See* Ex. 7, Call Dep. at 48:4-22 (explaining ViSalus's use of disposition codes to categorize the results of calls); *id.* at Ex. 12, Outbound Disposition Codes (listing disposition codes used by ViSalus including "Do Not Call" and "Hung Up"); *see also* Ex. 13, Excerpt of Contact List, APRIL2015_WinbackP2 (██████████

███████████████████████████████████████████████████████████

██████.) ViSalus also tracked all do not call requests. A "Do Not Call" disposition was used

---

[1]    To date, ViSalus has identified seven types of campaigns: Winback, Press One, Declines, Fuel Kit Upgrades, Welcome Calls, End of Month ("EOM") Reminders, and Special Projects. (Ex. 3, Gidley Dep. 30:16-21, 65:3-10, 98:3-12, 101:3-5, 168:18-22,  Of those campaigns, the Press One, Winbacks, EOM, and Declines all utilized a prerecorded message. (*See, e.g.*, Ex. 3, Gidley Dep. at 103:11-15, 178:16-22, 184:20-185:9 (describing use of prerecorded or artificial voices in Press One, Winback, and EOM campaigns); Ex. 7, Call Dep. at 73:9-15; 74:10-18 (describing ViSalus's use of prerecorded messages for Decline campaigns and identifying prerecorded message associated with Winback campaign).)

where a call recipient requested that ViSalus stop calling them. (Ex. 12, Outbound Disposition

Codes (Call recipient "request[ed] to be added to the Do Not Call list.").) Alternatively, ViSalus

would use the "plain English" dispositions, such as "████████" to denote where a call

recipient had requested to stop receiving unwanted telemarketing calls. (Ex. 7, Call Dep. 46:9,

84:4-12 (stating that the codes are written "in plain English" and the meaning of each code is

intuitive); *see also* Ex. 13, Excerpt of Contact List, APRIL2015_WinbackP2.)

### *ViSalus Never Obtained Express Written Consent or Scrubbed Consumer Telephone Numbers Against the DNC Registry, and Routinely Disregarded Consumers' Stop Calling Requests*

By far the most invasive part of Defendant's telemarketing campaign was that ViSalus

failed to obtain class members' prior express written consent, scrub consumers' telephone

numbers against the DNC Registry, and disregarded stop calling requests as a matter of course.

But like its calling practices, ViSalus's conduct here was consistent across the board.

First, ViSalus never obtained the express written consent required by the TCPA. Instead,

ViSalus used standardized forms—whether in hard copy or online—to collect contact

information from Promoters and purchasers, but those forms never once informed people that the

purpose of obtaining phone numbers was to place prerecorded telemarketing calls, as the law

requires. (*See* Ex. 6, Composite of Promoter and Purchaser Forms). The online application is no

different. (Ex. 3, Gidley Dep. at 154:25-155:6.) And, notably, despite Plaintiff's express request

for evidence of consent, ViSalus has produced no such evidence for Plaintiff or any other class

member.[2] (Ex. 5, Def's Supp. Int. Resp. at No. 9 (responding to Plaintiff's request for "all facts

---

[2]      ViSalus has produced a single document, which its representative describes as a fillable online form where Promoters and purchasers can modify their communications preferences. (Ex. 14, VISALUS_WAKEFIELD0000042, Communication Preferences; Ex. 3, Gidley Dep. at 131:12-30). That document, however, is not a sufficient record of consent. Indeed, although that screen shot purports to inform consumers that ViSalus "may call the [designated phone number]

and information demonstrating that YOU or any REPRESENTATIVE had PRIOR EXPRESS CONSENT to make the PHONE CALLS" by referring Plaintiff to approximately 130 spreadsheets, none of which show express prior written consent).)

ViSalus's do not call policies are even worse. That is, despite maintaining a single (and common) do not call policy, (*see* Ex. 15, VISALUS_WAKEFIELD000043, Do Not Call Process ██████████████████████████████████████████████████████████████████ ████), ViSalus admits that it never scrubbed its contact lists against the DNC Registry. (Ex. 3, Gidley Dep. at 126:21-127:5 ("Q: Do you check [call lists] against the National Do Not Call List? A: No.").) Additionally, ViSalus permitted its Promoters to override its "official" Do Not Call Process policy and place calls to individuals who had cancelled their accounts or submitted stop calling requests, notwithstanding their express requests to not be contacted. (*Id.* at 166:25-167:3 (explaining that Promoters could override the system and contact people who had been placed on the internal do no call list).)

As a result, once an individual found themselves in the unfortunate position of being on ViSalus's contact lists, it was literally impossible to avoid getting called. Ultimately, ViSalus ended up calling thousands of people who did not want to be contacted and who repeatedly

---

with prerecorded advertising marketing messages, or using an automatic telephone dialing system" (Ex. 14, VISALUS_WAKEFIELD0000042, Communication Preferences), ViSalus has not provided any evidence that any class members actually completed this form and confirmed that it does not maintain any records that would enable ViSalus to show whether class members consented to receive calls during the relevant time period. (Ex. 3, Gidley Dep. at 131:9-20; 215:4-24 (explaining that because ViSalus maintains these records in a live database, it cannot show whether an individual "consented" at any time other than the present).) This is significant because, as explained more fully below, prior express consent is an affirmative defense to, not an element of, a TCPA claim and, as such, it is ViSalus's burden to prove that it had the requisite prior express written consent to make the subject calls. *See e.g., Ott v. Mortgage Inv'rs Corp. of Ohio*, 65 F. Supp. 3d 1046, 1065 (D. Or. 2014). ViSalus has altogether failed to meet its burden.

requested that the calls cease. (Ex. 16, Excerpts of November 1, 2016 Deposition of Lori

Wakefield ("Wakefield Dep.") at 60:14-19, 61:10-15, 62:14-21 (describing unwanted calls and

her attempts to make them stop); Ex. 17, Excerpts of Customer Complaints (████████████

████████████████████████████████████████); Ex. 18, WAKEFIELD000001-

000015 (online complaints about ViSalus placing harassing calls).

