# Exhibit 1

Plaintiff's deposition designations for Justin Call

**Page 1**

```
1              UNITED STATES DISTRICT COURT
                   DISTRICT OF OREGON
2

3  LORI WAKEFIELD, on behalf of
   themselves and a class of
4  others similarly situated,
5       Plaintiff,          No. 3:15-cv-01857-BR
6  V.
7  VISALUS, INC., a Nevada
   Corporation,
8
        Defendant.
9

10

11

12 ********************************************************
13         ORAL DEPOSITION OF JUSTIN CALL
14                   VOLUME 1
15 ********************************************************
16
17     ANSWERS AND DEPOSITION OF JUSTIN CALL, produced as
18 a witness at the instance of the Plaintiff, taken in the
19 above-styled and -numbered cause on the 20th day of
20 January, 2017, A.D., beginning at 9:57 a.m., before
21 Brandy Cooper, a Certified Shorthand Reporter in and for
22 the State of Texas, in the offices of Esquire Deposition
23 Solutions, located at 1700 Pacific Avenue, Suite 1000,
24 Dallas, Texas, in accordance with the Federal Rules of
25 Civil Procedure and the agreement hereinafter set forth.
```

**Page 2**

```
1        A P P E A R A N C E S
2  FOR THE PLAINTIFF:
3      STEWART R. POLLOCK
        Edelson, PC
4      123 Townsend Street, Suite 100
        San Francisco, California  94107
5      (415) 212-9300
        spollock@edelson.com
6
   FOR THE DEFENDANT:
7
        SARAH R. ANCHORS
8      Quarles & Brady, LLP
        One Renaissance Square
9      Two North Central Avenue
        Phoenix, Arizona  85004-2391
10      (602) 229-5788
        sarah.anchors@quarles.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1                  I N D E X
2

3  Appearances . . . . . . . . . . . . . . . . Page    2
4  Exhibit Index . . . . . . . . . . . . . . Page    4
5  Stipulations . . . . . . . . . . . . . . Page    5
6  Examination by Mr. Pollock . . . . . . . . Page    5
7  Signature and Corrections  . . . . . . . . Page  125
8  Reporter's Certificate   . . . . . . . . . Page  126
```

**Page 4**

```
1          E X H I B I T   L I S T
2                            Page
   No.  Description
3
4  1   Plaintiff's Rule 30(a)(1) Amended Deposition
5      Notice to Defendant Visalus, Inc. of
6      Deponent Justin Call              12
7  2   Outreach, Outbound Disposition Codes      45
8  3   List of WAV Files          76
9  4   List of File Names         81
10 5   List of File Names         87
11 6   Organizational Summary            101
12 7   List of File Names         104
13 8   Outreach Support Team Recognition Guideline  106
14 9   Team Guidelines and Expectations      109
15 10  VI Support Team Document          113
```



JUSTIN CALL Volume 1                                          January 20, 2017
LORI WAKEFIELD vs VISALUS                                              5–8

Page 5

1               P R O C E E D I N G S
2          THE REPORTER:  Are there any stipulations
3  or agreements for the record before we begin?
4          MS. ANCHORS:  No.
5          MR. POLLOCK:  I don't think so.
6          THE REPORTER:  Will counsel please state
7  their names and whom they represent for the record.
8          MR. POLLOCK:  Stewart Pollock on behalf of
9  plaintiff.
10         MS. ANCHORS:  Sarah Anchors on behalf of
11  defendant.
12              JUSTIN CALL,
13  having been first duly sworn, testified as follows:
14              EXAMINATION
15  BY MR. POLLOCK:
16     Q.  Good morning, sir.
17     A.  Morning.
18     Q.  Would you please state your full name for the
19  record?
20     A.  Justin Call.
21     Q.  And have you ever been deposed before?
22     A.  Yes.
23     Q.  All right.  When were you deposed, most
24  recently?
25     A.  I don't know the exact dates, but probably a

Page 6

1  year or two ago.
2     Q.  Okay.  So we're going to circle back to that.
3  But I want to go over a couple of ground rules just to
4  make sure that everything today goes smoothly.  So I'm
5  going to be asking you questions today, and your job is
6  to answer those questions to the best of your ability.
7  At some points, your counsel will be making objections.
8  When that happens -- I assume -- when that happens, then
9  you should let, you know, the attorneys handle and
10  discuss the objections, and then if your counsel
11  instructs you not to answer, you can, you know, decide
12  whether you want to follow that instruction.  But
13  otherwise, I'm going to ask that you answer my question.
14  Do you understand?
15     A.  I understand.
16     Q.  Okay.  I'll probably ask some questions that
17  are poorly worded and don't make any sense.  If that
18  happens, then I want you to let me know that you don't
19  understand my question and ask me to clarify.
20  Otherwise, if you answer, I'm going to assume that you
21  understand my question.  Do you understand?
22     A.  Yes.
23     Q.  Okay.  And if you don't understand a word that
24  I say or if I mumble, then just let me know so that I
25  can rephrase it or clarify my question.

Page 7

1     A.  Okay.
2     Q.  As you've noticed, there's a court reporter
3  here today.  She is transcribing everything that is said
4  in this room today.  Because of that, it's important
5  that we do a couple of things.  First, it's important
6  that we don't speak over each other.  I'm going to do my
7  best to make sure I don't starting asking another
8  question until you've completed your response.  And I'll
9  ask that you don't start answering until I've completed
10  my question.
11         It's also important that we give audible
12  questions and responses.  For example, in ordinary
13  conversation we may use hand gestures or say things like
14  uh-huh or huh-uh, but those are difficult to transcribe
15  in a clear way.  So it's important that we give audible
16  responses and say yes or no.  Do you understand?
17     A.  I understand.
18     Q.  Okay.  If at any point you need a break today,
19  please feel free to do so, it's not an endurance
20  session.  Just -- you can either tell me or tell your
21  counsel that you need to take a break.  The only thing
22  that I would ask is that you answer any question that is
23  pending before we take a break.  Do you understand?
24     A.  I understand.
25     Q.  All right.  So this is a standard question.  I

Page 8

1  have to ask it.  Is there any medication, any medical
2  reason that would prevent you from giving your full and
3  accurate testimony here today?
4     A.  No.
5     Q.  Okay.  Earlier, you said that you had been
6  deposed before.  I think you said it was a year or two
7  ago; is that right?
8     A.  Yeah.  I don't recall the exact date, but it's
9  been -- yeah, a year or two ago.
10     Q.  Okay.  What was the case in which you were
11  deposed most recently?
12     A.  It was a lawsuit from somebody against Visalus.
13         THE WITNESS:  I don't know how specific
14  or --
15     A.  It was a lawsuit.  It was a different lawsuit.
16     Q.  (BY MR. POLLOCK)  Okay.  What was the nature of
17  that lawsuit?
18     A.  It was a wrongful termination, alleged.
19     Q.  Do you know name of that case?
20     A.  I do.
21     Q.  What is the name of that case?
22     A.  Sweeney versus Visalus or something like that.
23     Q.  So it's S-W-E-E-N-E-Y?
24     A.  I think so, yes.
25     Q.  Do you know where that case was filed?



Page 13

1   Q.  All right.  Did you do anything to prepare for
2   your deposition today?
3   A.  Yes.
4   Q.  Okay.  What did you do?
5   A.  I played the theme to Rocky and got -- no, just
6   kidding.  I spoke to Sarah prior to.
7   Q.  How many times did you speak with Sarah prior
8   to today's deposition?
9   A.  Well, in exact regards to preparing for this
10  deposition, really one time, maybe two times.
11  Q.  Okay.  When did you first speak with your
12  attorney to prepare for today's deposition?
13  A.  Yesterday.
14  Q.  Was that by phone or was that in person?
15  A.  By phone.
16  Q.  Okay.  How long did that call last?
17  A.  I don't recall; less than 30 minutes.
18  Q.  Was anyone else on that call?
19  A.  Not to my knowledge.
20  Q.  Okay.  Did you review any documents to prepare
21  for today's deposition?
22  A.  No.
23  Q.  All right.  Who is your current employer?
24  A.  Visalus.  I'm employed by Visalus.
25  Q.  Okay.  Do you have any other employers?

Page 14

1   A.  I'm currently employed by Visalus for -- I
2   mean --
3         THE WITNESS:  I mean, I don't know how
4   you...
5   A.  I mean, I'm employed by Visalus.
6   Q.  (BY MR. POLLOCK)  Okay.  What's your current
7   job title?
8   A.  VP of sales and global support.
9   Q.  How long have you held that title?
10  A.  That title?
11  Q.  Yeah.
12  A.  I mean, it's essentially been the same title
13  for five and a half years, close to five and a half
14  years.
15  Q.  Okay.
16  A.  The titles get adjusted here and there, but the
17  nature of VP of support has been the same for the whole
18  time.
19  Q.  Have you held any other positions at Visalus?
20  A.  No.
21  Q.  So you started there in 2011, approximately?
22  A.  Yes.
23  Q.  All right.  What were your job duties and
24  responsibilities in -- when you started in 2011?
25  A.  Primarily, it was the call center, and I mean,

Page 15

1   there was a lot -- I don't know how detailed you want me
2   to get, but that was the primary purpose.
3   Q.  And that includes inbound and outbound?
4   A.  At the time, we only had inbound.
5   Q.  When was the -- is it called outreach support?
6   Is that the outbound call center?
7   A.  That was a terminology that they kind of came
8   up with, yes.
9   Q.  Okay.  When was the outreach team created?
10  A.  Best of my recollection, somewhere, I would
11  think, beginning of 2012.  Somewhere in that range.
12  Q.  And the outreach team was terminated in January
13  2016?
14  A.  If that's the information you have, I don't
15  recall exactly.
16  Q.  Okay.  Was it --
17  A.  I have no reason to dispute if you've got that
18  information.  I don't recall exactly.
19  Q.  Does that sound approximately right to you?
20  A.  Yeah, it sounds -- yeah, it sounds right.
21  Q.  Okay.
22  A.  If I were to guess, I would have thought it was
23  before then, like the end of 2015.
24  Q.  All right.  So in 2011, I understand that you
25  oversaw the call center which was inbound only at that

Page 16

1   time?
2   A.  Uh-huh.
3   Q.  Did you oversee anything else in 2011?
4   A.  I did.
5   Q.  What else did you oversee?
6   A.  The commissions team; I created a compliance
7   team; ambassador liaison team, I created.  What else?  I
8   think that's about it for 2011.
9   Q.  Okay.  And then so you created all of those in
10  2011.  What would have been the next change to the
11  groups that you oversaw?
12        MS. ANCHORS:  Objection, form.
13  Q.  (BY MR. POLLOCK)  Do you understand the
14  question?
15  A.  Well, yeah, what other changes happened in my
16  role?  Is that what you're asking?
17  Q.  Yeah.  So you were overseeing the call center,
18  the commission's team, compliance and ambassador
19  liaisons?
20  A.  Uh-huh.
21  Q.  And then my question is:  At some point, did
22  the groups that you oversaw change?
23  A.  Those groups continued.  And when I say "I
24  oversaw" it means it's in my organization.  It doesn't
25  mean I ran the day to day --



Page 17

1    Q.   I understand.
2    A.   -- from a strategic purpose.  I don't recall
3 the exact dates, but I got the sales organization
4 events, recognition.  Yeah, those are the main other
5 additions over the years; sales, events, recognition.
6    Q.   Okay.  When were each of those added?
7    A.   Somewhere probably 2014, to the best of my
8 recollections.
9    Q.   Okay.
10    A.   I mean, I was involved -- it's hard to say the
11 exact date.
12    Q.   Are all of those teams still in existence?
13    A.   Are all the teams that I oversaw at Visalus --
14    Q.   Yeah.  Let's start one by one.  The
15 commission's team, is there still a commissions team at
16 Visalus?
17    A.   Yes.
18    Q.   How has that changed from 2011 to the present?
19    A.   It's just a lot smaller.  Well, let me -- I'm
20 sorry, let me -- from 2011 to today, it's pretty similar
21 size, so it's pretty -- pretty close to the same.
22    Q.   Okay.  But in between during that six or so
23 year span, it grew --
24    A.   Correct.
25    Q.   -- and then it shrunk?

Page 18

1    A.   Yes.
2    Q.   How about for compliance?
3    A.   It didn't exist initially in 2011, so it is
4 shrunk.  It went from nonexistent to, you know, several
5 people to -- it still exists, but it's very shrunk.
6    Q.   Okay.  One or two people in compliance now?
7    A.   One.
8    Q.   All right.  That would be Mr. Gidley?
9    A.   Yes.
10    Q.   How about ambassador liaison?
11    A.   Same story; still exists.
12    Q.   Okay.  How many ambassador liaisons are there?
13    A.   Three.
14    Q.   Is one of them Nick Sarnicola?
15    A.   No.
16    Q.   Okay.  Who are the ambassador liaisons?
17    A.   Melanie Muske, Nixon Demasek and Jodi Doll.
18    Q.   All right.  How about the sales team -- which I
19 understand was added in 2014 -- approximately how many?
20    A.   It was added to my responsibilities.
21    Q.   Okay.  It existed prior, but it was under
22 somebody else's control?
23    A.   Yes.  And it's not really -- the ambassador
24 liaison -- kind of the whole group was the sales team in
25 a way.  Again, it's small, there is really no sales

Page 19

1 team.  The sales team are the promoters.
2    Q.   How about events?
3    A.   There's no, like, official events team, now
4 there's just people that are responsible for an event
5 when it comes up that we kind of mobilize to handle.
6    Q.   So rather than having a dedicated events
7 department, you now have -- somebody in another
8 department will take on another responsibility?
9    A.   Multiple departments.
10    Q.   Okay.  How about recognition?
11    A.   That is -- that's not under my organization;
12 it's in marketing.  It's kind of --
13    Q.   That would be under John Laun?
14    A.   Yes.  It's somewhat similar.  It's kind of a
15 group effort.
16    A.   All right.  So for the most part, it sounds
17 like these teams have significantly fewer members now
18 than they did at their peak a few years ago; is that
19 right?
20    A.   Yes.
21    Q.   Do you know why that is?
22    A.   Yes.
23    Q.   Why is that?
24    A.   Our sales are a lot lower.
25    Q.   Do you know why sales are lower?

Page 20

1    A.   There's no simple answer, but I'm sure -- we
2 have less people selling this is probably the -- for
3 this forum would probably be the simplest way to
4 describe it.
5    Q.   Fewer promoters?
6    A.   Yes.
7    Q.   And if I understand it correctly, you're
8 leaving Visalus at the end of the month?
9    A.   Yes.
10    Q.   Okay.  Why is that?
11    A.   Better opportunity, different -- yeah, just a
12 different -- time to change.  I didn't get hired at
13 Visalus to run a team of five people.
14    Q.   Is that what you're doing now, running a people
15 of five people?
16    A.   Nine.  I exaggerated.
17    Q.   There have been a number of people who have
18 left Visalus in the last year or so, right?
19    A.   Yes.
20    Q.   Do you know why that is?
21        MS. ANCHORS:  To the extent that you know,
22 foundation.
23    A.   Well, lay offs is the number one reason.
24    Q.   (BY MR. POLLOCK)  Okay.  Are you familiar
25 with -- and I apologize if I mispronounce this -- Blyth?