### *Plaintiff Wakefield Received the Same Calls and Suffered the Same Injury as the Class Members*

Plaintiff Wakefield's experience was materially identical and mirrors the circumstances

described above. Wakefield briefly signed up to be a ViSalus Promoter in February 2012, but

ended her affiliation within two months. (Ex. 16, Wakefield Dep. at 39:16-21.) Nevertheless, in

April 2015—more than three years after she cancelled her account with ViSalus—ViSalus made

repeated calls to her—at least two of which featured a prerecorded voice—at a number she had

listed on the DNC Registry. (Ex. 19, WAKEFIELD000018, Wakefield DNC Registration

(showing Plaintiff registered her home telephone number with the DNC Registry on Feb. 15,

2008); Ex. 20, MOLALLA000001-000010, Wakefield Call Records (showing at least 5 calls

from ViSalus).)

As with ViSalus's other calls, each call was made in effort to sell ViSalus's Products.

(Ex. 16, Wakefield Dep. 60:14-19, 61:10-15, 62:14-21.) Additionally, despite that Plaintiff

expressly told ViSalus to stop calling her, she continued receiving telemarketing calls from

ViSalus. (*Id.*) And not at all surprisingly, ViSalus has produced *no* evidence of Wakefield's

consent other than an unexecuted promoter agreement, which neither informed Wakefield that

she was agreeing to receive telemarketing calls nor stated that such calls would be autodialed and

contain a prerecorded message. (Ex. 6, Composite of Promoter and Purchaser Forms.) As

Plaintiff was unable to stop ViSalus's illegal telemarketing activity, she ultimately filed suit.

## ARGUMENT

Federal Rule of Civil Procedure 23 governs the maintenance of class actions in federal court. Parties seeking class certification must satisfy each of the four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy—and at least one of the requirements of Rule 23(b). Fed. R. Civ. P. 23; *see also Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010). In this case, Plaintiff seeks certification of three Classes under 23(b)(3).

In determining whether to certify a proposed class, a court need not – and may not – "engage in free-ranging" inquiries into the merits of the plaintiff's claims. *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194–95 (2013). While the court in some cases may have to "probe behind the pleadings" to determine whether the plaintiff has satisfied Rule 23's requirements, the court only considers the merits of the claim insofar as they overlap with the certification requirements. *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551–52 (2011); *see also Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011). Additionally, at this stage, a court must accept the factual allegations of the complaint as true. *Phelps v. 3PD, Inc.*, 261 F.R.D. 548, 554 (D. Or. 2009) (citing *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.,* 691 F.2d 1335, 1342 (9th Cir.1982)). Thus, the plaintiff need not make an "extensive evidentiary showing" so long as the court has "sufficient material…to determine the nature of the allegations." *Id.*

As explained below, each of the proposed Classes satisfies all the requirements of Rule 23(a) and Rule 23(b)(3). Therefore, each of the Classes can be properly certified.

## I.    **Although the Ninth Circuit Recently Established that Plaintiff Need Not Demonstrate that the Classes are Ascertainable, Plaintiff Could Easily Do So.**

Though not explicitly required by Rule 23, many courts within the Ninth Circuit

previously required plaintiffs to demonstrate—as a threshold matter—that a proposed class was ascertainable. *See, e.g., Ott*, 65 F. Supp. 3d at 1064. That implicit condition required plaintiffs to show that class membership could be "determinable from objective, rather than subjective, criteria" *id.* (quoting *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1303 (D. Nev. 2014) (explaining that in order to satisfy the ascertainability requirement, the proposed class definition needed to "describe a set of common characteristics sufficient to allow a prospective plaintiff to identify himself or herself as having a right to recover based on the description")), and that there was an "administratively feasible" means of "determin[ing] whether a particular person is a class member." *See, e.g., Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 529 (N.D. Cal. 2012). That, however, is no longer the law, as the Ninth Circuit recently did away with the ascertainability requirement. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1133 (9th Cir. 2017) ("In summary, the language of Rule 23 neither provides nor implies that demonstrating an administratively feasible way to identify class members is a prerequisite to class certification…"). Thus, should it attempt to do so, ViSalus could not defeat certification on ascertainability grounds.

Nevertheless, even if ascertainability were an issue, Plaintiff could easily meet this standard. To be sure, membership within any of the three Classes hinges on objective criteria—i.e. straightforward questions that can be answered with a simple "yes" or "no." For the Robocall Class, those criteria include: (1) whether the potential Class member received a telemarketing call from ViSalus, (2) whether the call featured an artificial or prerecorded voice, and (3) whether ViSalus had a record of that individual's "express written consent" to receive the call. *See, e.g., Booth v. Appstack, Inc.*, No. C13-1533JLR, 2015 WL 1466247, at *4 (W.D. Wash. Mar. 30, 2015) (certifying robocall class where definition "relie[d] only on objective criteria, and

describe[d] a set of common characteristics sufficient to allow members to identify themselves based on the description" of the defendants' conduct). For the Do Not Call Class, the inquiry is similarly straight forward and defined by objective criteria, including: (1) whether the potential class member received two or more calls from ViSalus within a year at a telephone number listed on the DNC Registry, (2) whether he or she had bought any Products in the 18-month period prior to the call, and (3) whether ViSalus had a record of that individual's "express written consent" to receive the call. *See, e.g.*, *Panacci v. A1 Solar Power, Inc.*, No. 15-CV-00532-JCS, 2015 WL 3750112, at *8 (N.D. Cal. June 15, 2015) (finding DNC class was defined by reference to "objective criteria" such as whether more than one call was received within a one year period during which the phone number was listed on the DNC Registry and for whom the defendant had no current record of express written consent). Finally, for the Oregon Stop Calling Class, the criteria are simply whether (1) the potential class member—here Oregon residents—received a telemarketing call from ViSalus, and whether (2) ViSalus had a "stop calling" request on record in relation to that call. *Patten v. Vertical Fitness Grp., LLC*, No. 12CV1614-LAB (MDD), 2013 WL 12069031, at *6 (S.D. Cal. Nov. 8, 2013) (certifying TCPA class of "members [who] asked not to be contacted" as it could be ascertained by objective and common criteria).