JUSTIN CALL Volume 1                                    January 20, 2017
LORI WAKEFIELD vs VISALUS                                      21–24

Page 21

1    A.  I am.
2    Q.  Do you know what the relationship is between
3 Visalus and Blyth today?
4    A.  I believe they -- no, I don't know for sure.
5    Q.  Okay.  Who would know that?
6    A.  The founders, Blyth.
7    Q.  When you say "the founders," can you list
8 them -- I know Ryan Blair --
9    A.  Ryan, Nick and Blake; Ryan Blair, Nick
10 Sarnicola, Blake Mallen.
11    Q.  Is there anyone from Blyth who's on the board
12 of Visalus?
13    A.  No, not that I'm aware of.
14    Q.  Okay.
15    A.  There may be, I'm just not aware.
16    Q.  That's fine.  I understand that the
17 relationship between Visalus and Blyth has changed over
18 the last five or so years --
19    A.  Yes.
20    Q.  -- is that right?
21        Okay.  And initially Visalus was wholly
22 independent, correct, of Blyth?
23    A.  Yes.
24    Q.  And at some point, Blyth invested in Visalus;
25 is that right?

Page 22

1    A.  Yes.
2    Q.  Do you have any understanding about that
3 relationship?
4    A.  I do.
5    Q.  Okay.  What's your understanding?
6    A.  That they agreed to purchase Visalus over --
7 with a, you know, the terms of the deal to acquire a
8 certain percentage overtime and eventually it was
9 wholly-owned by Blyth.
10    Q.  Do you know when that happened?
11    A.  I think it became wholly-owned in maybe 2012,
12 somewhere in that range.
13    Q.  And then at some point then, Visalus purchased
14 itself back from Blyth or the owners purchased it back?
15    A.  Correct.
16    Q.  And so that would be Nick, Ryan and Blake,
17 right?
18    A.  Yes, and other principals as well.
19    Q.  Okay.  Do you know when the repurchase
20 happened?
21    A.  I think it was in the fall of '14, I think,
22 yeah.
23    Q.  So October or September --
24    A.  Yeah --
25    Q.  -- of 2014?

Page 23

1    A.  -- somewhere in 2014, if I recall.
2        THE REPORTER:  Will you make sure and let
3 him finish his question, please?
4        THE WITNESS:  Yes.
5    Q.  (BY MR. POLLOCK)  Do you know whether that
6 happened at all once, or whether that happened
7 gradually?  Do you understand?
8    A.  Yes, I understand.  I believe it was one
9 transaction.
10    Q.  Okay.  So currently, Blyth owns no percentage
11 of Visalus to your understanding; is that right?
12    A.  I don't know.
13    Q.  Okay.  And again, the best people to ask that
14 would be probably Ryan Blair or Nick Sarnicola or Blake
15 Mallen?
16    A.  Yes.
17    Q.  Is there a George Blyth that works with
18 Visalus?
19    A.  I've never heard that name.
20    Q.  Okay.  All right.  So I want to talk about the
21 outreach team -- what's the best term that I should use
22 just to make sure you and I will are clear about what
23 I'm referring to?
24    A.  Outreach is fine.
25    Q.  Okay.  And by outreach team, I understand that

Page 24

1 to mean a group within Visalus that places outbound
2 calls, is that --
3    A.  Yes.
4    Q.  -- accurate?
5    A.  Yes.
6    Q.  Okay.  So that team was created in 2012
7 sometime?
8    A.  Yes.
9    Q.  Can you give an estimate on a month?
10    A.  I believe first quarter of 2012, to the best of
11 my remembrance.
12    Q.  Understood.  It's five or so years ago.
13    A.  Yeah.
14    Q.  Was Bennie Smith involved in the outreach
15 support center at its inception?
16    A.  I don't recall.
17    Q.  Okay.  So when it was started in, you know,
18 approximately the first quarter of 2012, who all was
19 involved in the management and supervision of the
20 outreach support team?
21    A.  Marcus Jones.
22    Q.  All right.
23    A.  And now that I thought of it, Bennie was not
24 there at the inception.  He came -- he came later.
25    Q.  Okay.  So Marcus Jones, anyone else?



Page 25

1    A.  He was the person that I appointed to run that.
2    Q.  So he was your subordinate?
3    A.  Yes.
4    Q.  Anyone else involved in this supervision or
5  management of that team?
6    A.  He had subordinates as well; Dejan something or
7  another, and there was another lady that I don't recall
8  her name.
9    Q.  Okay.
10    A.  That were Marcus's subordinates.
11    Q.  And who replaced Marcus?  Who took that
12  position next?
13    A.  Jeana Asmaro.
14    Q.  When did that happen?
15    A.  She was over it for a short time before it
16  was -- before it was done.  So I don't -- I honestly
17  don't remember exactly when that happened.
18    Q.  Okay.
19    A.  She wasn't over it for long.
20    Q.  And I guess I should back up.  Jeana is spelled
21  J-E-A-N-N-A?
22    A.  J-E-A-N-A.
23    Q.  Thank you.  And Asmaro is A-S-M-A-R-O?
24    A.  Yes.
25    Q.  Okay.  Who followed Jeana?

Page 26

1    A.  I think it was over by then.
2    Q.  Okay.  When did Bennie Smith -- when was he
3  involved in the outreach team?
4    A.  He was hired under Marcus.  Whatever his hire
5  date was, he was hired before that.
6    Q.  Okay.  Was that 2012 or can you give me an
7  estimate?
8    A.  I honestly have no idea, '12 or '13.
9    Q.  How about Lu Williams?
10    A.  Lu was also my subordinate, and he was over the
11  entire call center, which when he was hired did not
12  include the outbound -- the outreach team.
13    Q.  Okay.  So when -- do you know when he was
14  hired?
15    A.  No, I -- probably '13, sometime.
16    Q.  Okay.  So just to make sure I've got this, from
17  2012 to whenever the outreach team was terminated,
18  whether it was December 2015 or January 2016, in order,
19  it would have been Marcus Jones, Jeana Asmaro would be
20  the two high level individuals supervising it?
21    A.  Managers.
22    Q.  Managers.  And then beneath Marcus Jones and
23  Jeana Asmaro, you would have had Dejan, Bennie Smith and
24  Lu Williams?
25    A.  No.  Lu Williams was -- Lu reported -- Lu

Page 27

1  became a person between me -- he was a director level.
2  And so he was above Jeana and Marcus as far as titles.
3  But initially, Marcus did not report to Lu.  He still
4  reported directly to me, initially.  And eventually,
5  they reported to Lu to me.
6    Q.  Would Jeana have reported to Lu?
7    A.  She did -- she did eventually.  She reported to
8  Lu when Lu was hired, yes.
9    Q.  Okay.  So from approximately, say, 2013 until
10  the end of 2015, beginning of 2016, in terms of the
11  order that we've just described, then it would go you,
12  Justin, at the top, and then Lu Williams, and then
13  beneath that, Jeana Asmaro, and then beneath that,
14  Bennie Smith?
15    A.  Bennie wasn't -- I don't recall Bennie ever
16  having supervisory responsibilities of -- you know,
17  where he managed people that had direct reporting
18  function to him.
19    Q.  Okay.  So the same -- the right sort of
20  structure or the right order there, it's just that I
21  might have inflated Bennie's role?
22    A.  Yeah.  And things change around.  And I mean,
23  so but it was -- outreach did not -- when Lu came in, he
24  was over the inbound; Marcus was over outbound.  And
25  eventually I put Lu over both.  And then Jeana was under

Page 28

1  Lu in the inbound, and then when Marcus left, we moved
2  Jeana to be over outbound.  So that's the high
3  level movement of it.
4    Q.  Okay.  At its inception, what was the purpose
5  of the outreach support team?
6    A.  To call declined credit cards, people whose
7  credit cards declined on autoship.
8    Q.  Okay.  What was the next responsibility that
9  was added to the outreach team?
10    A.  We did various campaigns, you know,
11  including -- we did, like, upsell campaigns.  People
12  that were on, you know, one kit to -- when we came out
13  with a new kit, we called them to let them know about
14  the new kit.  And then we also would have, like, a
15  Winback, you know, people that hadn't ordered, to let
16  them know about a special that if they want to come back
17  on the challenge.  Those are probably the three main
18  things.
19    Q.  The Winback campaign started in 2013; is that
20  correct?
21    A.  I honestly have no idea.  We could have -- as
22  far as -- mostly Winback campaign was not generally an
23  outbound campaign.  Winback existed without any
24  outbound.  It was a marketing e-mail, you know, social
25  campaign primarily.  That was the -- that was how it was



Page 29

1   created.
2      Q.  Okay.  When did the outreach team start
3   participating in the Winback campaign in terms of
4   placing phone calls?
5      A.  I don't recall.  I think probably in 2013 or
6   '14.
7      Q.  And the other campaigns that the outreach team
8   was placing calls in relation to would have been for
9   declined credit cards --
10     A.  That the primary function.
11     Q.  And then also for upselling on new kits like a
12  fuel kit upgrade, something like that?
13     A.  Fuel kit upgrade was the main one, yeah.  We
14  came out with the fuel kit, which was a new kit.  So we
15  called people who were on the kits lower than that and
16  said, Hey, here's a new kit.
17     Q.  Do you know when or what telephone system
18  Visalus and the outreach team were using starting in
19  2012?
20     A.  Just the -- we just dialed on the phones
21  manually at the inception of it.
22     Q.  Okay.  And was that -- so that wasn't exactly
23  my question.
24          The phones that you -- between 2011 and
25  the end of 2015, beginning of 2016, did the actual phone

Page 30

1   system change?  Which is different from the question --
2   that's a different question from how you used the phone
3   system.
4          MS. ANCHORS:  Objection, form.
5      Q.  (BY MR. POLLOCK)  Do you understand my
6   question?
7      A.  Seemed like there was several.  So can you ask
8   it again?
9      Q.  Sure.  Yeah.  Do you know what the devices that
10  were used, the telephone devices beginning in 2011?
11         MS. ANCHORS:  Objection, form.
12     A.  Well, 2011, it didn't exist, as we talked
13  about.  We started the -- you're speaking specifically
14  for the outbound campaign, the --
15     Q.  (BY MR. POLLOCK)  I'm talking about the
16  outreach team.
17     A.  So as we mentioned earlier, it was started in
18  2012, so 2011 it didn't exist.
19     Q.  Starting in 2012, do you know what the devices
20  that were used by the outreach team were for placing
21  calls?
22     A.  Telephones.  It was just -- it was just a
23  regular telephone.
24     Q.  Okay.  Do you know if that was part of Avaya
25  telephone system that I understand you were using up

Page 31

1   until recently?
2      A.  We -- so when we started, we didn't have the
3   Avaya system.  So we just had -- it was a Shoretel
4   manual dialing phone.  You just picked it up and dialed
5   when the outreach team first started.
6      Q.  When did the Avaya system -- strike that.
7          When did Visalus begin to use an Avaya
8   system?
9      A.  In October of 2012.
10     Q.  Other than how you used it, has the actual
11  system been changed between October 2012 and the end of
12  January -- sorry, the end of 2015, beginning of 2016?
13         MS. ANCHORS:  Objection, form.
14     A.  I don't understand.
15     Q.  (BY MR. POLLOCK)  Did you switch out the
16  devices at any point between October 2012 and the
17  present?
18         MS. ANCHORS:  Objection, form.
19     A.  I don't -- we used phone -- we used the same
20  phones then as we do now.
21     Q.  (BY MR. POLLOCK)  Okay.  It's the same Avaya
22  system that you started using in October of 2012; is
23  that right?
24     A.  I don't understand the question.  You asked
25  what -- were the devices the same.  Yes, the devices

Page 32

1   have been the same since we started using Avaya, the
2   devices.
3      Q.  Okay.  Are the devices through Avaya?
4          MS. ANCHORS:  Objection, form.
5      Q.  (BY MR. POLLOCK)  Are the devices that you
6   began using in October of 2012, are they Avaya devices?
7      A.  Yes.
8      Q.  Okay.  And then so I guess walk me through the
9   changes to how the outreach team placed calls between
10  October 2012 and when it was ended.  What was the --
11  what was the next change after you acquired the Avaya
12  devices in October 2012?
13         MS. ANCHORS:  Objection, form.
14     Q.  (BY MR. POLLOCK)  Do you understand?
15     A.  Not really the way you're asking.  I think it's
16  been established, the devices were phones that were, to
17  the best of my knowledge, manufactured by Avaya instead
18  of Avaya on the phones.
19     Q.  Okay.
20     A.  It was an Avaya phone system and Avaya devices.
21     Q.  Got it.  At some point then, was it George
22  Vary, is that the Avaya engineer?
23     A.  What's -- is there a question?
24     Q.  I'm sorry.  I just want to make sure I got the
25  name right.  Is George Vary the name of the individual



JUSTIN CALL Volume 1
LORI WAKEFIELD vs VISALUS

January 20, 2017
33–36

Page 33

1  who was employed as an Avaya engineer for Visalus?
2      A.  Yes.
3      Q.  Okay.
4      A.  I don't know what his title exactly was, but
5  George was an employee of Visalus that worked on phones.
6      Got it.  At some point then he learned about
7  some additional functionality in the Avaya devices,
8  right, specifically with regard to progressive outreach
9  manager?
10          MS. ANCHORS:  Objection, foundation.
11     A.  I mean, the question doesn't really make sense.
12     Q.  (BY MR. POLLOCK)  Okay.  Do you know what a
13  progressive outreach manager is?
14     A.  Yes.
15     Q.  Okay.  What is it?
16     A.  I've never heard it called that exactly, but...
17     Q.  Have you heard it referred to as a POM or
18  P-O-M?
19     A.  Yes.
20     Q.  Okay.  So if I use that term, POM, P-O-M, you
21  have an understanding about what I'm referring to,
22  correct?
23     A.  I do.
24     Q.  And what's your understanding?
25     A.  It is -- it's a dialer.

Page 34

1      Q.  Okay.  And that's a functionality within the
2  Avaya system, correct?
3      A.  No.  It's an addition.
4      Q.  Okay.  So when you say "dialer," what do you
5  mean by that?
6      A.  It means instead of you having to push the
7  buttons yourself, it can dial it for you.
8      Q.  Okay.  And when did Visalus begin to use POM?
9      A.  Boy, it took forever to get going.  I think it
10  was probably -- I just don't really -- it was probably
11  '14, I would think, maybe '13.  It took -- I'm thinking
12  it took -- might have been beginning of '14 by the time
13  it actually got going.  But I honestly don't recall it
14  if the -- yeah.
15     Q.  Okay.  What was the purpose of using POM?
16     A.  So you didn't have to dial the phone manually.
17     Q.  Okay.  Do you know when Visalus stopped using
18  POM?
19     A.  Just probably around the coincide of the time
20  we stopped doing outreach.
21     Q.  Okay.
22     A.  So somewhere end of whatever we decided -- end
23  of '15.  We may have even stopped using that beforehand.
24     Q.  Okay.  What sort of campaigns did Visalus use
25  POM for?

Page 35

1      A.  Same campaigns we already discussed.
2      Q.  That would be the Winback campaign, fuel kit
3  upgrade, cancel credit cards?
4      A.  And declined credit cards.
5      Q.  Okay.  You said that the purpose was so people
6  didn't have to manually dial numbers, right?
7      A.  Correct.
8      Q.  So I understand that a spreadsheet full of
9  phone numbers would be uploaded into POM; is that right?
10     A.  I never uploaded --
11         MS. ANCHORS:  Foundation.
12     A.  -- anything.  I didn't do that, so I have no
13  idea.
14     Q.  (BY MR. POLLOCK)  Okay.
15     A.  I can make a guess, but I've never actually
16  done that.
17     Q.  I don't want you to guess, but to the extent
18  you can estimate, then I would want that.
19     A.  I don't know the process they've got to get
20  data onto the dialer.  I don't know specifically for
21  sure.
22     Q.  Okay.  Who made the decisions about who would
23  be contacted as part of the campaign?
24         MS. ANCHORS:  Objection, foundation.  You
25  can answer to the extent you know.