In addition to that objective criteria, ViSalus's call spreadsheets also provide an administratively feasible means of identifying class members. *See Agne*, 286 F.R.D. at 566 (certifying cell-phone TCPA class where the defendant's call records could be cross-referenced and modified to determine class membership). Specifically, ViSalus's records ███████████ ████████████████████████████████████████████████████████████████ ███████████████████████ (*See, e.g.,* Ex. 4, Composite Excerpts of Contact Lists at Did Not Buy Neon Yet.csv & VISALUS_WAKEFIELD000242); *see also* Ex. 3, Gidley Dep. at

103:12-15 (explaining that Press One campaigns such as the "███████████████████" would

involve a computerized dialer "introduc[ing] the call and then require the recipient to press one

to be connected to a live agent").)

ViSalus has likewise produced lists of all the individuals it contacted, and given that it

admits that it did not scrub any of those numbers against the DNC Registry (*see* Ex. 3, Gidley

Dep. 126:21-22), membership in the DNC Class could easily be defined by reconfiguring

Defendant's records to determine which class members received at least two calls and the last

time they purchased or sold Defendant's products, and then scrubbing Defendant's records

against the DNC Registry. *See Krakauer*, 311 F.R.D. at 391 (holding that plaintiff's National

DNC class could be ascertained by taking the defendant's call list and removing calls that could

not result in TCPA liability). Finally, ViSalus concedes that it kept records of individual do not

call requests (Ex. 7, Call Dep. at 46:9, 47:17-48:3, 68:7-18 (explaining that disposition codes are

written "in plain English" to "characterize the outcome of that call," such as a stop calling

request); *see* Ex. 12 (setting out disposition codes used by ViSalus, including but not limited to:

"Do Not Call" ); *see also* Ex. 13, Excerpt of Contact List, April2015_WinbackP2 Spreadsheet

(████████████████████████████████████)), and its call lists plainly

evidence ██████████████████████. (*See, e.g.*, Ex. 21, Composite Excerpts of Contact

Lists (Oregon Filtered) at 2014 Winback Master List (████████████████████████);

*id.* at Winback_USA_Customers_Jan_Dec2013 (same).) As such, the members of the Oregon

Stop Calling Class are easily ascertainable as well. *See Krakauer*, 311 F.R.D. at 393 (finding

plaintiff's do not call class to be ascertainable because the defendant documented internal do not

call requests in its records, which was "persuasive circumstantial evidence that persons

associated with those numbers had asked to not be called," and therefore, there was a

"manageable process" to determine class membership without "individual inquiry") (citation omitted).

Thus, even if Rule 23's implicit ascertainability showing was still required in this Circuit (it no longer is), Plaintiff could readily meet her burden on the issue.

## II.     The Proposed Classes Meet the Requirements of Rule 23(a).

Moving past ascertainability, the four express requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy—are easily satisfied here.

### A.     The Numerosity Requirement is Satisfied.

The first express requirement of Rule 23(a)(1) requires that the class be so numerous that joinder of all members in a single action is impracticable. Fed. R. Civ. P. 23(a)(1). There is no "fixed numerical threshold" to meet the numerosity requirement," but generally, a class of forty or more satisfies this requirement. *Rannis v. Recchia,* 380 F. App'x 646, 651 (9th Cir. 2010); *Chastain v. Cam, No.* 3:13-CV-01802-SI, 2016 WL 1572542, at *4 (D. Or. Apr. 19, 2016) (holding that the "rough rule of thumb" is that forty class members is sufficient). Additionally, "general knowledge or common sense will often support judicial notice or an assumption that there is sufficient numerosity to make joinder impracticable." Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 7:20 (4th ed. 2002); *see also Guenther v. Pac. Telecom*, Inc., 123 F.R.D. 333, 336 (D. Or. 1988) (holding that the plaintiff had satisfied numerosity requirement by providing a "reasonable estimate" of the class size). Plaintiff Wakefield readily satisfies this requirement here.

To be sure, ViSalus produced nearly one thousand contact lists, collectively containing names and telephone numbers of ██████████████████████████████████████ ████████████████. (Ex. 3, Gidley Dep. at 118:14-119:3, 120:23-121:1; *see also, e.g.*, Ex. 4,

Composite Excerpts of Contact Lists at VISALUS_WAKEFIELD000242.) As such, this fact alone makes it "reasonable" to estimate that each of the Classes are sufficiently numerous. *Guenther*, 123 F.R.D. at 336.

Notwithstanding, there is also ample evidence to demonstrate that each of the Classes, standing on their own, more than satisfy the numerosity threshold. First, with regards to the Robocall Class, the record demonstrates that ViSalus effectuated prerecorded telemarketing calls to at least ███████████████████. (*See e.g.*, Ex. 4, Composite Excerpts of Contact Lists at Did Not Buy Neon Yet.csv (███████████████████████

████████████████████████████); *id.* at VISALUS_WAKEFIELD000242 (████████████████████████████

█████████████████).) Next, given that approximately 72% of Americans have registered their numbers on the National DNC Registry,[3] and ViSalus admits to placing more than a ████████████████ of people (*see e.g.*, Ex. 4, Composite Excerpts of Contact Lists), there can be no doubt that there are well over forty class members in Do Not Call Class as well. Finally, as evidenced by records, ViSalus called ████

█████████████ in 2013 and 2014, respectively, on account of just *one* of its calling campaigns. (Ex. 21, Composite Excerpts of Contact Lists (Oregon Filtered) at 2014 Winback Master List (██████████████████); *id.* at Winback_USA_Customers_Jan_Dec2013 (same).) Given the nature and purpose of this specific campaign—i.e. to "win back" customers who no longer did business with and, presumably, did

---

[3]     In 2007, 72% of Americans had collectively registered 145 million telephone numbers with the National DNC Registry. *See* 2009 ECONOMIC REPORT OF THE PRESIDENT, Ch. 9, Box 9-1; *see also* Federal Trade Commission, NATIONAL DO NOT CALL REGISTRY DATA BOOK FY 2016 at p.4 (Dec. 2016). Since 2007, the number of active registrations has increased by nearly 80 million phone numbers. *Id.*

not want to be bothered by the company, it is "reasonable" to estimate that numerosity is

satisfied for the Oregon Stop Calling Class as well. *See Guenther*, 123 F.R.D. at 336.