Page 36

1      Q.  (BY MR. POLLOCK)  Do you understand what I'm
2  asking?
3      A.  You're asking who decided who was going to be
4  called?
5      Q.  Yeah.
6      A.  So there was never -- nobody ever sat down and
7  said are we going to call John, Susie, it was...
8      Q.  You would make a decision about a group, right?
9  We're going to call people who haven't placed an order
10  in 90 days?
11         MS. ANCHORS:  Objection, foundation.
12         THE WITNESS:  I mean, I don't know -- am I
13  supposed to answer that or not?  I don't know what
14  you're saying.
15         MS. ANCHORS:  You can answer to the extent
16  you know and you understand the question.
17     A.  Right.  So the way it works is that if you have
18  a campaign, you define the parameters and then you pull
19  the people that fit those parameters, that definition.
20     Q.  (BY MR. POLLOCK)  Okay.  Who would define the
21  parameters?
22     A.  I mean, they define themselves a lot -- you
23  know, their credit card declined, so that person's
24  credit card declined, then they're on the list as their
25  credit card declined.  You know what I mean?  So that's



Page 37

1 self-defining I guess is what I'm saying.
2    Q.   Sure.  But somebody had to come up with the
3 definition at the onset to say, We're going to call
4 people whose credit cards were declined?
5    A.   Right.
6    Q.   And who came up with that idea?
7         MS. ANCHORS:  Objection, foundation.
8    Q.   (BY MR. POLLOCK)  Who made that decision?
9    A.   It's always -- call people's credit cards
10 declined as courtesy so their orders can go through and
11 they get paid commissions.  So there wasn't like a
12 moment in time where it was, like, here's a great idea.
13 When somebody -- I mean, if you order online at Amazon
14 and your credit card declines, they contact you to let
15 you know.  That's how that happened.
16    Q.   Okay.  Have the credit card declines -- has
17 Visalus always placed calls to people whose credit cards
18 are declined?
19         MS. ANCHORS:  Objection, foundation.  You
20 can answer to the extent that you know.
21    A.   I have no idea.  I haven't worked there since
22 the beginning of time of their company.
23    Q.   (BY MR. POLLOCK)  Okay.  But since you've been
24 there in 2011, they have done that?
25    A.   No.

Page 38

1         MS. ANCHORS:  Objection foundation.
2    A.   No.
3    Q.   (BY MR. POLLOCK)  When you started in 2011 they
4 weren't calling people whose credit cards were declined?
5    A.   No.
6    Q.   Okay.  When did that start then?
7    A.   As we established when the outreach team
8 started, that's when we started calling people's cards.
9 There's no easy answer to that because could -- were
10 there people that maybe called some people whose credit
11 cards declined?  Sure.  But there wasn't a systematic
12 methodology of calling them to make sure we extend the
13 courtesy to everybody.
14    Q.   And that was implemented in 2012?
15    A.   With the outreach, yes.
16    Q.   And you were supervising or maybe one step
17 above supervising the outreach team in 2012, right?
18    A.   Yes.  That was the genesis for starting the
19 outreach team was to have a structured way of calling
20 people whose autoships declined; that was the purpose of
21 creating that.
22    Q.   Okay.
23    A.   Rather than, you know, people in between calls
24 maybe calling somebody, you know, it was hit or miss.
25 The outreach team was created to have a professional

Page 39

1 structured way to call the people whose cards were
2 declined as a courtesy.
3    Q.   Okay.  And to make it systematic so that any
4 time a credit card was declined, they would get a call,
5 right?
6    A.   Correct.
7    Q.   And then at some point, the outreach team
8 started also making the same sort of systematic calls to
9 people as part of a Winback campaign, right?
10    A.   That was added as well.  I mean, the core
11 foundation was always the credit card declines based on
12 sheer numbers; that was by far and away the largest
13 population of work and people.  But then we did add, you
14 know, as we've talked about, other campaigns for certain
15 people to call as well.
16    Q.   Were you involved in adding those additional
17 campaigns?
18    A.   Yes.
19    Q.   Okay.  Were you involved in adding the Winback
20 campaign?
21    A.   Sure.
22    Q.   Also the fuel kit upgrade?
23    A.   Yes.
24    Q.   Okay.
25    A.   To the extent of what you're saying involved

Page 40

1 means -- from a strategic standpoint, yes.
2    Q.   And just to make sure I understand what your
3 role was -- I'm not trying to put words in your mouth.
4 I'm just trying --
5    A.   Sure.
6    Q.   -- to describe what I've heard, and I'm sure
7 you'll correct me.  Your role was more at the high level
8 strategic saying, we should call people who haven't
9 placed orders in a while.  And then somebody would go
10 and pull a list of names that hadn't placed orders
11 within a specified time period, right?
12    A.   So we -- as I mentioned earlier, the Winback
13 campaign was a -- was a promotion, so to speak,
14 irregardless of any outbound calling that we did.  It
15 was more of a marketing campaign to get people.  But
16 because we had this outbound function, we said, you know
17 what, that's -- that would be a great tool and great
18 courtesy to let people know that we have a 50 percent
19 discount if they want to come back on the challenge.
20    Q.   Okay.
21    A.   So it was an added component to an already
22 existing Winback campaign that we had done for a long
23 time, if that makes sense.
24    Q.   Sure.  So the idea for it and most of the
25 implementation of the Winback campaign would have come



Page 41

1 from the marketing side, but the actual calls would have
2 placed by your team?
3    A.  It's not -- sales and marketing would create
4 the Winback campaign because it was a sales driver.  So
5 you know, Guys, you want to get back on the challenge,
6 come back 50 percent off, fantastic.  You know, get back
7 on the challenge, get your goals back in line, 50
8 percent off, amazing deal.  So that campaign went -- and
9 the avenue of that was, you know, e-mail, social, those
10 types of things, right.  And we had a lot of success
11 with that.
12        So then you have, Oh, you know what, how
13 can we -- how can we extend that courtesy even further
14 so more people are aware of it because, you know, we got
15 feedback from people that, I didn't know that was
16 Winback campaign.  50 percent off?  I would have done
17 that.
18        So since what we had team calling
19 declines, let's have a portion of them also enhance this
20 already existing campaign that we have and call people
21 as well to let them know.
22    Q.  Okay.
23    A.  So that's the full enchilada.
24    Q.  Got it.  And the fuel kit upgrade, same story
25 or more focused on your team rather than sales and

Page 42

1 marketing?
2    A.  The fuel kit upgrade was -- pretty much all
3 these things we used all forms of communication that
4 were feasible.  So we have a new fuel kit.  We're going
5 to put it on social.  We're going to communicate through
6 e-mail.  We're going to put it on our website.  And
7 then from the call we got -- we got down to, you know,
8 those -- the fuel kit was $150.
9        So we called people that were on the $100
10 -- whatever, the $125 kit and said, Hey, the fuel kit is
11 125 bucks, you can get this additional thing.  So it was
12 more focused but the same concept.  It's a broader
13 campaign and that was a way to focus into the
14 individuals to let them know that they may miss the wide
15 net.
16    Q.  Okay.  And then in terms of the creation of
17 these lists -- and I understand that you might not have
18 been involved at the very granular level, those phone
19 numbers and names of the people to be contacted, that
20 would have been pulled from a Visalus database?
21    A.  Yes.
22    Q.  Okay.  Visalus wouldn't have to go contact all
23 of its promoters and say, Hey, who are all of your down
24 line that should be contacted as part of this?
25    A.  No.

Page 43

1    Q.  Okay.
2        MS. ANCHORS:  Stewart, can we take a quick
3 restroom break?
4        MR. POLLOCK:  Absolutely.  Let's go off
5 the record.
6        (Break was taken from 10:53 a.m. to 11:03 a.m.)
7    Q.  (BY MR. POLLOCK)  So we were talking a little
8 bit before the break about using POM to dial phone
9 numbers as part of a variety of campaigns, including
10 Winback, fuel kit upgrades and cancelling credit cards,
11 right?  Do you remember that?
12    A.  Yes.
13    Q.  And I understand this might not be something
14 you know.  Do you have any understanding as to once that
15 specific campaign was started, whether all of the phone
16 numbers would be dialed on a specific list?
17    A.  I -- I don't know.  I mean, I -- yeah, I don't
18 know if every single number gets called or how that --
19 how that systematically works.
20    Q.  Okay.  And the people that would know that, who
21 would be the best person to ask?
22        MS. ANCHORS:  Objection, foundation.
23    A.  I mean, I think the intent is to call all the
24 numbers, but whether that happens or not, you may have
25 to talk to somebody at Avaya, you know the corporation.

Page 44

1    Q.  (BY MR. POLLOCK)  Okay.  Have you ever seen any
2 analytics reports from POM saying whether certain
3 numbers weren't called, whether certain calls failed?
4    A.  I have never seen anything personally, no.
5    Q.  Okay.  Do you -- are you aware of the existence
6 of that sort of analytics report about call campaign
7 success rates?
8    A.  Ask it again.
9    Q.  Sure.  You said you've never personally seen
10 that sort of a report.  And I'm asking whether you're
11 aware of their existence?
12    A.  What you're describing, it could be a lot of
13 different things.  But from my career and experience,
14 I'm aware that there are reports from -- you know, from
15 dialers that would breakdown, you know, the calls you
16 make and things of that, so...
17    Q.  Okay.  So there would be a report that would
18 say whether or not a call went through?
19    A.  Based on my --
20        MS. ANCHORS:  Objection, foundation.
21    A.  -- experience, I would assume so.  But I don't
22 know for sure because -- we were beta testing POM.  So I
23 don't know -- it was not -- we were one of the first
24 people to actually use it, so I have no idea if it
25 actually existed with that.



JUSTIN CALL Volume 1
LORI WAKEFIELD vs VISALUS

January 20, 2017
45–48

Page 45

1    Q.    (BY MR. POLLOCK)  Are you familiar with the
2    disposition codes that were used for various calls
3    placed by the outreach team?
4    A.    I'm familiar with the term "disposition codes."
5    Q.    Okay.  Do you -- have you ever seen say a list
6    of the various disposition codes?
7    A.    Specifically to Visalus?
8    Q.    Correct.
9    A.    I would assume I have, but I don't recollect a
10   specific time looking at them.
11        (Exhibit No. 2 was marked.)
12   Q.    (BY MR. POLLOCK)  You've been handed a document
13   marked as Exhibit 2.  Do you know what this document is?
14   A.    Based on the title, I would say it's Outreach,
15   Outbound Disposition Codes.
16   Q.    Okay.  Have you ever seen that before?
17   A.    Not the -- I may have, not that I recall.
18   Q.    Does this appear to be a document with the
19   various disposition codes used by Visalus during 2014?
20        MS. ANCHORS:  Objection, foundation.
21   A.    I don't see any codes on here, so it's kind of
22   an interesting document.
23   Q.    (BY MR. POLLOCK)  So where it says, for
24   example, number busy, that wouldn't be a disposition
25   code?

Page 46

1        MS. ANCHORS:  Objection, foundation.
2    A.    I mean, I don't understand the question.
3    Q.    (BY MR. POLLOCK)  Sure.
4    A.    This is a -- this -- I'll just speak to this.
5    This is -- looks like a list of potential outcomes of
6    telephone calls.
7    Q.    Okay.  And then you said there weren't any
8    codes on here, but what did you mean by that?
9    A.    I mean, it's in plain English.  I don't see any
10   number -- numerical -- you know, things assigned to it
11   or codes.  When I hear a code, I'm thinking it's going
12   to be a list of like number busy, 2516.
13   Q.    Okay.  So you would expect to see this line up
14   with some sort of code that you could then enter into a
15   spreadsheet that would reflect something like number
16   busy?
17        MS. ANCHORS:  Objection, form.
18   A.    I mean, it says "codes," so that's -- when I
19   hear that, I'm looking for something more than just
20   this.  This looks like a list of dispositions.
21   Q.    (BY MR. POLLOCK)  Okay.  Do you know whether
22   the dispositions changed between 2012 and the end of
23   2015?
24        MS. ANCHORS:  Objection, foundation.
25   A.    I'm certain they did.  I don't know anything

Page 47

1    specifically, but just based on logic.
2    Q.    (BY MR. POLLOCK)  Okay.
3    A.    Go ahead.
4    Q.    What was the purpose of having disposition
5    codes or --
6        MS. ANCHORS:  Objection, foundation.
7    Q.    (BY MR. POLLOCK)  -- dispositions generally?
8        MS. ANCHORS:  Objection, foundation.
9    A.    Next question I guess?
10        THE WITNESS:  When you say --
11        MS. ANCHORS:  You can answer to the extent
12   that you know.
13        THE WITNESS:  Okay.
14        MS. ANCHORS:  That you understand the
15   question.
16   A.    Can you repeat it?  Sorry.
17   Q.    (BY MR. POLLOCK)  Sure.  What's the point --
18   what's the purpose of having dispositions or disposition
19   codes when you're placing an outbound call campaign?
20        MS. ANCHORS:  I'm going to object based on
21   foundation.
22   A.    To characterize the outcome of that call.
23   Q.    (BY MR. POLLOCK)  Okay.  So you want to know
24   sort of in a uniformed way what happened with a call,
25   for example, whether when you placed the call, the

Page 48

1    number was busy or whether the person who received the
2    call hung up, right?
3    A.    Correct.
4    Q.    So because of that, Visalus created a list of
5    dispositions or disposition codes to organize their
6    records about the outcome of each call, right?
7        MS. ANCHORS:  Objection, foundation.
8    A.    Every call center in the world has dispositions
9    to categorize the calls, that's -- so yeah, that's a
10   common practice to -- if you do something, then you
11   assign a description of what just happened, you know.
12   So I mean it -- to answer your question, that's common
13   practice to -- so that you have metrics of what
14   happened, you know what I mean?
15        So Johnny called 100 calls and you, know,
16   22 of them were busy, where everybody else had two busy.
17   So then you can go, Oh, there's something wrong with
18   Johnny because he had 22 percent busy, and everybody
19   else had two, so these a common thing.
20   Q.    (BY MR. POLLOCK)  And that's something Visalus
21   did, right?
22   A.    Yes.
23        MS. ANCHORS:  Objection, foundation.
24   Q.    (BY MR. POLLOCK)  So you would be able to look
25   at a record of a specific call and figure out from the



Page 49

1  disposition code whether the number was busy or
2  generally, from that disposition, figure out the
3  outcome?
4          MS. ANCHORS:  Foundation.
5      A.  To the extent that the employee dispositioned
6  it correctly.
7      Q.  (BY MR. POLLOCK)  Yeah.  Subject to human
8  error --
9      A.  Correct.
10     Q.  -- the record of a call would reflect its
11  outcome via its disposition code?
12     A.  In theory, that's the idea of a disposition,
13  yes.
14     Q.  Okay.  And the difference between the theory of
15  it and the practice of it is that sometimes humans make
16  mistakes; is that right?
17     A.  To the best of my knowledge, yes, humans make
18  mistakes, absolutely.  And humans cheat and do it wrong
19  and mislead and all those other things in a call center.
20  You know what I mean?  Somebody could -- like I said,
21  they don't want to say they got a no, so they put it as
22  busy, you know, every time.
23     Q.  But more likely than not, the disposition codes
24  would be correct?
25     A.  That's a hard question to answer, but overtime,