Numerosity is therefore not a barrier to certification.

### B.    Members of the Proposed Classes Share Common Issues of Law and Fact.

Rule 23(a)'s next requirement—commonality—is met where "there are questions of law

or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to

demonstrate that the class members have suffered the same injury." *Wal-Mart Stores*, 131 S. Ct.

at 2551. That is, the claims of the class must "depend upon a common contention…of such a

nature that it is capable of classwide resolution—which means that determination of its truth or

falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."

*Id.* This rule is "construed permissively," *Parra v. Bashas', Inc.*, 536 F.3d 975, 978 (9th Cir.

2008), meaning all questions of law and fact need not be common to satisfy the commonality

requirement. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir.1998) ("The existence

of shared legal issues with divergent factual predicates is sufficient, as is a common core of

salient facts coupled with disparate legal remedies within the class.").

Courts routinely find that common questions predominate in cases where plaintiffs allege

that the defendant's conduct occurs through a common scheme. *See, e.g., Edwards v. First Am.

Corp.*, 798 F.3d 1172, 1183 (9th Cir. 2015), *cert. dismissed sub nom. First Am. Fin. Corp. v.

Edwards*, 136 S. Ct. 1533 (2016) (certifying class because "issues relating to the alleged

common scheme predominate over individual issues for the proposed class[.]") In TCPA cases

such as this one where the claims arise from standardized conduct—the alleged practice of

placing calls to telephones using a robotic voice despite that class members were listed on the

DNC Registry (in the case of the Do Not Call Class), and/or specifically requested that the calls

cease (in the case of the Oregon Stop Calling Class)—the commonality requirement is often easily met. *See, e.g.*, *Booth*, 2015 WL 1466247, at *8 (finding commonality based on "the use of the same predictive dialer to robocall and play the same recorded message to various cell phone numbers."); *Malta v. Fed. Home Loan Mortg. Corp.*, 2013 WL 444619, at *2 (S.D. Cal. Feb. 5, 2013) (finding commonality in robocall class where "the calls were made by [defendant] to class members between [the same time period] using auto-dialing equipment or with a prerecorded voice message"); *Krakauer*, 311 F.R.D. at 394 (finding commonality in DNC Registry class because whether defendant "called a number on the [DNC Registry] is a common question that can be decided in one hearing"); *Robinson v. Paramount Equity Mortg.*, LLC, No. 214CV02359TLNCKD, 2017 WL 117941, at *4 (E.D. Cal. Jan. 10, 2017) (finding commonality in TCPA case where the "operative questions" in each claim are "(1) whether [d]efendant used an auto-dialer or prerecorded message to make unsolicited calls …(2) whether [d]efendant's conduct violated the TCPA; (3) whether [d]efendant acted willfully; (4) whether [d]efendant systematically made calls to people whose phone numbers were registered on the National Do Not Call Registry.").

Similarly, in this case, Plaintiff's and the other class members' claims are based upon the same common contention: that Defendant violated the TCPA by repeatedly making automated telemarketing calls to their telephone numbers that appear on the DNC Registry, despite the fact that Defendant did not have authorization to do so. (FAC ¶ 28.) Additionally, in regards to the Oregon Stop Calling Request Class, Plaintiff argues that she, like each member of that Class, received Defendant's telephone calls despite requests that they stop, and that Defendant systematically failed to adhere to its own Do Not Call Process policy. (Ex. 3, Gidley Dep. at 166:25-167:3.) Those common facts give rise to several common and controlling factual and

legal questions that will resolve each class member's TCPA claims against Defendants in one stroke.

**First**, whether Defendant's calls constitute a telemarketing call "made for a commercial purpose" and/or a "solicitation" as required by the TCPA[4] and the Oregon Statute[5] is a common question that must be answered for all three Classes. The answer to that question—which, given that Defendants admit that the calls are placed for the common purpose of increasing sales (Ex. 3, Gidley Dep. at 30:2-7 (stating common purpose of calls was to promote products and retain customers), is unequivocally, "yes"—will turn on the same information. Thus, the ultimate answer to this question of Defendant's liability can be commonly resolved. *See, e.g., Kavu, Inc. v. Omnipak Corp.*, 246 F.R.D. 642, 647 (W.D. Wash. 2007) (finding commonality requirement is met where all recipients were sent fax "as part of the same effort to generate new business"); *Turza*, 728 F.at 688 (finding commonality in TCPA blast fax case involving mixed advertisement and information material because the question of "whether a given fax is an advertisement [is] common to all recipients" where "promotion or marketing was the reason these faxes were transmitted").

**Second,** for the Robocall Class, whether Defendant's calls utilized an artificial or prerecorded voice presents another common factual issue. Indeed, ViSalus represented that it effectuated numerous campaigns that utilized prerecorded calls, that each call used the same Avaya telephone dialing system, and that the uniform purpose of the calls was to boost sales. (Ex. 3, Gidley Dep. at 176:22-178:5, 178:12-22, 179:11-16, 180:7-22.) Thus, the Court's

---

[4]     *See* 47 U.S.C. § 227(b)(2)(B)(i) (exempting certain calls from TCPA liability that "are not made for a commercial purpose").

[5]     Or. Rev. Stat. § 646.561 (defining a "telephone solicitation," in relevant part, to mean "the solicitation by telephone by any person of a party for the purpose of encouraging the party to purchase real estate, goods or services, or make a donation").

determination as to whether prerecorded calls were placed to the class members will similarly be resolved by consideration of the same operative facts. There is no question commonality is satisfied under such circumstances. *See Agne*, 286 F.R.D. at 567 (finding commonality in robocall class because "all class members were sent substantially similar unsolicited text messages by the same defendant"); *Abdeljalil v. Gen. Elec. Capital Corp.*, 306 F.R.D. 303, 308 (S.D. Cal. 2015) (finding commonality in robocall class because "whether Defendant placed ATDS and/or artificial or prerecorded voice calls via [the identified dialer]" gives rise to common questions of law and fact); *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 247 (N.D. Ill. 2014) (finding commonality in robocall class where class members "by definition received the same calls … made by or for one of the defendants, using the same artificial or prerecorded voice technology" for the same purpose).