Page 50

1  statistically, the dispositions are going to tell you if
2  there may be a problem from a performance standpoint
3  over time because you're going to be able to look and
4  compare, you know, over all the other employees.
5          Like the example I gave you.  If Johnny
6  has 22 percent busies, everybody else has two percent,
7  there may be a problem with Johnny and how he's
8  dispositioning calls.
9      Q.  Okay.  But if you were to look at a list of
10  disposition codes, would you expect most of them to be
11  right?
12         MS. ANCHORS:  Objection, foundation, form.
13     A.  What I'm saying if I looked at -- if a looked
14  at a summary of dispositions, I would be able to
15  statistically tell if an individual is perhaps -- if
16  there may be an issue or something.  It's a performance
17  metric; it's a way to look and see if something's
18  outside the norm.
19     Q.  (BY MR. POLLOCK)  Okay.  It's useful definitely
20  for looking at individual performance, I get that.
21  Isn't it also useful for looking at the campaign
22  performance?
23     A.  Sure.  I mean if -- from campaign to campaign,
24  it's a way to establish a track -- a track record of a
25  campaign.  You know, so I mean but -- it's meaningless

Page 51

1  in and of itself because if you get 50 percent of the
2  numbers are busy on a campaign, you may think that's
3  weird, but maybe that's the reality of that particular
4  campaign.  If you do another campaign and there's only
5  one percent busy, then you might go, that's strange.
6  It's just a means to say -- to look further into
7  something, so -- just like any profession.
8      Q.  Well, I would expect that most of them would be
9  right because I would anticipate that -- I mean you
10  mentioned that sometimes somebody might lie to make
11  their numbers look better?
12     A.  Right.
13     Q.  But I would expect that to be the minority.
14         MS. ANCHORS:  Objection, form.
15     A.  I would expect that, but I don't know what
16  you're trying to -- you know, it's a common practice to
17  track what you do; that's what dispositions are.  And if
18  somebody was misleading in what they do, you know, a
19  human is misleading then you would -- if you're looking
20  at the numbers, you would expect to be able to determine
21  that at some point.
22     Q.  (BY MR. POLLOCK)  But you would expect that
23  more or less than half of people are misleading when
24  they input their numbers?
25         MS. ANCHORS:  Objection, form,

Page 52

1  foundation --
2      A.  I have no idea --
3          MS. ANCHORS:  -- asked and answered.
4      A.  -- how to answer that.  Dispositions are there
5  to track the results of calls, that's what they're there
6  for.
7      Q.  (BY MR. POLLOCK)  I'm just trying to figure out
8  whether they're reliable in doing that.
9          MS. ANCHORS:  Objection, foundation.
10     A.  It's what we have.  It's what every call center
11  has is that.
12     Q.  (BY MR. POLLOCK)  It's the best tool we have?
13     A.  It's the best thing we have.  There's
14  automatic -- it's just a -- it's a longer discussion,
15  but I mean, there's -- automatically there's sit tone
16  detect.  You know, the system can automatically tell if
17  it was an invalid number.  There's all kinds of complex
18  things you can do that you can -- just like anything,
19  you can do -- take out the human error on certain points
20  of it.
21          But at the end of the day, there's going
22  to be certain dispositions that a human is going to have
23  decide if that it was right one.  Someone said French
24  speaking call only -- if somebody answers the phone in
25  Russian and I don't know Russian so I think it's French,



1 right, so -- but yes, this is the way that a call center
2 tracks their calls.
3     Q.   And Visalus tracked its calls and their
4 outcomes prior to starting to use POM, right?
5         MS. ANCHORS:  Objection, foundation.
6     A.   There wasn't -- didn't exist to be able to have
7 a way to select dispositions prior to that, no.
8     Q.   (BY MR. POLLOCK)  Okay.
9     A.   So it would be like tick marks and manual type
10 of things, so...
11     Q.   Okay.  So if there's a spreadsheet with
12 disposition codes, that would have been after you
13 started using POM right?
14     A.   Not necessarily.  It's all how you characterize
15 it.  I mean, you can say you're dialing manually and
16 here's the list of the -- we want you to put a tick mark
17 next to each of these things right here that happened.
18 So in theory that's a disposition as well.  A
19 disposition code would be a number assigned to a
20 disposition -- disposition codes on the these.  So you
21 can have a list of dispositions and manually track them
22 as well with tick marks.
23     Q.   All right.  I want to put a document up on the
24 projector.
25     A.   Okay.

1     Q.   Then the Bates number of this document is
2 Visalus_Wakefield 242.  Can you see that?
3     A.   Uh-huh.
4     Q.   Do you know what this is?
5     A.   Looks like a list of Visalus promoters and
6 their contact information.
7     Q.   All right.
8     A.   I'm assuming they're Visalus.
9     Q.   So it says customer type distributor, and the
10 second one here says Upreferred.  Is distributor -- is
11 that a promoter?
12     A.   Yes.
13     Q.   What's a Upreferred?
14     A.   Customer.
15     Q.   Okay.  So there's a way to distinguish between
16 customers and promoters on this spreadsheet, right?
17     A.   Based on what you're showing me there, it looks
18 like that's the case, yes.
19     Q.   And then here, there's a column that says
20 customer ID.  Do the customer IDs -- is there a way to
21 figure out whether customer ID is assigned to a promoter
22 or a customer?
23     A.   By looking at the number?
24     Q.   Let's start with that.
25     A.   No.

1     Q.   Is there any other way to figure out whether a
2 customer ID is assigned to a customer or promoter?
3     A.   Yes.
4     Q.   How is that?
5     A.   You would look it up in the database.
6     Q.   Okay.  If you look it up in the database, you
7 would see, for example, that 608425 is assigned to
8 customer type distributor?
9     A.   Yes.
10     Q.   Okay.  So the title of this spreadsheet is
11 PatriciaRottmann_Winback_JAN2015.  Do you have any
12 understanding as to what this spreadsheet would have
13 been used for?
14     A.   I mean, based on the title and the contents
15 you're showing me, I can certainly come to a conclusion,
16 yes.
17     Q.   Okay.  What conclusion would you come to?
18     A.   That this was a list of people underneath
19 Patricia Rottmann that are eligible for the Winback in
20 January of 2015.
21     Q.   Okay.  Is this a list that would have been
22 uploaded into POM and then dialed as part of a Winback
23 campaign?
24         MS. ANCHORS:  Foundation.
25     A.   No.  I mean, to my knowledge, I've never known

1 that we just uploaded a specific person's Winbacks.
2 This would have been something -- if I saw this, I would
3 say this is something I provided Patricia Rottmann for
4 her benefit.
5     Q.   (BY MR. POLLOCK)  And how would Patricia
6 Rottmann have contacted these people?
7         MS. ANCHORS:  Objection, foundation.
8     A.   How would she?  There's a phone number on the
9 spreadsheet.
10     Q.   (BY MR. POLLOCK)  Okay.  But you were never
11 involved in the creation of spreadsheets for purposes of
12 Winback campaigns, right?
13     A.   Not -- I didn't create spreadsheets for -- to
14 put on the dialer for -- to put on POM for the Winback
15 campaign.  I've been the recipient of spreadsheets to
16 send out to leaders so they could go after their own
17 Winbacks, which is what this looks like to me, based on
18 the title.  So you know, somebody gives me -- here's
19 Patricia Rottmann's eligible list of Winback, I would
20 e-mail that to Patricia say, Hey Patricia, here's all
21 your people that are eligible for the Winback and then
22 she knows who they are.
23     Q.   Okay.  Was that part of Visalus' practice was
24 to send out --
25     A.   Uh-huh, yes.  Not just -- sorry.  Go ahead and



Page 57

1 finish.  I don't want to get scolded.
2    Q.   Was it part of Visalus' practice to send out
3 contact lists for Winback campaigns to send those to
4 promoters?
5    A.   We would send out contact lists to leaders for
6 various campaigns or promotions, so they had the ability
7 to know who to contact, you know, specifically and
8 qualify for those promotions, yes.  Now, did we do that
9 specifically for this Winback campaign at this time?  I
10 can't -- you know, I can't tell you that.
11    Q.   And this spreadsheet tells you the last order
12 date for a particular individual, correct?
13    A.   Yes.
14    Q.   And Visalus regularly maintains records of an
15 individual's last order date?
16    A.   In our database, we have the ability to see
17 when the last time they ordered, yes.
18    Q.   And that's true of all your customers and
19 promoters?
20    A.   Yes.
21    Q.   And there's no disposition code in this
22 spreadsheet, right?
23          MS. ANCHORS:  Objection, foundation.  He
24 can't see the whole spreadsheet.
25    Q.   (BY MR. POLLOCK)  All right.  We can walk

Page 58

1 through the --
2    A.   I have no idea is the answer.
3    Q.   Let me see if there's a better way to do this.
4 So do you see this first column here labeled customer
5 ID?
6    A.   Yes.
7    Q.   The next column is labeled first name, last
8 name, customer type, address, address 2, city, state,
9 zip, country, language, phone, phone 2, enroll date,
10 last order date and hours behind Troy.  Are there any
11 other headers of columns that I did not read?
12    A.   You read all the ones that are visible.
13    Q.   And beyond the last header, hours beyond Troy,
14 it appears that the remaining headers are blank, right?
15    A.   As far as what you've shown me.  But I mean, it
16 could -- yeah.  I don't know what the purpose of the
17 question is, but obviously any spreadsheet can go to
18 infinity.  But the ones you read are the ones you read,
19 yes, I agree.
20    Q.   Okay.  And none of those would reflect a
21 disposition code, correct?
22    A.   Not -- not the ones you just read.  You didn't
23 read disposition codes, so no, it doesn't.
24    Q.   Okay.  Would there be a specific category that
25 said disposition code?

Page 59

1    A.   I don't know.
2    Q.   Who would know?
3          MS. ANCHORS:  Foundation.
4    A.   That's just a wide-open question.  It's not
5 necessarily relevant to the spreadsheet.  I mean, it
6 doesn't -- this is a contact list.  The contact list in
7 theory wouldn't have a disposition code.  It makes no --
8 it would make no sense to have a disposition code on a
9 contact list.
10    Q.   (BY MR. POLLOCK)  Where will you see a
11 disposition code?
12    A.   Just -- I mean, I don't know how the answer
13 that either.  You could see it on a report.  You can see
14 it on a computer screen.  You could see it on a
15 printout.
16    Q.   Sorry.  You said you wouldn't see it on a
17 contact list?
18    A.   Right.
19    Q.   So I'm trying to figure out the right place to
20 look for it.
21    A.   A list of output from -- it would be output of
22 what you called and the result of that.  So it would be
23 results of calls, not a list of people you're going to
24 call.
25    Q.   How did Visalus maintain lists of output calls?

Page 60

1          MS. ANCHORS:  Objection, foundation.
2    A.   I don't understand the question.
3    Q.   (BY MR. POLLOCK)  I was trying to repeat back
4 the same language you used.  So you said that you would
5 see dispositions on a list of results of calls.  And I'm
6 trying to figure out how Visalus maintained those lists
7 of results of calls.
8    A.   I don't know.
9    Q.   Who would know?
10    A.   Maybe George.  I mean, there's no -- you
11 don't -- the reason why you have it on a computer is so
12 you don't print out lists and spreadsheets every time.
13 So a list may not even exist.  It could be just in a
14 database.  That's the point of dialer system is you
15 don't have to have manual lists and spreadsheets and
16 papers; it's all in a database.
17    Q.   Okay.  So once an outbound call campaign was
18 started, how was the content of that campaign
19 determined?  So what sort of message was delivered for a
20 specific campaign?
21    A.   Are you asking about scripting?
22    Q.   Sure.  Let's start there.  Were scripts used
23 for the outbound call campaigns?
24    A.   Yes.
25    Q.   Okay.



Page 61

1    A.    Or talking points.

2    Q.    Who created those scripts?

3    A.    I mean, I certainly helped create some,
4    marketing -- I mean, it was a collaborative effort.

5    Q.    And there would have been scripts used for the
6    campaign whether it was a Winback campaign, a fuel kit
7    campaign or a credit card campaign, right?

8    A.    Yeah.  I always made a point of calling them
9    talking points because I didn't want to be robotic.  So
10   we would always try to provide talking points to every
11   campaign, yes.

12   Q.    Okay.  And the purpose of all those -- or
13   strike that.

14         What was the purpose of having those
15   talking points?

16   A.    To cover -- you know, to be consistent on what
17   you're talking about on the call and to give them
18   the things that are effective on that campaign.

19   Q.    And were all of those campaigns to promote
20   Visalus' products?

21         MS. ANCHORS:  Objection --

22   A.    No.

23         MS. ANCHORS:  -- foundation.

24   Q.    (BY MR. POLLOCK)  Okay.  Which ones were
25   promoting Visalus or Visalus' products?

Page 62

1    A.    Well, declined credit card -- we talked about
2    three campaigns, so declined credit card; your credit
3    card was declined, I need to get a new number for you.
4    So that wouldn't be really promoting Visalus or its
5    products.

6    Q.    Well, it's promoting the sale of Visalus'
7    products right --

8    A.    It is.

9    Q.    -- because if you don't have a valid credit
10   card, then the person can't buy the products, right?

11        MS. ANCHORS:  Objection, foundation, form.

12   A.    It's very administrative.  I mean, there's no
13   -- we're not calling saying, My gosh guys, this is an
14   amazing thing.  You know, it's like, sir, your credit
15   card declined, can I get a new one.

16   Q.    (BY MR. POLLOCK)  Okay.  But the example you
17   just gave, you know, the excitement about a new product,
18   that would be true of, say, a fuel kit upgrade, right?

19   A.    A fuel kit upgrade -- everything was so
20   everything was -- all the talking points were centered
21   around just being courteous.  You know, it was, Hey,
22   your monthly order didn't go through because your credit
23   card declined, we wanted to update that for you.  Hey,
24   guys, we want to know -- you're on the shape kit and we
25   came out with a new kit, a fuel kit, and we wanted to

Page 63

1    let you know about that because it's only $25 more and
2    you get this much more.  Winback, hey you came on the
3    challenge before, you know, you've -- you know, you
4    liked us and wanted to be a part of it before and you
5    haven't ordered in a while.  Now we're going you 50
6    percent off discount if you want to come back in the
7    challenge and meet -- go after the goals that you set
8    before.

9          So everything was done as a courtesy, you
10   know, to -- which of course, is if they go on the
11   products.  I mean, 50 percent off, we're not making much
12   money on that.  We're just giving them a courtesy call
13   to let them know about it.  So everything we tried to --
14   the way that we tried to give the talking points is all
15   to make it a service oriented call, service selling.

16   Q.    Yeah, I understand.  I think you're trying to
17   distinguish between a pushy sales call versus what
18   Visalus did which was offer products discounts on the
19   products that they -- that Visalus was selling, right?

20   A.    Well --

21   Q.    It was a courtesy in that it was, Hey, here's
22   50 percent off, you might not have known --

23   A.    On that specific campaign, right.

24   Q.    And that would be say a Winback, right?

25   A.    Right.  Like I said, declined credit card, the

Page 64

1    fuel kit was, Hey, we have a new kit, 25 bucks more, you
2    get this much more.  And the Winback was, Hey, if you
3    want to come back and get on the 90-day-challenge, you
4    can do it for 50 percent off from what you did before.

5    Q.    And then even with the credit card declines,
6    then you're giving a call saying, Hey, you tried to
7    order this but it didn't go through because your credit
8    card was declined, so you're not going to get it
9    unless --

10   A.    Right.

11   Q.    -- we can update your credit card information?

12   A.    Correct.

13   Q.    So looking at that spreadsheet we have, before
14   we were able to distinguish between promoters and
15   customers.  Is there a way to tell from Visalus' records
16   whether an account had been canceled?