**Third,** the question of whether ViSalus can assert, and ultimately satisfy their burden of proving, any affirmative defense of prior express written consent likewise presents common issues. *See e.g.*, *Ott*, 65 F. Supp. 3d at 1065 ("'[E]xpress consent' is not an element of a TCPA plaintiff's prima facie case, but rather is an affirmative defense for which the defendant bears the burden of proof.") (quoting *Grant v. Capital Mgmt. Servs., L.P.*, 449 Fed. App'x 598, 600 n.1 (9th Cir. 2011)). Namely, ViSalus will likely claim that it obtained express written consent from class members in one of two ways—either (i) by asking Promoters and purchasers to provide their telephone numbers when completing ViSalus's forms, or (ii) by allowing purchasers and Promoters to log on to ViSalus's online portal, Vi-Net, and update their communication preferences. (*See* Ex. 6, Composite of Promoter and Purchaser Forms*;* Ex. 3, Gidley Dep. at 131:12-20, 150:10-15; Ex. 14, Communications Preferences.) Putting aside that ViSalus has not proffered any evidence to meet its affirmative obligation—i.e. to date, ViSalus has only

proffered form documents not completed by actual class members (*see, e.g.,* Ex. 6, Composite of Promoter and Purchaser Forms) and expressly testified that they do not maintain records of consent (Ex. 3, Gidley Dep. at 215:17-18)[6]—because both the ViSalus Promoter and Purchaser forms do not contain any disclosures about consenting to receive autodialied or prerecorded calls by providing ones phone number and there is no evidence that call recipients ever completed the online communication preferences, the issue of consent can be resolved for everyone in a common way as well. That is, either ViSalus's records are legally sufficient to elicit class member consent or they are not. *See, e.g.,* *Kavu, Inc.,* 246 F.R.D. at 647 ("whether the recipients' inclusion in the Manufacturer's News database constitutes express permission to receive advertisements via facsimile is a common issue"); *Manno v. Healthcare Revenue Recovery Group, LLC,* 289 F.R.D. 674, 688 (S.D. Fla. 2013) (finding that consent is a common issue when "'[a]ll [class members] went through the same or similar admissions process, during which they provided their phone numbers") (subsequently relied on in *Lee,* 289 F.R.D. at 295); *Hinman v. M & M Rental Ctr., Inc.,* 545 F. Supp. 2d 802, 807 (N.D. Ill. 2008) (finding where "broadcasts were transmitted *en masse* based on the 'leads' list compiled several years earlier… the question of consent may rightly be understood as a common question") (citing *Kavu,* 246 F.R.D. at 646).

**Fourth,** the issue of what damages are available is a common question of law that can likewise be decided on a common basis for members of each class. *See, e.g.,* *Reynoso v. S. Cnty. Concepts,* No. SACV07-373-JVSRCX, 2007 WL 4592119, at *2 (C.D. Cal. Oct. 15, 2007) (noting that the entitlement to statutory damages was an "overriding legal issue" that militated in

---

[6]    As Plaintiffs discuss in greater detail *infra* at III.A., the mere "speculation that [proposed class members] may have given their express consent to receive [calls] is not sufficient to defeat class certification." *Agne,* 286 F.R.D. at 567; *see also Meyer v. Portfolio Recovery Assocs., LLC,* 707 F.3d 1036, 1042 (9th Cir. 2012) (holding that in the absence of any evidence of consent by defendant, consent is a common issue with a common answer).

favor of commonality); *Medrano v. WCG Holdings, Inc.*, No. SACV 07–0506, 2007 WL 4592113, *2 (C.D. Cal. Oct. 15, 2007) (same). Here, each member of the Robocall and Do Not Call Class allege privacy violations that invoke the TCPA, which provides for monetary damages of $500 per violation that may be trebled to $1,500 if Defendant's conduct is proven willful. 47 U.S.C.§ 227(b)(3)(B). Accordingly, the amount of statutory damages for individuals within those classes—as well as proving that ViSalus's conduct was knowing and willful, and therefore that damages should be trebled—can be calculated and assessed in a common way. *See, e.g., Targin Sign Sys., Inc. v. Preferred Chiropractic Ctr.,* Ltd., 679 F. Supp. 2d 894, 898-99 (N.D. Ill. 2010) (availability of statutory damages in TCPA case made individualized damages inquiry unnecessary and class certification appropriate); *Reynoso*, 2007 WL 4592119, at *2 (finding commonality where the "overriding legal issue" is "whether [defendant's] non-compliance was willful so that the class members are entitled to statutory damages"). And, because the Oregon Stop Call Class presents the same common issue of statutory liability for its members, commonality is satisfied with regards to this Class as well. *See, e.g., Birchmeier*, 302 F.R.D. at 253 (finding commonality in TCPA case where "plaintiffs are asking [ ] for statutory damages, which eliminates individual variations").

In short, the presence of these common issues of both fact and law each separately satisfy the prerequisite of commonality.

### C.    Plaintiff's Claims Are Typical of the Classes.

Rule 23 next requires that class representatives have claims that are typical of those of the putative class members. Fed. R. Civ. P. 23(a)(3). Plaintiff's claims "are typical if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Magallon v. Robert Half Int'l, Inc.*, 311 F.R.D. 625, 638 (D. Or. 2015) (quoting

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). Notably, "the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims" when plaintiffs allege "that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented." *Magallon*, 311 F.R.D. at 638 (citation and quotation omitted). Additionally, because "[t]he commonality and typicality requirements of Rule 23(a) tend to merge," *General Tel. Co. v. Falcon*, 457 U.S. 147, 157 n.13 (1982) where commonality is satisfied, typicality is as well.