17   A.    Sure.

18   Q.    How do you find out?

19   A.    You would have to look it up and look -- and
20   look in the database.

21   Q.    Okay.  But in Visalus' database there's an
22   indication on each account whether that account had been
23   canceled?

24   A.    Yes.  I mean, there's variety of different ways
25   that an account could be closed, canceled, deactivated,



Page 65

1 terminated, yes.
2    Q.  And all of those are indicated, right?
3    A.  Yes.
4    Q.  And that's true whether it's a promoter or
5 customer, right?
6    A.  Promoter for sure; customer, I don't recall.
7    Q.  Okay.  Would -- at least limiting it to
8 promoters for the time -- would it indicate when the
9 account became deactivated, terminated --
10    A.  Yes.
11    Q.  -- otherwise canceled?  There would be a date
12 of cancellation?
13    A.  Yes.
14    Q.  And there may be that information for customers
15 as well, but you're not sure?
16    A.  I mean, I would assume so on the customer.  I'm
17 just thinking because the customer, there's no business
18 center or anything, so if they just -- you know, if they
19 don't order anymore, they just don't order anymore.  But
20 I would imagine if there was like a formal cancellation
21 of a customer, it would probably be in there.
22    Q.  Okay.  There would at the very least be a
23 record of the last time they ordered?
24    A.  Yes.
25    Q.  So I want to show you another document that has

Page 66

1 the title 10-16 unsubscribes, confidential.  Have you
2 ever seen this document before?
3    A.  No.
4    Q.  Do you know what it is?
5    A.  I mean, just --
6        MS. ANCHORS:  Foundation.
7    A.  Yeah.  I mean, on the title -- I mean, I can
8 take an educated guess, but I've never seen it before,
9 so I don't know that for sure.
10    Q.  (BY MR. POLLOCK)  Okay.  Based on the title,
11 what do you believe it is?
12    A.  A list of unsubscribes.
13    Q.  What's an unsubscribe?
14    A.  It could be -- I mean, I'm assuming this is
15 Visalus list?
16    Q.  Well, I'll represent that Visalus' counsel
17 produced this to plaintiff, so my understanding would be
18 yes.
19    A.  Okay.  Just because there's nothing that
20 indicates that, so that's why I asked.
21        So under the assumption this is a Visalus
22 list, I would guess that this means they're unsubscribed
23 from -- you know, in each of this case, it's probably
24 unsubscribed from receiving calls.  But I have no way of
25 knowing that.  I've never seen the report.

Page 67

1    Q.  Have you ever seen the status unsubscribed?
2    A.  No.  Well, in what context?  I've certainly
3 seen unsubscribed.  I got Sports Illustrated and I
4 unsubscribed.  But in Visalus, I've never seen that in
5 the database.
6    Q.  Okay.  Do you know whether Visalus tracks -- so
7 I guess we've already established that Visalus tracks
8 individuals who cancel their accounts or promoters who
9 cancel their accounts, right?
10    A.  Yes.
11        MS. ANCHORS:  Objection, form.
12    Q.  (BY MR. POLLOCK)  Does Visalus track, to your
13 knowledge, people who contact Visalus and say, stop
14 calling me?
15    A.  There is an opt out of communication.
16    Q.  And that would be the tab -- sorry,
17 communications tab on Avaya net?
18    A.  Yeah, as far as the exact procedure, I'm not --
19 but there's the ability to opt out of being communicated
20 to, yes.
21    Q.  And you can -- or customers or promoter can go
22 on to an online portal through Visalus' website or
23 something secondary --
24    A.  Yes.
25    Q.  -- website associated with Visalus and indicate

Page 68

1 that they no longer want to receive calls?
2    A.  Receive communication.
3    Q.  Okay.  Are you aware of any other way of
4 tracking stop calling requests?
5        MS. ANCHORS:  Objection, foundation.
6    A.  I don't really understand the question.
7    Q.  (BY MR. POLLOCK)  So you've stated one way that
8 you might indicate to Visalus that you don't want to
9 receive communications, which is to go on the website?
10    A.  Uh-huh.
11    Q.  I'm asking whether you're aware of any other
12 ways that Visalus records individuals who have made that
13 indication?
14    A.  Yes.  In the dialer -- within the dialer,
15 there's the ability to say they don't want anymore
16 calls, and it would pull it from the dialer.
17    Q.  That would be a disposition code?
18    A.  Sure, yes.
19    Q.  Once Visalus started using POM, under what
20 circumstances, if any, would Visalus have placed
21 manually dialed outbound calls?
22        MS. ANCHORS:  Objection, foundation.
23    A.  I mean, there's 1,000 ways.  I have no idea how
24 to answer that.
25    Q.  (BY MR. POLLOCK)  Okay.  Under what



JUSTIN CALL Volume 1
LORI WAKEFIELD vs VISALUS

January 20, 2017
69–72

1 circumstances would Visalus have placed outbound calls
2 using POM?
3     A.   If it was part of the campaign that we
4 previously talked about.
5     Q.   Are there any other campaigns other than the
6 ones we talked about that -- where POM would have been
7 used?
8     A.   Where POM would have been used?
9     Q.   Yeah.
10     A.   There may be.  Nothing that comes to mind in my
11 head right now, so not to the -- not to my recollection.
12     Q.   Okay.
13     A.   Those are the three main ones that I can
14 recall.
15     Q.   What were the main ones -- sorry, the main
16 areas, the main campaign, circumstances where Visalus
17 would have manually dialed a call subsequent to
18 discovering POM?
19         MS. ANCHORS:  Objection, foundation.
20     A.   So you said -- you asked the main campaigns or
21 circumstances, so that's two very different questions.
22     Q.   (BY MR. POLLOCK)  Okay.  Let's separate them
23 out then.  What were the main campaigns where Visalus
24 would have manually dialed numbers?
25     A.   Once we had POM, I -- I'm not aware of -- I

1 mean, of a campaign that would manually dial.  It would
2 be -- that's the point of having it, so you don't have
3 to manually dial.
4     Q.   Okay.  What about circumstances after you've
5 had POM where you would have manually dialed numbers?
6     A.   I mean, there's a number -- tons of different
7 ways.  You're calling somebody back that had an issue.
8 You're -- I mean, you know, you got an e-mail and
9 somebody asked you to call them.  I mean, on my cell,
10 you know, I used 5, 6,000 minutes on my cell phone every
11 single month with Visalus because somebody needs to talk
12 to you about or, you know, you're going to invest.
13 There's countless ways that you're calling somebody on a
14 phone manually.
15     Q.   But those would be more one-off situations
16 rather than -- or in contrast to the larger scale of
17 campaigns that we've discussed?
18     A.   Once we had POM, I'm not aware of any organized
19 campaign that would be done manually, to my
20 recollection.
21     Q.   Because for -- if you're going to be calling a
22 lot of people, it's way more efficient --
23     A.   Exactly.
24     Q.   -- to use POM?
25         Let's talk about prerecorded messages.  Do

1 you understand what I mean by prerecorded message?
2     A.   A message that was recorded previously.
3     Q.   And then was sent to somebody over a telephone,
4 that would be the specific context --
5     A.   Okay.
6     Q.   -- that I'm looking at here.
7         Are you aware of whether Visalus ever used
8 prerecorded messages as part of its campaigns?
9     A.   I am aware, yes.
10     Q.   Okay.  When did Visalus begin using prerecorded
11 messages?
12     A.   I have no idea.
13         MS. ANCHORS:  Foundation.
14     A.   Yeah, I have no idea.  I mean, it would have
15 been during the time we had POM, that we were using POM.
16     Q.   (BY MR. POLLOCK)  Okay.
17     A.   When I say that, not at the beginning of using
18 POM.  I'm saying it would have been within the -- it was
19 in association with POM, for most part, that I'm aware
20 of.
21     Q.   Because it wouldn't make sense to manually dial
22 and --
23     A.   And play -- you know, a prerecorded messages,
24 yeah.
25     Q.   Whose decision --

1     A.   Well --
2     Q.   Sorry.  Go ahead.
3     A.   No, go ahead.  POM is not the only way to play
4 a prerecorded message, but as far as to my awareness and
5 any involvement, that would be what it was limited to is
6 the POM instance of that.  There's lots of different
7 things that do prerecorded messages.
8     Q.   Did Visalus use any of the other mechanisms
9 that you've identified?
10         MS. ANCHORS:  Foundation.
11     A.   I mean, we -- yeah, we've done voice casting
12 before, yes.
13     Q.   (BY MR. POLLOCK)  Okay.
14     A.   With -- it's basically just a message saying
15 your credit card declined, please contact us.
16     Q.   When did Visalus begin using voice casting?
17         MS. ANCHORS:  Foundation.
18     A.   I don't know.
19     Q.   (BY MR. POLLOCK)  Prior to beginning to use
20 POM?
21     A.   I'm not -- I don't know.  I mean, I just don't
22 know.  We used it with POM.  We just called it voice
23 casting, you know, it was with POM or with -- you know,
24 so that's just -- that was the terminology that we used,
25 voice casting.



## Page 73

1    Q.  Okay.  And then the prerecorded messages
2  whether they were sent via voice cast, POM or some
3  other --
4        MS. ANCHORS:  Form.
5    A.  And voice casting, I'm saying that's what I
6  called them with POM.
7    Q.  (BY MR. POLLOCK)  Got it.
8    A.  Like let's send a voice cast out through POM.
9    Q.  Okay.  So for the messages for the voice casts,
10  who created those messages?
11    A.  I can -- I mean, the only one I can recall
12  specifically was one that Blake -- Blake did about
13  registering for an event.  And I know we had -- I know
14  we had one for the declined credit cards, but I don't
15  recall who did that message.
16    Q.  Are you aware of any voice casts done in
17  conjunction with a Winback campaign?
18    A.  Not that I specifically recall.
19    Q.  Okay.  So I want to go ahead and play an audio
20  clip for you.
21    A.  Okay.
22    Q.  Let me restart that.
23        (Audio portion was played.)
24    Q.  (BY MR. POLLOCK)  Have you ever heard that
25  message before?

## Page 74

1    A.  No.
2    Q.  I guess just for the record, that file that
3  names Rachel Winback PR and customers dot (inaudible) --
4        THE REPORTER:  I'm sorry?  I couldn't hear
5  you.  Dot what?
6        MR. POLLOCK:  Dot W-A-V.
7    Q.  (BY MR. POLLOCK)  Have you ever heard any other
8  messages like that?
9    A.  You mean -- that exact message, no.
10    Q.  So I know you haven't heard that exact message.
11  What did that message sound like it was to you?
12    A.  A Winback.
13    Q.  Okay.
14    A.  No, I haven't heard any other recorded messages
15  like that.
16    Q.  All right.  Does that sound like a Winback
17  campaign message?
18    A.  I mean, yeah, obviously.
19    Q.  Okay.  Is that something that would have been
20  sent out via voice cast?
21    A.  I have no idea.
22    Q.  Okay.  How would you figure out how that
23  message was distributed?
24    A.  I don't know that that message was distributed.
25  Are you saying it was?

## Page 75

1    Q.  How would you figure out whether or not it was?
2    A.  I mean, that's -- I don't understand the
3  question.  I mean, I -- I mean, if you played a song
4  with me and asked the same question, I mean, how would I
5  know?  You know what I mean?  I hear -- I hear the
6  message.  I understand what the message is.  You're
7  asking me do I know if that was distributed or not.  I
8  don't know.  You know, we'd have to look at a system
9  administrator to see if that specific message or one
10  like that was deployed via POM or not.
11    Q.  Okay.  So you're -- what do you mean by system
12  administrator?
13    A.  Just somebody who does -- like George, you
14  know, somebody who knows the system that can look it up.
15  I have no idea if that was distributed through POM or
16  not.
17    Q.  Okay.
18    A.  That's not an employee -- you know, that
19  message is not from an employee.
20    Q.  Who's it from?
21    A.  Rachel Jackson.
22    Q.  Okay.  Are you aware of whether Visalus sent
23  out any voice casts relating to Winback campaigns?
24    A.  As a result of this case, I'm aware that we
25  have sent out some of those from the -- that the

## Page 76

1  promoters did.  I wasn't -- I wasn't aware of that prior
2  to this, that we did customized promoter recordings like
3  that.
4        (Exhibit No. 3 was marked.)
5    Q.  (BY MR. POLLOCK)  I've handed you a document
6  that's marked as Exhibit 3.
7        MS. ANCHORS:  Is it Exhibit 3?
8        THE REPORTER:  (Moves head up and down.)
9        MS. ANCHORS:  I thought we were on the 4
10  already.
11    Q.  (BY MR. POLLOCK)  Do you know what this
12  document shows?
13    A.  It appears to be a list of WAV files.
14    Q.  Do you know -- do you recognize any of the
15  names of these WAV files?
16    A.  I recognize some of the names contained within
17  the file names, yes.
18    Q.  Okay.  What do you mean by that?
19    A.  What I mean is Nick Sarnicola, I recognize that
20  name and others; Rachel Jackson, Kevin Merriweather and
21  certain employees.  Some I don't recognize.
22    Q.  Do you have any understanding about what
23  these WAV files would be?
24    A.  I mean, based on the names, I can come to an
25  educated conclusion.  But I don't know of a certainty of



JUSTIN CALL Volume 1
LORI WAKEFIELD vs VISALUS

January 20, 2017
77—80

Page 77

1  what they all are, but it looks like they're -- a WAV
2  file is an audio file.  And based on the descriptions, I
3  can make a guess on some of these what they are WAV
4  files of.
5      Q.   These look to be audio recordings of messages
6  for a Winback campaign?
7          MS. ANCHORS:  Objection, foundation.
8      A.   No.
9      Q.   (BY MR. POLLOCK)  Some of them are though,
10 right?
11         MS. ANCHORS:  Foundation.
12     A.   Some appear that potentially they are.
13     Q.   (BY MR. POLLOCK)  For example, Rachel Winback,
14 that would appear to be --
15     A.   Correct.
16     Q.   -- part of a Winback campaign?
17     A.   When it says Winback, that would appear to be,
18 yes.
19     Q.   Same for the last two,
20 Winback_Voice_case_With_Neon,
21 WinbackCustomerPromoterLuceroRecorded?
22     A.   I would guess that the ones that say Winback or
23 for that purpose, yes.
24     Q.   Are there any other files on here that you
25 expect to be associated with Visalus outbound campaign?

Page 78

1      A.   Well, I mean I would guess that all of them are
2  associated with Visalus if this, you know, if -- showing
3  this list and recognizing the people, yes.  I would
4  assume they all are -- have to do with Visalus.
5      Q.   Okay.  My question is a little bit more
6  specific than that about whether they're associated with
7  an outbound call campaign.  I know that Winback is one
8  type of outbound call campaign.  But I also understand
9  that, you know, you probably are much more familiar with
10 a broad range of outbound campaigns than I am?
11     A.   Uh-huh.
12     Q.   So for example, I don't know what --
13     A.   These all appear to be -- sorry.
14         MS. ANCHORS:  Let him ask the question
15 first, please.
16         THE WITNESS:  Yeah.
17     Q.   (BY MR. POLLOCK)  I don't know what NST 2015
18 is.  Do you know what that means?
19     A.   Yes.
20     Q.   What is that?
21     A.   National Success Training, 2015.
22     Q.   So those would have been, more likely than not,
23 calls placed to people regarding attending a National
24 Success Training, right?
25         MS. ANCHORS:  Objection, foundation.