Here, Plaintiff more than meets Rule 23(a)(3)'s bar. First, with respect to all three Classes, Plaintiff's claims arise from the same course of conduct: ViSalus's pattern and practice of making telemarketing calls using an automated voice (in the case of the Robocall Class), despite (in the case of Do Not Call Class) that their telephone numbers appeared on the DNC Registry, and (in the case of the Oregon Stop Calling Class) that call recipients repeatedly requested that ViSalus's solicitations cease. Additionally, the content of the messages were materially identical and had the same purpose—to sell Defendant's products. (Ex. 3, Gidley Dep. at 30:2-7 (testifying that the common purpose of calls was to promote products and retain customers), 109:13 (referring to calls as "the same means to an end"), 176:22-177:24, 181:1-23 (transcribing materially identical prerecorded messages), 184:20-185:2, 186:7-15 (same); Ex. 2, Composite of Outbound Call Scripts; *id.* at 30:2-7 (evidencing that the common purpose of calls was to promote products and retain customers).) As a result, Plaintiff's rights under the TCPA and the Oregon Stop Calling statute were violated in the same way as every other putative class member, and thus, Plaintiff, like all of the other class members, suffered the exact same injury. Typicality is quite clearly satisfied. *See Kavu*, 246 F.R.D. at 648 (finding typicality satisfied in

TCPA case because the plaintiff "possess[ed] the same interests and suffer[ed] the same injury as the class members") (citation and quotation omitted).

### D.    Both Wakefield and Her Counsel Will Adequately Represent the Class.

Finally, Rule 23(a)(4)'s adequacy requirement mandates "(1) that the proposed representative [p]laintiffs do not have conflicts of interest with the proposed class, and (2) that [p]laintiffs are represented by qualified and competent counsel." *Magallon*, 311 F.R.D. at 638 (quoting *Giles v. St. Charles Health Sys., Inc.,* 294 F.R.D. 585, 592 (D. Or. 2013)). Rule 23's adequacy requirement also requires that the plaintiff be able to "prosecute the action vigorously on behalf of the class." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000), as amended (June 19, 2000) (citing *Hanlon*, 150 F.3d at 1020). Plaintiff and her counsel satisfy each of these requirements.

First, the interest of Plaintiff and the other members of all three Classes are aligned. Like every other class member, Plaintiff received unwanted telemarketing calls from ViSalus, and therefore, her interests lie in ensuring that ViSalus's unlawful conduct does not continue in the future and that she and the other members of the classes recover the statutory damages and injunctive relief to which they are entitled. *See, e.g., Bee, Denning, Inc. v. Capital All. Grp.*, 310 F.R.D. 614, 627 (S.D. Cal. 2015) (finding adequacy satisfied where the plaintiff and class members shared a common interest in "receiv[ing] compensation for alleged violations of the TCPA and[] deter[ring] [d]efendants from engaging in the alleged conduct."). Further, Plaintiff has no interests antagonistic to those of the Classes. *See Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003) (affirming class certification and adequacy of representations because there was no "evidence of an actual conflict"); *Kavu, Inc.*, 246 F.R.D. at 648 (certifying TCPA class where plaintiff and class members sought "same relief" and therefore their interests were not

"antagonistic"). Moreover, Plaintiff Wakefield has a full understanding of and actively participated in this case—by helping her counsel with their investigations, responding to numerous sets of discovery, and sitting for her deposition—so she is unquestionably committed to prosecuting this case on the Classes' behalf. (Ex. 16, Wakefield Dep. at 9:5-11:6 (Wakefield testifying that she has spent approximately 75-100 hours participating in this case and assisting her attorneys, including reviewing the complaint, responding to discovery, and attending her deposition). *See Manouchehri v. Styles for Less, Inc.*, No. 14CV2521 NLS, 2016 WL 3387473, at *3 (S.D. Cal. June 20, 2016) (finding plaintiff had satisfied adequacy by "actively…participating in the litigation and discovery") (quotation omitted).

Similarly, there can be no serious dispute that Plaintiff's counsel are willing and able to vigorously prosecute the suit on behalf of the class members. In terms of the work conducted to date, Plaintiff's Counsel's efforts—which include thoroughly investigating Plaintiff's and the Classes' claims, conducting substantial discovery, engaging in briefing on various issues and, now, moving for certification—evidence that they are ready and willing to zealously represent and advocate on behalf of the Classes as a whole. *See Bee, Denning, Inc.*, 310 F.R.D. at 627 ("there is no indication that the named plaintiffs and their counsel lack the incentive to prosecute this action vigorously—indeed, they have done so thus far.") Additionally, Plaintiff's Counsel have expended significant resources in pursuit of Plaintiff's and the Classes' claims and they will continue to do so.

In terms of experience, Plaintiff's Counsel are well-respected members of the legal community, with extensive experience litigating class actions of similar size, scope, and complexity, particularly in the TCPA space. Indeed, they were co-lead counsel in *Satterfield v. Simon & Schuster, Inc.*, where the Ninth Circuit confirmed the TCPA's application to text

message calls. 569 F.3d 946, 949 (9th Cir. 2009). Likewise, they have acted as lead counsel in cases upholding the constitutionality of the TCPA against First and Fifth Amendment challenges. *See Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999, 1011–12 (N.D. Ill. 2010) (First Amendment); *Kramer v. Autobytel, Inc.*, 759 F. Supp. 2d 1165, 1169–71 (N.D. Cal. 2010) (Fifth Amendment vagueness). Further, Edelson served as class counsel and successfully certified the largest adversarially certified class in TCPA history, obtaining summary judgment in the process, and only days before trial striking an extremely favorable settlement—the largest in TCPA history (subject to the Court's now pending final approval). *See Birchmeier*, 302 F.R.D. 240 (certifying classes); *Aranda v. Caribbean Cruise Line, Inc.*, No. 12 C 4069, 2016 WL 1555576, at *14 (N.D. Ill. Apr. 18, 2016) (granting plaintiffs' motion for partial summary judgment and denying defendants' motion for summary judgment); *see also Lee*, 289 F.R.D. at 295 (Edelson appointed as class counsel in adversarial class action); *Kristensen*, 12 F. Supp. 3d 1308 (same); *Kolinek v. Walgreen Co.*, No. 13-cv-4086 (N.D. Ill.) (Edelson appointed settlement class counsel); *Hopwood v. Nuance Communc'ns, Inc.*, No. 13-cv-2132 (N.D. Cal.) (same); *Rojas v. CEC*, 10-cv- 5260 (N.D. Ill.) (same).