Page 79

1      A.   You sound like you said they would most likely
2  not be.
3      Q.   (BY MR. POLLOCK)  Sorry.  I didn't mean to say
4  that.
5          THE WITNESS:  I think that's what he said.
6      Q.   (BY MR. POLLOCK)  Would you expect to file,
7  quote, NST 2015 followed by an individual's name to be a
8  recording of that person discussing National Success
9  Training in 2015?
10         MS. ANCHORS:  Objection, foundation.
11     A.   I would -- I would surmise that that would be
12 what it was.  But I have no way of knowing.
13     Q.   (BY MR. POLLOCK)  Okay.  And who would -- who
14 would receive such a message?
15         MS. ANCHORS:  Objection, foundation.
16     A.   I mean, I can guess.  I mean, but I don't
17 know -- I mean, I don't know.  I mean, I would -- Jason
18 O'Toole NST 2015, I would guess that people are on
19 Jason's team would receive a message to go to NST 2015.
20     Q.   (BY MR. POLLOCK)  How would you figure out who
21 received that message?
22     A.   I don't know.  You'd have to ask somebody -- a
23 technical person.
24     Q.   George Vary?
25     A.   He probably would.

Page 80

1      Q.   Is there anyone left at Visalus with any
2  technical expertise that could answer that question?
3          MS. ANCHORS:  Objection, foundation.
4      A.   I don't -- I have no idea.
5      Q.   (BY MR. POLLOCK)  Because George Vary is no
6  longer --
7      A.   No.
8      Q.   -- with Visalus?
9          Is anyone else from his team still around?
10     A.   He didn't have a team.  He was an individual
11 contributor.
12     Q.   Do you know where he is now?
13     A.   No.
14     Q.   All right.  So if NST refers to National
15 Success Training, let's see, what are the other file
16 types we have here?  EOM, that's an end-of-month blast;
17 is that right?
18     A.   Yes.
19     Q.   What would an EOM blast -- what would its
20 purpose be?
21         MS. ANCHORS:  Objection, foundation.
22     A.   My guess is it would be like, Hey, guys, it's the
23 end of the month, let's rock and roll, you know, let's
24 get it done.
25     Q.   (BY MR. POLLOCK)  That would get a message to



Page 81

1  promoters to try to encourage them?
2      A.  Like a rally call, just -- yeah, from a
3  promoter to a promoter.  Or it could be -- there's just
4  a -- it could be, Hey, guys, here's the end-of-the-month
5  details; the end of the month closes on midnight on
6  January 31st.  We're going clean up until the end of the
7  -- it could be an informative piece like that as well.
8      Q.  Okay.  RST, does that stand for Regional
9  Success Training?
10     A.  Yes.
11     Q.  There a file called POMR announce.  Do you know
12 what that POMR stands for?
13     A.  I don't.  I can imagine the P-O-M is POM, but
14 yeah, I don't know.  So with the R in there, I don't
15 know if -- maybe it doesn't stand for POM, I don't know.
16         (Exhibit No. 4 was marked.)
17     Q.  (BY MR. POLLOCK)  I've handed you a document
18 marked as Exhibit 4 which is another list of file names.
19 Do you recognize any of these file names?
20     A.  No.
21     Q.  Do you have any understanding about what they
22 might be?
23     A.  Sure.  I mean like the declines, those I
24 would -- those are the ones I'd recognize like that's
25 the decline list from those -- because our autoship's on

Page 82

1  the 5th, 12th and 19th.
2      Q.  Okay.
3      A.  So I understand those.
4      Q.  Some of them say call blast and some of them
5  say decline and others say final run; is that right?
6      A.  Yes.
7      Q.  What's a final run?
8      A.  I don't know.  I mean, I can guess, but I don't
9  know.
10     Q.  What's a decline?
11     A.  A declined credit card, as we've discussed.
12     Q.  Okay.  What's a call blast?
13     A.  I mean, I don't know what -- I know what a call
14 blast is.  In this -- like I already mentioned, I don't
15 know what these files are except for the 5th, 12th and
16 19th I can guess.  A blast would be you send out a
17 blast, and I would imagine it's -- it might be -- yeah,
18 I mean I -- I would think the declines are the people
19 you're going send a blast out that your card declined.
20     Q.  Okay.
21     A.  I don't know what a separate file blast is.
22 It's probably just semantics of what they titled it
23 because July 12th -- or July 19th blast.  You could make
24 a guess that would be the July 19th declines and call
25 blasts to them.

Page 83

1      MR. POLLOCK:  Let's go off the record.
2      (Break was taken from 12:09 p.m. to 12:38 p.m.)
3      Q.  (BY MR. POLLOCK)  Earlier today, we were
4  talking about disposition codes and how to figure out
5  the result of a call.  So I want to show you a document
6  and the file name is April2015_WinbackP20.  I guess
7  first off, do you have any understanding about what that
8  file name would refer to?
9      A.  Winback in April.
10     Q.  Okay.  And the P20 portion of the name?
11     A.  I don't know.
12     Q.  Okay.  So here is the document and this is a
13 spreadsheet.  Can you see that all right?
14     A.  Uh-huh.
15     Q.  So the first column says ID, and that would
16 refer to the customer or promoter ID?
17     A.  I don't know.  It's a little bit different
18 format, so I don't know if that's the case or not.  It
19 could be a call -- some sort of a call ID based on
20 looking at there's dispositions attached to it.
21     Q.  And when you say "there's disposition attached
22 to it," that's the column entitled reason?
23     A.  I'm making an assumption.
24     Q.  Okay.  These look like dispositions that
25 Visalus would use for dispositioning a call, right?

Page 84

1      MS. ANCHORS:  Objection, foundation.
2      A.  Yeah, they look like dispositions that a call
3  center would use.
4      Q.  (BY MR. POLLOCK)  Is the first one here says
5  answering machine, that's a disposition code that is
6  pretty intuitive, right?  That would be if the call goes
7  to an answering machine?
8      A.  Correct.
9      Q.  Then there's no answer in the second
10 disposition, which I would also understand would be
11 pretty intuitive, right?
12     A.  Yes.
13     Q.  So based on this, it looks like there are
14 records saved by month and year and campaign type here;
15 April 2015, a Winback campaign.  And the spreadsheet
16 then would indicate the results of calls by disposition,
17 right?
18     A.  I mean, that appears -- at least at a point in
19 time this was pulled the result of a series of calls is
20 what this appears to me to be.
21     Q.  What is disconnected by user?  That's a
22 disposition here in Column D, Row 20 of this file.  What
23 does that refer to?
24     MS. ANCHORS:  Objection, foundation.
25     A.  I don't know.  I could guess, but I don't



Page 85

1  really -- doesn't really make sense, so I don't know.
2     Q.  (BY MR. POLLOCK)  You don't think that that
3  makes sense as a disposition?
4     A.  I mean, there's dispositions that are very --
5  that are out of the box for, like, across the board for
6  call center.  So I imagine that might be a sit tone
7  detect that's says that, you know, at the request of the
8  caller this phone was -- something like that.
9     Q.  Okay.  Have you ever worked in a call center
10  other than your role in supervising the call center for
11  Visalus?
12     A.  Yes.
13     Q.  Actually you weren't the supervisor, but --
14     A.  Right, yes.
15     Q.  When did you work in a call center?
16     A.  I've been involved in call centers for 20
17  years.
18     Q.  Okay.  So you're familiar then with the various
19  dispositions that you may have for --
20     A.  Yes.
21     Q.  -- calls?
22         In this file then, it just has phone
23  numbers listed as 1 for everyone.  Does that make any
24  sense to you?
25         MS. ANCHORS:  Objection, foundation.

Page 86

1     A.  I mean, I know -- I mean, it doesn't just say
2  phone number.  If you read the whole thing, then it
3  actually makes sense.
4     Q.  (BY MR. POLLOCK)  It says phone number country
5  code?
6     A.  Right.
7     Q.  So this would be referring -- which this lists
8  then would be is pulling any calls to the U.S., right,
9  because that -- U.S.'s country code is 1?
10     A.  U.S.'s country code is 1.  Doesn't mean they
11  pulled calls only for U.S., but based on this, all these
12  calls are the U.S.  But the fact that it has a call in
13  there would seem to indicate that it possibly could have
14  other country codes.
15     Q.  All right.  It looks there are about 2777
16  entries in this file.  Is that what you're seeing as
17  well?
18     A.  Uh-huh.
19     Q.  Sorry, can you give a verbal response?
20     A.  Yes.  I was waiting for you to go back up to
21  answer.  I wanted to see how many rows are in the
22  heading.  Yes.
23         (Exhibit No. 5 was marked.)
24     Q.  (BY MR. POLLOCK)  All right.  I want to have
25  this document marked as Exhibit 5.  This is another

Page 87

1  printout of a list of file names.  Are you familiar with
2  the various file names that are listed here?
3     A.  Some.  I mean, not -- I mean, I'm familiar --
4  the names, I could guess what some of these are.
5     Q.  All right.  Which ones -- which ones look
6  familiar to you or could you describe what they are?
7     A.  Well, the first one looks like a 2014 Winback
8  master list, which I would imagine is everything.
9     Q.  You'd expect that to have the entire year's
10  worth of WinBacks?
11         MS. ANCHORS:  Objection, foundation.
12     A.  It's a snapshot in time that somewhere in 2014
13  I would imagine this was people eligible for Winback.
14  Just logical, I mean, Spanish speaking cue 1, 2014
15  Winback, French speaking.  I mean, so the ones that are
16  self-explanatory I'm familiar with.
17     Q.  (BY MR. POLLOCK)  The ones that say Winback are
18  contact lists for Winback campaigns, right?
19         MS. ANCHORS:  Objection, foundation.
20     A.  I would assume to the best of my knowledge,
21  but...
22     Q.  (BY MR. POLLOCK)  Anything on here that's not a
23  Winback?
24         MS. ANCHORS:  Objection, foundation.
25     A.  The titles seem to -- the file names seem to

Page 88

1  indicate that they're all related to Winback based on
2  the file names.
3     Q.  (BY MR. POLLOCK)  Okay.  And any Winback
4  campaign that was conducted after POM became operational
5  would have been run through POM, right?
6         MS. ANCHORS:  Objection, foundation.
7     A.  To -- that's -- logically that's what I would
8  assume, yes.
9     Q.  (BY MR. POLLOCK)  Because it wouldn't make
10  sense to try to manually dial --
11     A.  Right.  Unless you had like, you know, somebody
12  had ten names or something, you know.  But -- but I want
13  to say these are files that don't necessarily mean
14  they're for POM though.  These don't -- nothing here
15  says they're for POM, they're just data -- they're Excel
16  files of Winback communication lists.
17     Q.  Okay.  Do you know whether Visalus titled --
18  strike that.
19         You said these files don't necessarily
20  indicate that they're for POM.  Are there files that in
21  their name would indicate that they were for POM?
22     A.  Not that I'm aware of.
23     Q.  Okay.  So I want to put this document next to
24  earlier the exhibit that I showed you with the audio
25  file names.  Do you recall that?



Page 93

1  never gave promoter any list of people that weren't in
2  their own downline.  We would never give a list to a
3  promoter of people they don't already have access to, if
4  that makes sense.
5     Q.   Okay.  Would you give a promoter a Winback
6  contact list?
7     A.   Yes.
8     Q.   Why would Visalus give a promoter a Winback
9  contact list rather than contacting those individuals on
10  their own?
11     A.   For the reason I said earlier is that if I --
12  if a call center agent calls you and says, Hey, we have
13  this great deal and you're like, Okay, whatever.  Or if
14  your friend calls you and says, Hey, you know, you did
15  this before, let's do it again, and I'll work with you,
16  which is more powerful; the person who you know or just
17  some call center agent?
18     Q.   When a contact list such as a Winback list was
19  provided to a promoter, would the promoter have access
20  to Visalus' Avaya system in order to --
21     A.   No.
22     Q.   -- use the Avaya system to contact the people
23  on that list?
24     A.   They would not.
25     Q.   Okay.  So turning back to Visalus Wakefield

Page 94

1  242, PatriciaRottmann_Winback_June2015.  I think you
2  said earlier this is a contact list that you believe
3  would have been provided directly to Patricia Rottmann?
4     A.   I didn't say that specifically.  I said this
5  appears to be a communication list for, as I said,
6  Patricia Rottmann's downline.  So that's -- and based on
7  the file title, that's what I -- the conclusion I came
8  to.  This would be a list of people in that promoter's
9  downline that are eligible for the Winback.
10     Q.   All right.  There are 6367 people on this list,
11  right?
12     A.   That's what it looks like, yes.
13     Q.   Patricia Rottmann was in Rachel Jackson's
14  downline right?
15        MS. ANCHORS:  Foundation.
16     A.   Yes.
17     Q.   (BY MR. POLLOCK)  How do you know that?
18     A.   I worked there for five and a half years.  I
19  know most leaders' hierarchy relationships.
20     Q.   Rachel Jackson was one of the top promoters,
21  right?
22     A.   She was one of our top leaders, yes.
23     Q.   And Patricia Rottmann was her mother, correct?
24     A.   Yes.
25     Q.   Do you know whether Visalus had any policy as

Page 95

1  to whether or not to contact individuals who canceled
2  their accounts?
3     A.   If we had a -- if we had a prior business
4  relationship with them, we would -- we felt that we had
5  the ability to call them and let them know about a
6  special.
7     Q.   Even if they canceled their account?
8     A.   Yes.
9     Q.   Okay.  Did that prior business relationship and
10  your belief that you could contact them -- was there any
11  temporal point at which you would feel it was no longer
12  okay to contact them?
13     A.   Please explain temporal.
14     Q.   Sure.  After a certain amount of time, so if
15  they canceled in 2007, January 1, 2007, then, you know,
16  a year later, is it still okay to contact them?
17     A.   As a general rule, we -- the newer WinBacks
18  were the more productive.  So we -- you know, we tended
19  to, you know, particularly as we learned more about the
20  Winback campaign what was most effective, then we tended
21  to just focus on the more recent ones, you know, the
22  three to -- three to six months, three-to-nine month,
23  you know, time frame because then you tend to -- they
24  don't remember who you are -- well, they know the
25  Visalus -- when you say the 90-day body challenge, they

Page 96

1  say, Oh yeah.  But we found, you know, the three to nine
2  months is more the sweet spot.
3     Q.   Okay.  So that wasn't exactly my question.
4        You said something to the effect of that
5  if you had an existing business relationship, you felt
6  you could contact people, even if they canceled their
7  accounts, right?
8     A.   I said if we had a previous business
9  relationship.
10     Q.   Okay.  How does cancelling your account affect
11  a previous business relationship?
12     A.   It doesn't affect a previous business
13  relationship.  There still is a previous business
14  relationship.
15     Q.   Okay.  But cancelling your account has no
16  impact on whether or not you're going to get a
17  subsequent call?
18        MS. ANCHORS:  Objection, foundation.
19     A.   I don't -- not -- I don't know.  I mean,
20  there's not -- I don't really know how to answer that.
21  If we -- if they're in our database and we have -- as a
22  courtesy, let them know they could do what they've
23  already done before for half price, we felt that was a
24  good reason to let them know.  And I answered your
25  question in the sense that you asked if there was any