Simply put, Plaintiff and her counsel have and will continue to adequately represent the Classes, and thus, Rule 23's adequacy requirement is satisfied.

## III.   The Proposed Classes Satisfy 23(b)(3)'s Requirements.

In addition to meeting the prerequisites of Rule 23(a), Plaintiff must also meet the requirements of Rule 23(b)(3) by demonstrating that common questions of law or fact predominate over any individual questions and that a class action is superior to multiple individual actions. Fed. R. Civ. P. 23(b)(3). Those requirements are readily satisfied here.

A.        **Common questions of law and fact predominate.**

The predominance inquiry requires a court to decide whether "common questions '*predominate* over any questions affecting only individual [class] members.'" *Amgen Inc.*, 133 S. Ct. at 1196 (quoting Fed. R. Civ. P. 23(b)(3)) (emphasis in original). Predominance tests the balance between common questions, where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof," and individual ones, which call for "evidence that varies from member to member." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (citations and internal quotations omitted). The "central concern of the Rule 23(b)(3) predominance test is whether adjudication of common issues will help achieve judicial economy." *Whitaker v. Bennett Law, PLLC*, No. 13-CV-3145-L NLS, 2014 WL 5454398, at *6 (S.D. Cal. Oct. 27, 2014) (quoting *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009)). This does not mean, however, that individual issues need be entirely absent. Rather, "[c]ourts have recognized that individual issues will likely be present during class actions, but that such issues should not prevent class certification so long as they do not override the common question." *Id.* (quoting *Smith v. Cardinal Logistics Mgmt. Corp.*, No. 07-2104 SC, 2008 WL 4156364, at *10 (N.D. Cal. Sept. 5, 2008)). As such, predominance is clearly satisfied where "common evidence and common methodology [can] be used to prove the elements of the underlying cause of action." *In re High-Tech Employee Antitrust Litig.*, 985 F. Supp. 2d 1167, 1187 (N.D. Cal. 2013) (citing *Amgen*, 133 S.Ct. at 1191).

Here, the foregoing discussion about the common issues confronting the Proposed Classes demonstrate that Rule 23(b)(3)'s predominance prong is satisfied. As discussed in detail above, ViSalus (i) placed telemarketing calls, (ii) featuring an artificial or prerecorded voice (for the Robocall Class), (iii) without consent, (iv) to individuals on the DNC Registry (for the Do Not Call Class) and/or after requests to stop the calls (for the Oregon Stop Calling Class). Each

substantive issue relies on evidence common to the Classes; that is, whether each substantive issue lands in favor of Plaintiff or ViSalus, it would apply all the same for all respective class members. As to each of these issues, then, the Classes are "entirely cohesive: [they] will prevail or fail in unison." *See Amgen Inc.*, 133 S. Ct. at 1191; *see also Kristensen*, 12 F. Supp. 3d at 1306 (holding that predominance was satisfied in TCPA case where class's claims could be resolved through "overarching common issues" of consent and defendant's vicarious liability for the calls); *Agne*, 286 F.R.D. at 570 (same).

     While—as noted above—ViSalus will likely argue that consent creates individualized issues, that argument would be a non-starter. For one, Defendant has not provided any evidence of consent—and it's Defendant's burden to do so—and merely suggesting that such defense may exist is not sufficient. *See Kristensen*, 12 F. Supp. 3d at 1307 (rejecting the defendant's attempt to use "unfounded testimony" as substitute for "evidence of consent"); *Meyer*, 707 F.3d at 1042 (noting propriety of certification where defendant fails to "point to a single instance" where an individual falling within the class definition provided prior express consent to be called); *G.M. Sign, Inc. v. Finish Thompson, Inc.*, No. 07-cv-5953, 2009 WL 2581324, at *5 (N.D. Ill. Aug. 20, 2009) (holding that a defendant cannot "defeat class certification by asserting the vague possibility that some of the individuals on the anonymous lists may have perchance consented to receive the [communication]").

     Moreover, ViSalus's only conceivable argument in support of its consent defense—that the mere provision of telephone numbers constitutes consent to be called—is a common and predominating issue susceptible to class-wide adjudication. *See Patten*, 2013 WL 12069031 at *9 (predominance satisfied where "the only individual question is whether the same membership agreement form" constituted consent and "[o]n this defense, call class members will prevail or

PLTF'S RENEWED MOT. AND MEMO
IN SUPP. OF MOTION FOR CLASS CERT.

30

lose together") (citation and quotations omitted); *Saulsberry v. Meridian Fin. Servs., Inc.*, No. CV146256JGBJPRX, 2016 WL 3456939, at *10 (C.D. Cal. Apr. 14, 2016) ("The issue of consent, as previously argued by the parties, does not significantly interfere with the Court's ability to answer [a common question], or that answer's ability to drive the resolution of the litigation."); *Agne*, 286 F.R.D. at 570 (explaining that even if defendant could "come forward with evidence of individual consent…if and when individual class members are permitted to present claims" it would be a "non issue" for purposes of predominance).[7] In short, the question is a legal one – i.e., whether the mere provision of one's phone number is sufficient to constitute prior express written consent – and thus, the answer would apply to the class as a whole.  Thus, there's no doubt that even the question of consent is a common and predominating one.