Page 97

1  time frame where we kind of decided it was too long.
2  And through trial and error we've learned that, you
3  know, there's really no point in calling people past,
4  you know, that kind of three to six month without
5  ordering window?
6      Q.  If somebody hadn't ordered in a year, you
7  wouldn't contact them?
8      A.  I didn't say we wouldn't.  But we just -- I'm
9  saying that we -- you know, at first, we wanted to let
10  everybody know and then we started seeing like the
11  metrics that this group of people, they don't care
12  anymore, but this group does.
13      Q.  Okay.  So that's the sweet spot.  Is there any
14  point where -- and I pose this as a hypothetical -- a
15  year, you said you might still contact people after a
16  year.  Is there any point in which you definitely
17  wouldn't contact somebody?
18      A.  Well, and you're speaking in present tense now,
19  so we don't make phone calls for this at all and we
20  haven't for sometime.  So we don't call anybody.  We
21  only use e-mail campaign and social campaign which is
22  what we did before and what we've only been doing for
23  sometime after.
24      Q.  Okay.  So if we take it out of the present
25  tense and put it in the time when -- from 2012 to the

Page 98

1  end of 2015 when the outreach team existed?
2      A.  So it was a pretty short window of time.  So
3  wanted to try everybody because we wanted -- you know,
4  we wanted -- you don't get all the rates.  Your open
5  rates on e-mails are pretty small so you want to try to
6  reach more people because obviously it's good for the
7  company if people come back.  And it's good for them if
8  they can come back to do something they've purchased at
9  full price and come back and do it half price.  And we
10  quickly realized that the old ones don't -- aren't
11  productive, and we don't have enough people and enough
12  manpower to hit them all anyway, so we focused on the
13  more recent three-to-nine-month period.
14      Q.  Okay.  So when a campaign was started and
15  people were receiving calls, say a Winback campaign, do
16  you have any understanding as to what the first thing
17  that the call recipient would hear would be?
18      A.  I don't.
19      Q.  Okay.  Do you know what a Press One campaign
20  is?
21      A.  Yes.
22      Q.  What is a Press One campaign?
23      A.  It's -- if you Press One to be connected to a
24  live person now.
25      Q.  Is that typically how Winback campaigns were

Page 99

1  done?
2      A.  There was no typical, you know, just tried to
3  find the best -- best way to reach people.  Phone is a
4  tough -- is not what it once was to contact people, so
5  you just look for ways, you know, to reach people.
6      Q.  When did Visalus operate Press One campaigns?
7      A.  I -- I mean, during that time period with
8  the -- sometime in that small time period with POM.
9      Q.  Okay.  How would you figure out what the date
10  range is for a Press One campaign?
11      A.  I'd ask one of the technical people that could
12  probably tell you the first time that went live.  It was
13  a very short time.  It took a long time to get the
14  technology to work.
15      Q.  So I understand that the time line is generally
16  something as follows:  You started working at Visalus
17  2011, 2012 they started the outreach team?
18      A.  Uh-huh.
19      Q.  2013, 2014, you started using POM; is that
20  right?
21      A.  Yeah, somewhere in that range.  I don't recall
22  the POM dates exactly, but October 2012, we started --
23  got the Avaya for inbound and then, you know, some
24  ensuing date, we got POM up and running.
25      Q.  Okay.

Page 100

1      A.  You know, we can verify dates from somebody.  I
2  have no idea.
3      Q.  Okay.  And then at some point end of 2015,
4  beginning of 2016, the outreach team was eliminated?
5      A.  Yes.
6      Q.  So where on that date range would the Press One
7  campaign fall?
8      A.  It would have been more on the latter part of
9  it.
10      Q.  Okay.  Do you have any understanding as to how
11  long the POM campaigns began that it took to start doing
12  Press One campaigns?
13      A.  I don't recall.  It took -- it took sometime.
14  It was -- it wasn't out of the box.  It was something
15  that was customized to be able to do.
16      Q.  Okay.
17      A.  And again, the purpose of it was for the
18  declines, the declined credit cards, because all
19  throughout this, that's by far the biggest body of
20  people on a -- and most productive thing was just
21  renewing -- updating the credit card information.  So if
22  there's a problem with your account, Press One to be
23  connected and fix this now.
24      Q.  Okay.  Were Press One campaigns used for
25  anything other than declines?



Page 101

1    A.  I imagine so, but I don't recall exactly.
2    Q.  Okay.  Once Press One campaigns started being
3  used for -- once Visalus started conducting Press One
4  campaigns, were all campaigns conducted as Press One
5  campaigns?  Does that make sense?
6        MS. ANCHORS:  Foundation.
7    A.  I don't think so, but -- I don't think all
8  campaigns would be, no.
9    Q.  (BY MR. POLLOCK)  Okay.
10        MR. POLLOCK:  Can you mark that next in
11  order, please.
12        (Exhibit No. 6 was marked.)
13    Q.  (BY MR. POLLOCK)  All right.  The document
14  marked as Exhibit 6, have you ever seen this before?
15    A.  This specific document, not that I -- not to my
16  knowledge.
17    Q.  Okay.  Do you know who created it?
18    A.  No.
19    Q.  Do you know what it is?
20    A.  Well, it's -- it's kind of a -- not really an
21  org chart, but kind of an employee or organizational
22  summary of some sort.
23    Q.  When would this have been created?
24        MS. ANCHORS:  Foundation.
25    A.  I have no idea.  I mean, sometime -- I guess

Page 102

1  sometime probably in 2013 or 2012 just based on the
2  employees listed.
3    Q.  (BY MR. POLLOCK)  So that's what I was asking.
4  I understand you didn't create this, but you are aware
5  of, you know, when various people worked for you.  So --
6  and your estimate would be 2013?
7    A.  I mean, '12 or '13.
8    Q.  Okay.
9    A.  Probably '13.
10    Q.  Where did George Vary fit into the organization
11  of Visalus?
12    A.  He was in IT.
13    Q.  Was anyone else in IT?
14    A.  Dozens, tons.
15    Q.  Okay.  And today?
16    A.  Probably, I don't know, six or seven.
17    Q.  But none of those -- strike that.
18        Did any of those six or seven individuals
19  who remain in the IT department, did any of them work on
20  the Avaya system?
21    A.  I mean, lots of people touched it in some form
22  of another, you know, with -- whether it was, you know,
23  setting up the database in the -- the physical, you
24  know, thing on the facility or setting up a phone or
25  headsets of things of that.  But nobody -- I mean,

Page 103

1  nobody that I can think of that's -- you know, that was
2  directly -- George was the only person we ever had that
3  was directly Avaya.
4    Q.  If you wanted to pull something from POM today,
5  who in the IT department would you talk to?
6    A.  Darren.
7    Q.  What's Darren's last name?
8    A.  Seablom or whatever.
9    Q.  Okay.  Do you know how to spell that?
10    A.  S-E-A-B-L-O-M, Seablom.
11    Q.  And he's a Visalus employee?
12    A.  Yes.
13    Q.  Do you know whether he has plans to leave
14  Visalus in the next few months?
15    A.  You'd have to ask him.  I have no idea.
16    Q.  Okay.
17    A.  He's the director of IT, infrastructure, or IT
18  ops or whatever.
19    Q.  Okay.  Do you know whether there's a contact
20  for Visalus at Avaya?  Do you understand what I mean?
21    A.  Yes.
22    Q.  Okay.
23    A.  I would assume there's some sort of account
24  manager assigned to us.  But we only have four call
25  center agents, so it's not a real pressing need.

Page 104

1    Q.  You're probably not one of their top accounts
2  at this point?
3    A.  Good conclusion.  That's for sure.  At the time
4  when we got it, we had 3 or 400.
5    Q.  3 or 400 what?
6    A.  Call center agents.
7        (Exhibit No. 7 was marked.)
8    Q.  (BY MR. POLLOCK)  This document is labeled
9  Exhibit 7.  Again, this is a list of file names.  Are
10  you familiar with any of these file names?
11    A.  I mean, just in a general sense, I know what
12  CSV files are, but I'm not familiar with any of the
13  specific files.  I mean, I know what DNC generally
14  stands for -- unsubscribes, I can draw conclusion based
15  on logic and experience.
16    Q.  Okay.  What are your conclusions based on logic
17  experience and working at Visalus?
18    A.  Unsubscribes are people that probably
19  unsubscribe to something, and DNC would be somebody that
20  does not want to be called.
21    Q.  Okay.  You weren't involved in the process of
22  collecting or aggregating information about
23  unsubscribed --
24    A.  No.
25    Q.  -- accounts?  And that would be something that



Page 105

1 Visalus would compile from its own records, rather than
2 going around and asking each individual promoter, right?
3      A.   I mean, we have an opt in and a consent form
4 for them when they join Visalus so we can contact them.
5 And then we had a -- when we had a dialer that we were
6 calling them, we had the opportunity for them to opt out
7 of being called by the dialer -- or you know, by the
8 outbound team.
9      Q.   Okay.  And that would have been communicated
10 directly from a customer to Visalus rather than Visalus
11 needing to obtain that information from each promoter;
12 does that make sense?
13      A.   Well, I mean, I think you're asking the same
14 thing.  I mean, so if a -- if the end consumer, whether
15 customer or promoter, says don't call me anymore, then
16 we would -- we would capture that -- indicate that.
17      Q.   Okay.  That would all be one, sort of, common
18 file or database that Visalus would maintain?
19           MS. ANCHORS:  Objection, foundation.
20      A.   I don't know.  I know from -- on a -- as I
21 already mentioned, there's -- on the dialer, there's a
22 database that shows people on the dialer that have said
23 they do not want to be called again.
24      Q.   (BY MR. POLLOCK)  Okay.
25      A.   And then that was on the dialer.  Doesn't mean,

Page 106

1 like, if somebody wasn't on that dialer and they said it
2 on some other type of thing, it wouldn't go be put on
3 the dialer list.
4           MR. POLLOCK:  Why don't we go off the
5 record.
6           MS. ANCHORS:  Okay.
7      (Break was taken from 1:19 p.m. to 1:33 p.m.)
8           (Exhibit No. 8 was marked.)
9      Q.   (BY MR. POLLOCK)  Marking as Exhibit 8, have
10 you ever seen this document before?
11      A.   I may have, but it's pretty -- pretty common
12 type of thing for departments to have, but I don't know
13 if I've seen this specific one before, but...
14      Q.   Okay.  What does it appear to be to you?
15      A.   An Outreach Support Team Recognition Guideline.
16      Q.   Were these the guidelines that were in place
17 when you started the outreach support team?
18      A.   I mean, these were not given out of the box,
19 you know, when we started.  It was just started, you
20 know, with a couple people, you know, to start calling
21 the declines.  So I mean, this definitely would not have
22 been from day one, but probably came about at some point
23 after it started.
24      Q.   Okay.  And looking down at Roman Numeral 4, top
25 producer of the year award, the Roman 1, there are two

Page 107

1 asterisks, and it says, 2012 will be based on creation
2 date of the team, 6-4-2012?
3      A.   Uh-huh.
4      Q.   Do you understand that as referring to the
5 creation of the outreach support team as being June 4th,
6 2012?
7      A.   That's what it appears to be, yeah.
8      Q.   Is that consistent with your recollection?
9      A.   I knew it was in 2012.  I didn't know
10 specifically when.
11      Q.   Okay.  And then this document would have been
12 created sometime --
13      A.   After that point?
14      Q.   Correct.
15      A.   Yes.
16      Q.   There's a reference in a couple of places to
17 the 50K award.  What does that refer to?
18      A.   50K in production, so just measured as revenue
19 dollars, you know, saved through declines and -- or
20 which was the -- at this point in time, that was the
21 only thing they really did was that.  So it was
22 declines, recovering declines.
23      Q.   Okay.  So I just want to make sure I understand
24 how you count that.  So if somebody buys something and
25 their credit card is then declined and that purchase

Page 108

1 that was declined was $100, that would count toward this
2 50K total, correct?
3      A.   Correct.  If you look at Line 1A -- 1A, this
4 awards to the top agent who recovers the most dollars in
5 production.  So recovers means it existed and it went
6 away and you recovered it.
7      Q.   Okay.  So a purchase that was declined that --
8      A.   Correct.
9      Q.   -- is then later reaffirmed?
10      A.   Correct.
11      Q.   Okay.  What does a triple crown winner refer
12 to?
13      A.   It would appear that they were a top producer
14 of the month, also got the outstanding service and
15 excellence award and got a 50K award.  So anybody that
16 achieved all three of those things during the course of
17 the year would be eligible for the top producer of the
18 year.
19      Q.   Okay.  So I understand this document is from
20 2012.  Did these guidelines and awards generally
21 continue after 2012?
22           MS. ANCHORS:  Objection, foundation.
23      A.   No.  I mean, they -- I mean, there was always
24 some sort of awards and recognition, but they change all
25 the time with the business.



Page 109

1  Q.  (BY MR. POLLOCK)  Okay.
2  A.  And across all aspects of the business.
3  Q.  But throughout 2012 through 2015 and 2016, the
4  awards would have been generally for the same reasons,
5  for example, for bringing in 50K in recovered --
6  A.  No.  I mean, the -- the business changed.  I
7  mean, in 2012 we did 624 million annual revenue in the
8  company, and in 2015, we did under 100 million.  So I
9  mean, the business changed in a lot of ways.  So I can't
10  tell you how far this extended or how close to this
11  continued through the end of it.
12  Q.  Okay.
13  A.  But I can say that across all departments in
14  the company, including this department, through the end
15  of it, we were always looking at ways to recognize and
16  award for performance.
17  Q.  Okay.  And one of the ways you recognize
18  performance is through sort of the hard numbers of
19  production?
20  A.  Through productivity, yeah.
21  Q.  In terms of the amount of dollars they're
22  bringing in in revenue or profits for the company?
23  A.  Correct, that was their job.
24       (Exhibit No. 9 was marked.)
25  Q.  (BY MR. POLLOCK)  Have you ever seen this

Page 110

1  document before?
2  A.  Not that I know of, no.
3  Q.  Do you know what it is generally?
4  A.  It looks like it says Team Guidelines and
5  Expectations, so just trying to understand the -- trying
6  to lay out the expectations for each employee in this
7  group.
8  Q.  Do you know who would have created this?
9  A.  Is there a date on this one?
10  Q.  I don't have a date, no.
11  A.  Then I have no idea.
12  Q.  Okay.  In the bottom left, it says total
13  dollars in production, total dollar average per hour,
14  quality scores.  Do you know what that refers to?
15  A.  Yes.
16  Q.  Okay.
17  A.  So total dollars in production, that would be
18  like Exhibit 8, like 50K, you know, like the total
19  overall in production that they achieved.  Total dollar
20  average per hour would be that divided by the number of
21  hours that you worked.  So in other words, if somebody
22  worked 50 hours in a week and got 50,000 and somebody
23  worked ten hours a week and got 50,000 that person is
24  more productive.
25       And the quality score is kind of the ying

Page 111

1  to that yang.  So it's based on productivity also
2  quality.  So you can't just get results at any cost.  We
3  want the right results.  So that's why we have the
4  quality so that the results are not just results, but
5  it's the right result.
6  Q.  How do you evaluate quality?
7  A.  There's a lot of different things.  But I mean,
8  it's just listening, making sure they're hitting the
9  talking points that they talked about earlier.  If
10  they're hitting the certain talking points that you
11  outlined their tone and the way they talk to a person
12  is -- you know, is pleasant and nice and you know, on
13  cue.  That they're -- that they're dispositioning the
14  calls, that their wrap time is -- wrap time is the
15  amount of time from ending one call to taking the next.
16  All those things are in line.
17       So it's the overall quality of the job,
18  not just the productivity.  So one thing with these guys
19  I always say is anybody can get results, but we want to
20  get the right results.  So that's kind of the balance.
21  Q.  In terms of evaluating the total dollars in
22  production, I understand that credit card decline
23  recovery is one component of that?
24  A.  Sure.
25  Q.  Are there other components?