### B.    A Class Action is the Superior Way to Handle This Lawsuit.

Finally, Rule 23(b)(3) requires that the class action mechanism be "superior to other

---

[7]      Any suggestion by Defendant that the potential existence of an established business relationship (an "EBR") between ViSalus and some of the members of the Classes could justify the denial of class certification would also be misplaced. Foremost, FCC eliminated the narrow exemption of the EBR in 2012, rendering it inapplicable to any calls made after October 16, 2013. *See In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 F.C.C. Rcd. at1857. Moreover, even if the existence of the EBR did require some individual analysis, certification would still be appropriate because (i) other common issues raised by this litigation would still predominate, s*ee St. Louis Heart Ctr., Inc. v. Vein Centers For Excellence, Inc.*, No. 4:12 CV 174 CDP, 2013 WL 6498245, at *9 (E.D. Mo. Dec. 11, 2013) at *9 (finding the predominance requirement to be satisfied and certification of the TCPA class to be appropriate where the resolution of any individual issues would not "consume more time or resources than the resolution of common issues"), and given that (ii) ViSalus has access to records indicating when an individual last purchased ViSalus's Products ceased and could therefore determine which individuals should and should not part of the class. *See e.g.*, *Krakauer*, 2015 WL 5254293, at *13 (explaining that even if the EBR exemption applied "several times" the fact finder could easily determine "whether those individuals were entitled to recover" simply by referencing defendant's list); *Saf-T-Gard Int'l, Inc. v. Vanguard Energy Services, LLC*, No. 12 C 3671, 2012 WL 6106714, at *6 (N.D. Ill. Dec. 6, 2012) (recognizing that although the need to determine if some recipients gave consent or whether certain individuals had an EBR could create an individual issue, "such issues are minor and can certainly be handled within the framework of a class action.") (quoting *Reliable Money Order, Inc. v. McKnight Sales Co.*, 281 F.R.D. 327, 337 (E.D. Wis. 2012)).

available methods for fairly and efficiently adjudicating of the controversy." Fed. R. Civ. P. 23(b)(3); *see also Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175-76 (9th Cir. 2010) (explaining that the superiority requirement serves to assure that a class action is the "most efficient and effective means of resolving the controversy") (citation omitted). "Where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification." *Id.* at 1175. Relatedly, the class action mechanism is superior to individual actions in consumer cases with thousands of members, as "Rule 23(b)(3) was designed for situations such as this [claim], in which the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate." *Holloway v. Full Spectrum Lending*, CV 06-5975 DOC RNBX, 2007 WL 7698843 at *9 (C.D. Cal. June 26, 2007) (citation and quotation omitted).

This case is particularly suited for class treatment because the claims of the Plaintiff and the respective Classes involve identical alleged violations of the same statute—the TCPA, with respect to the Robocall and DNC Classes, and the Oregon Stop Calling Statute, with respect to the Oregon Stop Calling Class—, and the damages sought here are limited to the statutory amounts: $200 under the Oregon Stop Calling Statute and $500 (or $1,500 if trebled) under the TCPA. Courts are quick to recognize that such an amount "is not sufficient to compensate the average consumer for the time and effort that would be involved in bringing a small claims action [under the TCPA] against a national corporation." *Agne*, 286 F.R.D. at 571; *see also Kavu*, 246 F.R.D. at 650 (holding that claims under the TCPA were sufficiently small such that they are unlikely to be litigated individually). Certifying the Classes would thus serve the policy "at the very core of the class action mechanism [which] is to overcome the problem that small recoveries do not provide the incentive" for individuals to bring claims. *Amchem Products, Inc.*

*v. Windsor*, 521 U.S. 591, 617 (1997); *see also Bellows v. NCO Fin. Sys., Inc.,* No. 3:07–CV–01413–W–AJB, 2008 WL 4155361, at *8 (S.D. Cal. Sept. 5, 2008) (holding that "[t]he class action procedure [in a TCPA action] is the superior mechanism for dispute resolution" because "[t]he alternative mechanism, permitting individual lawsuits for a small statutory penalty, would be costly and duplicative").

In addition, even if individual lawsuits were filed, given that there are thousands of class members, hearing essentially the same case over and over again would be patently inefficient. In contrast, class certification would avoid the need for multiple individual actions, which would inevitably result in enormous and unnecessary expense to both the judicial system and its litigants. In that same vein, class certification would promote consistency of rulings and judgments, while at the same time giving all parties the benefit of finality by resolution in a single action. This too, favors certification. *See, e.g., Magallon*, 311 F.R.D. at 641 (finding superiority satisfied in FCRA class action because "individual actions would entail increased expenses, duplication of discovery, and a potential for inconsistent results").

A class action is therefore the superior method of adjudicating this case, and in sum, all of Rule 23(b)(3)'s requirements are fully satisfied.

## CONCLUSION

For the reasons set out above, Plaintiff respectfully requests that the Court enter an order (i) certifying the Robocall, Do Not Call, and Oregon Stop Calling Classes, (ii) appointing Plaintiff as the class representative and appointing Rafey Balabanian and Eve-Lynn J. Rapp of Edelson PC as Class Counsel, and (iii) granting such further relief as this Court deems reasonable and just.

Dated: February 10, 2017                Respectfully Submitted,

                                        **LORI WAKEFIELD**, individually and on behalf
                                        of classes of similarly situated individuals,

                                        By:  Eve-Lynn J. Rapp

                                              One of Plaintiff's Attorneys

                                        **Scott F. Kocher, OSB #015088**
                                        scott@forumlawgroup.com
                                        FORUM LAW GROUP LLC
                                        811 SW Naito Parkway, Suite 420
                                        Portland, Oregon 97204
                                        Tel: 503.445.2102
                                        Fax: 503.445.2120

                                        Rafey S. Balabanian*
                                        rbalabanian@edelson.com
                                        Eve-Lynn Rapp*
                                        erapp@edelson.com
                                        Stewart R. Pollock*
                                        spollock@edelson.com
                                        EDELSON PC
                                        123 Townsend Street, Suite 100
                                        San Francisco, California 94107
                                        Tel: 415.212.9300
                                        Fax: 415.373.9435


                                        *Admitted *pro hac vice*

                                        Attorneys for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I, Eve-Lynn J. Rapp, an attorney, certify that on February 10, 2017 I caused to be served the foregoing by sending copies of such papers by electronic mail to all counsel of record.


_____Eve-Lynn J. Rapp_____