Page 112

1  A.  Well, when the campaigns that we've spoken
2  about -- so there's recovery and then there's -- then
3  production would also be if I upgraded a fuel kit,
4  whatever that delta would be would go towards
5  production.  Or if I sold a Winback, whatever that
6  amount would be would also go towards production.
7  Q.  Okay.  Does the quality score take into
8  consideration that perhaps some of those are easier ways
9  to bring in revenue?
10  A.  The quality doesn't -- doesn't -- really has
11  nothing to do with whether it's easy or not, but it's
12  just how you do your job.
13  Q.  Okay.  I suppose I made an assumption that some
14  of those were easier ways to bring in revenue than
15  others.  Am I right about that?
16  A.  Yes, yeah, for sure.
17  Q.  Are the credit card declines the easiest way to
18  bring in revenue?
19  A.  Probably, yeah.
20  Q.  Okay.  Followed -- what would be second to
21  that?
22  A.  I mean, it's a guess.  But I mean, Winback
23  would probably be second.  Fuel kit -- I mean, it just
24  depends.  I mean, but somewhere Winback or fuel kit --
25  the reason why we did those campaigns on an ongoing

Page 113

1 basis is they were both productive. All three of those
2 campaigns were. If something's not productive we tend
3 to not try to do it.
4    Q.  That makes sense.
5    A.  Yeah. So both of those were -- and some people
6 were more, you know, were more inclined towards one
7 thing or another, you know, better at one thing or
8 another. So -- but declines were definitely easier
9 because it was recovery versus almost sales; two
10 different kind of mind sets.
11         (Exhibit No. 10 was marked.)
12    Q.  (BY MR. POLLOCK)  Have you ever seen this
13 document before?
14    A.  I'm fairly certain I have, yes.
15    Q.  Do you know what it is?
16    A.  It's the VI Support Team and it's PACE,
17 promoter and customer -- I don't remember what it stands
18 for, that's horrible. Promoter and -- yeah, anyway,
19 it's basically quality -- it's a quality document.
20         Promoter and Customer Experience, sorry.
21 I came up with the acronym and I've forgotten the name
22 of it.
23    Q.  Preeti Lorio and Miranda Oltesvig?
24    A.  Pretty good, yeah.
25    Q.  Were those both individuals who worked in the

Page 114

1 outreach support team?
2    A.  No, neither one did.
3    Q.  What was their role?
4    A.  If you -- if you go back to --
5    Q.  Page 4?
6    A.  Exhibit 6, you can see under training and
7 development, Preeti Lorio was the manager and Miranda
8 was a junior training specialist.
9    Q.  Okay. And at some point, based on Page 4, it
10 appears Preeti Lorio's title was PACE manager?
11    A.  Yeah. I mean, training -- it's the same thing,
12 just semantics.
13    Q.  Of the individuals identified on this document,
14 Page 4 of Exhibit 10, who still is employed at Visalus?
15    A.  Zorica.
16    Q.  That's it?
17    A.  That's it, yeah.
18    Q.  Did she play any role in the outbound or the
19 outreach support team?
20    A.  No. You can look at her -- structure and
21 commissions, it's not -- she's the back office paying
22 the commissions to the promoters.
23    Q.  How were the commissions calculated?
24    A.  Through -- it's through Exego (phonetic). It's
25 through the commission engine. It's programmed. It's a

Page 115

1 complex commission engine that does all the calculation.
2    Q.  Was there a set percentage that people would
3 receive?
4         MS. ANCHORS:  Objection, foundation.
5    A.  It's -- it's too hard to answer in one
6 question. It's not just do this, get this. It's do
7 this, get this, do this, do this. It's very complex.
8 It's a huge document.
9    Q.  (BY MR. POLLOCK)  It depends on like what rank
10 you are, what percentage you get; is that right?
11    A.  It's not just a percentage. There's -- I mean,
12 the easiest way to put it is it's the more sales volume
13 you do in your organization, then the more you get paid
14 on a very, very high level simplified way of putting it.
15    Q.  Sure.
16    A.  You know, in your organization below you.
17    Q.  I know you mentioned that you had worked
18 previously in a call center for the last 20 years or so?
19    A.  Uh-huh.
20    Q.  Have you worked for other multilevel marketing
21 companies before this?
22    A.  Yes.
23    Q.  Which ones?
24    A.  Max International.
25    Q.  What's Max International do?

Page 116

1    A.  It's a nutraceutical company. It's a
2 multilevel marketing product. It's nutraceutical based
3 in Salt Lake City.
4    Q.  Okay. Is your next job also multilevel
5 nutraceuticals?
6    A.  No.
7    Q.  If you turn to Page 7, it says outreach support
8 and inside sales. We've been discussing outreach
9 support all day, right?
10    A.  Correct.
11    Q.  Have we discussed inside sales at all?
12    A.  No. But we agreed in the beginning that we
13 would refer to it all as outreach support to clarify
14 terminology.
15    Q.  Okay. So we have been talking about things
16 that would fall within inside sales, I've just one
17 overarching term?
18    A.  Correct. So if you see here at the top,
19 outbound support, kind of the -- that's kind of what we
20 agreed on, outreach support, but outbound support,
21 semantics, but we agreed that that would --
22    Q.  Okay.
23    A.  -- cover all of it.
24    Q.  This document doesn't say when it was created
25 as far as I can tell. Do you see any indication as to



Page 117

1  when it was created?
2     A.  No.  I mean, just based on the employees on
3  Page 4, you know, we probably -- this was probably --
4  just kind of on the terminology with PACE and all that
5  kind of stuff, I'd say this was probably 2013, maybe
6  '14, but most likely '13.
7     Q.  All right.  What, if any, significant changes
8  would have happened after this was created until the --
9  when the outreach support team was terminated?
10         MS. ANCHORS:  Objection, form.
11    A.  I mean, everything's changed, so I don't really
12  know how to answer that.  None of these departments
13  exist.
14    Q.  (BY MR. POLLOCK)  Sure I'm --
15    A.  Half of them --
16    Q.  That's why I was limiting my question until the
17  end of January 2015.  But -- and I guess my question
18  was:  Was the outreach support team run and organized
19  more or less the same from 2013, 2014 when this was
20  created until the end of the outreach support team?
21    A.  I guess I still don't understand the question.
22  I mean, everything changed because we had -- our peak --
23  we had a lot more people doing it, and then it shrunk
24  down to a smaller group, and then we laid off everybody
25  that was in it.

Page 118

1    Q.  When was the peak?
2    A.  2000 -- well, the peak revenue wise was June of
3  2012.  As far as manpower wise, probably late 2012,
4  early 2013.  And then I think the first -- well,
5  actually, the first big lay off they had I think was in
6  October of 2013.  They laid off about 100 and something
7  people.  So somewhere in 2013 was when the employee
8  count started going down substantially.
9    Q.  Did the revenues go back up once you started
10  using POM to place outbound calls?
11    A.  No.  That was -- that was all during the -- the
12  revenues have never gone back up.  It went up like a
13  rocket ship and went down like a -- whatever you want to
14  pick -- falling star, asteroid, whatever, sinking ship.
15    Q.  Did the use of POM have any impact on the
16  revenue trajectory?
17    A.  No.  No, I mean -- well, it's hard to -- you
18  can really never characterize it because we were
19  straight up double digit compounded growth month over
20  month for, you know, consecutive -- I don't know how
21  many couple years and then gone down for the most part
22  since then.  So you know, there's really no pattern.
23  There's nothing to indicate what anything affected one
24  way or the other, if that makes sense.
25    Q.  Okay.  Turning to Page 16.

Page 119

1    A.  Got it.
2    Q.  It says, Meet Our Founders.
3    A.  I can arrange that if you'd like.  Meet Our
4  Founders.  It looks so inviting.
5    Q.  It does.  Who are -- can you identify these
6  individuals for me?
7    A.  Left to right, Nick Sarnicola, Ryan Blair,
8  Blake Mallen.
9    Q.  All right.  Then if you turn to Page 17, that's
10  a mini-biography of Ryan Blair, right?
11    A.  It appears to be, yes.
12    Q.  Okay.  Ryan Blair is still the CEO of Visalus,
13  right?
14    A.  No.
15    Q.  No?
16    A.  (Moves head side to side.)
17    Q.  What is his current role at Visalus?
18    A.  Founder and board member and advisor to the
19  CEO.
20    Q.  Who is the CEO?
21    A.  Nick Sarnicola.
22    Q.  When did that happen?
23    A.  I think the press release said officially
24  January, this month.  It was announced in December.  If
25  you Google it, there's a press release about it.

Page 120

1    Q.  Okay.  Do you know why that happened?
2    A.  Yeah.  Just a -- Ryan was the CEO for twelve
3  years, and they just wanted to change the direction.
4  There's a lot of, you know, reasons why you can
5  speculate on why.  But Nick's the network marketer and,
6  you know, if you want a network marketing company to get
7  back growing, who better to be the CEO than the
8  networker; that's kind of the high level logic.
9    Q.  That's his background -- Nick's background
10  is --
11    A.  Yeah.  He's the one that's now still driving
12  it.  And he left corporate and went to the field when
13  the company took off and so it was, you know, they had
14  to do something different.  So that's why they --
15    Q.  What you mean by that is that he was, at one
16  point, not only a founder but also part of the --
17    A.  They was chief sales officer in corporate.
18    Q.  And then when he went back into the field as a
19  promoter.  Right?
20    A.  Correct, as a nonemployee, founder.  You know,
21  and had obviously the equity tied to it, but not a --
22  but he was a 1099 employee -- or a 1099 promoter.
23    Q.  But now he's back to being on -- an employee as
24  an executive, right?
25    A.  Yeah.  He was announced as CEO.  As far as, you



JUSTIN CALL Volume 1
LORI WAKEFIELD vs VISALUS

January 20, 2017
121–124

Page 121

1 know, behind the scenes, how that's structured, I have
2 no idea.  But it was announced that Nick was now the
3 CEO.
4    Q.   Are you on the board?
5    A.   No.
6    Q.   So at bullet point 4, it notes in August 2011,
7 Ryan authored the number one New York Times best seller;
8 Nothing to Lose, Everything to Gain, How I Went From
9 Gang Member to Multimillionaire Entrepreneur.  Did you
10 read that book?
11    A.   Yes.
12    Q.   Did everyone at Visalus read that book?
13         MS. ANCHORS:  Objection, foundation.
14    A.   I have no idea.  I would say no, not everybody
15 at Visalus has read the book.
16    Q.   (BY MR. POLLOCK)  Okay.  And that would give
17 some indication as to when this document was created
18 because he has a subsequent book out, right?
19    A.   Yeah, but that didn't come out until just late
20 this year -- or '16.
21    Q.   From Rock Bottom to Rock Star?
22    A.   Correct.
23    Q.   Did you read that?
24    A.   I haven't read that yet.
25    Q.   All right.

Page 122

1    A.   I do have a signed copy of it though, so I plan
2 on reading it at some point, for the record.
3    Q.   In case your boss ever reads the transcript?
4    A.   Exactly.
5    Q.   Turning to the next page, Page 18, Blake
6 Mallen, is he still the CMO?
7    A.   No.
8    Q.   What's his current role?
9    A.   President.
10    Q.   Is that also part of the January 2017 --
11    A.   No.  That happened about a year ago.
12    Q.   Okay.  And then turn the Page 19, it's got Nick
13 Sarnicola listed as a global ambassador.  I understand
14 that that's no longer his title?
15    A.   Correct.  Let me reiterate that was announced
16 in the press release.  And as far as all the deal
17 structure, all the stuff -- I have no idea, that's
18 just -- so whether he's going to continue to be global
19 ambassador and CEO, I would imagine not, but I don't
20 know all the details of that.
21    Q.   Do you know whether that press release
22 identifies the various board members presently?
23    A.   I don't know.  I know it referenced -- there
24 was two of them.  Ryan put out one and then the company
25 put out one.  So yeah, there's two different -- the

Page 123

1 company one just, you know, announces that it came out
2 three weeks ago or so.
3    Q.   Okay.  I think we talked a little bit about
4 consent records earlier.  Do you recall that?
5    A.   Consent records?
6    Q.   Let's just circle back.  So when promoters sign
7 up to be promoters, they fill out a form, right, and
8 that can either be a physical form or an online form; is
9 that correct?
10    A.   Correct.  I mean, that's -- yeah.
11    Q.   And then the information from that includes, at
12 least in the online portal, then there's a tab that says
13 communication preference, right?
14    A.   Correct.
15    Q.   And that information then is for each
16 individual there, their communication preference --
17    A.   Yes.
18    Q.   -- is stored in a database maintained by
19 Visalus, correct?
20    A.   Yes.
21    Q.   So you could look at one of Visalus' databases
22 to figure out any specific individual's communication
23 preference, right?
24    A.   Correct.
25         MR. POLLOCK:  Okay.  I have no further

Page 124

1 questions at this time.
2         MS. ANCHORS:  I have no questions.
3         THE REPORTER:  We are off the record.
4         (End of Proceedings at 2:01 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



## Page 125

```
 1              CORRECTIONS AND SIGNATURE
 2  WITNESS: Justin Call        DEPOSITION DATE:  1-20-2017
 3  PAGE/LINE     CORRECTION         REASON FOR CHANGE
 4  _____
 5  _____
 6  _____
 7  _____
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15       I, JUSTIN CALL, have read the foregoing deposition
    and hereby affix my signature that same is true and
16  correct except as noted herein.
17
18                          _____
                            JUSTIN CALL
19                          CA# 3:15-cv-01857-BR
20  STATE OF TEXAS )
         Subscribed and sworn to before me by the said
21  witness, JUSTIN CALL, on this the _____ day of
    _____,  2017.
22
23                          _____
                            NOTARY PUBLIC IN AND FOR
24                          THE STATE OF TEXAS
25  My Commission Expires:  _____
```

## Page 127

```
 1  2017.
 2
 3                    Brandy Cooper
                      _____
 4                    BRANDY COOPER, CSR
                      Certification Expires 12-31-2018
 5                    Firm Registration No. 286
                      1700 Pacific Avenue, Suite 1000
 6                    Dallas, Texas  75201
                      (214) 257-1436
 7
 8
 9
10
11
12  Taxable cost of original charged to Plaintiff:
    $_____
13  Attorney:  Mr. Pollock
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 126

```
 1  STATE OF TEXAS )
 2       I, Brandy Cooper, a Certified Shorthand Reporter
 3  duly commissioned and qualified in and for the State of
 4  Texas, do hereby certify that there came before me on
 5  the 20th day of January, A.D., 2017, at 9:57 a.m., at
 6  the offices of Esquire Deposition Solutions, located at
 7  1700 Pacific Avenue, Suite 1000, in the City of Dallas,
 8  State of Texas, the following named person, to wit:
 9  JUSTIN CALL, who was by me duly cautioned and sworn to
10  testify the truth, the whole truth and nothing but the
11  truth, of knowledge touching and concerning the matters
12  in controversy in this cause; and that he was thereupon
13  carefully examined upon his oath, and his examination
14  was reduced to writing under my supervision; that the
15  deposition is a true record of the testimony given by
16  the witness.
17       I further certify that the witness has requested a
18  review pursuant to Rule 30(e)(2).
19       I further certify that I am neither attorney or
20  counsel for, nor related to or employed by any of the
21  parties to the action in which this deposition is taken,
22  and further that I am not a relative or employee of any
23  attorney or counsel employed by the parties hereto, or
24  financially interested in the action.
25       CERTIFIED TO BY ME on this 23rd day of January,
```

