# EXHIBIT "B"

# JUSTIN CALL DEPOSITION
# JANUARY 20, 2017

1          UNITED STATES DISTRICT COURT
                DISTRICT OF OREGON
2

3  LORI WAKEFIELD, on behalf of
   themselves and a class of
4  others similarly situated,

5       Plaintiff,                    No. 3:15-cv-01857-BR

6  V.

7  VISALUS, INC., a Nevada
   Corporation,
8
        Defendant.
9

10

11

12  **********************************************************

13          ORAL DEPOSITION OF JUSTIN CALL

14                  VOLUME 1

15  **********************************************************

16

17      ANSWERS AND DEPOSITION OF JUSTIN CALL, produced as

18  a witness at the instance of the Plaintiff, taken in the

19  above-styled and -numbered cause on the 20th day of

20  January, 2017, A.D., beginning at 9:57 a.m., before

21  Brandy Cooper, a Certified Shorthand Reporter in and for

22  the State of Texas, in the offices of Esquire Deposition

23  Solutions, located at 1700 Pacific Avenue, Suite 1000,

24  Dallas, Texas, in accordance with the Federal Rules of

25  Civil Procedure and the agreement hereinafter set forth.



```
 1                 A P P E A R A N C E S

 2   FOR THE PLAINTIFF:

 3         STEWART R. POLLOCK
           Edelson, PC
 4         123 Townsend Street, Suite 100
           San Francisco, California  94107
 5         (415) 212-9300
           spollock@edelson.com
 6
     FOR THE DEFENDANT:
 7
           SARAH R. ANCHORS
 8         Quarles & Brady, LLP
           One Renaissance Square
 9         Two North Central Avenue
           Phoenix, Arizona  85004-2391
10         (602) 229-5788
           sarah.anchors@quarles.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1                P R O C E E D I N G S

 2              THE REPORTER:  Are there any stipulations

 3  or agreements for the record before we begin?

 4              MS. ANCHORS:  No.

 5              MR. POLLOCK:  I don't think so.

 6              THE REPORTER:  Will counsel please state

 7  their names and whom they represent for the record.

 8              MR. POLLOCK:  Stewart Pollock on behalf of

 9  plaintiff.

10              MS. ANCHORS:  Sarah Anchors on behalf of

11  defendant.

12                    JUSTIN CALL,

13  having been first duly sworn, testified as follows:

14                     EXAMINATION

15  BY MR. POLLOCK:

16      Q.   Good morning, sir.

17      A.   Morning.

18      Q.   Would you please state your full name for the

19  record?

20      A.   Justin Call.

21      Q.   And have you ever been deposed before?

22      A.   Yes.

23      Q.   All right.  When were you deposed, most

24  recently?

25      A.   I don't know the exact dates, but probably a
```



1  there was a lot -- I don't know how detailed you want me

2  to get, but that was the primary purpose.

3      Q.   And that includes inbound and outbound?

4      A.   At the time, we only had inbound.

5      Q.   When was the -- is it called outreach support?

6  Is that the outbound call center?

7      A.   That was a terminology that they kind of came

8  up with, yes.

9      Q.   Okay.  When was the outreach team created?

10     A.   Best of my recollection, somewhere, I would

11 think, beginning of 2012.  Somewhere in that range.

12     Q.   And the outreach team was terminated in January

13 2016?

14     A.   If that's the information you have, I don't

15 recall exactly.

16     Q.   Okay.  Was it --

17     A.   I have no reason to dispute if you've got that

18 information.  I don't recall exactly.

19     Q.   Does that sound approximately right to you?

20     A.   Yeah, it sounds -- yeah, it sounds right.

21     Q.   Okay.

22     A.   If I were to guess, I would have thought it was

23 before then, like the end of 2015.

24     Q.   All right.  So in 2011, I understand that you

25 oversaw the call center which was inbound only at that



 1      Q.   Okay.  And that's a functionality within the

 2   Avaya system, correct?

 3      A.   No.  It's an addition.

 4      Q.   Okay.  So when you say "dialer," what do you

 5   mean by that?

 6      A.   It means instead of you having to push the

 7   buttons yourself, it can dial it for you.

 8      Q.   Okay.  And when did Visalus begin to use POM?

 9      A.   Boy, it took forever to get going.  I think it

10   was probably -- I just don't really -- it was probably

11   '14, I would think, maybe '13.  It took -- I'm thinking

12   it took -- might have been beginning of '14 by the time

13   it actually got going.  But I honestly don't recall it

14   if the -- yeah.

15      Q.   Okay.  What was the purpose of using POM?

16      A.   So you didn't have to dial the phone manually.

17      Q.   Okay.  Do you know when Visalus stopped using

18   POM?

19      A.   Just probably around the coincide of the time

20   we stopped doing outreach.

21      Q.   Okay.

22      A.   So somewhere end of whatever we decided -- end

23   of '15.  We may have even stopped using that beforehand.

24      Q.   Okay.  What sort of campaigns did Visalus use

25   POM for?



1    Q.   You're probably not one of their top accounts

2  at this point?

3    A.   Good conclusion.  That's for sure.  At the time

4  when we got it, we had 3 or 400.

5    Q.   3 or 400 what?

6    A.   Call center agents.

7         (Exhibit No. 7 was marked.)

8    Q.   (BY MR. POLLOCK)  This document is labeled

9  Exhibit 7.  Again, this is a list of file names.  Are

10  you familiar with any of these file names?

11    A.   I mean, just in a general sense, I know what

12  CSV files are, but I'm not familiar with any of the

13  specific files.  I mean, I know what DNC generally

14  stands for -- unsubscribes, I can draw conclusion based

15  on logic and experience.

16    Q.   Okay.  What are your conclusions based on logic

17  experience and working at Visalus?

18    A.   Unsubscribes are people that probably

19  unsubscribe to something, and DNC would be somebody that

20  does not want to be called.

21    Q.   Okay.  You weren't involved in the process of

22  collecting or aggregating information about

23  unsubscribed --

24    A.   No.

25    Q.   -- accounts?  And that would be something that



1  Visalus would compile from its own records, rather than

2  going around and asking each individual promoter, right?

3       A.   I mean, we have an opt in and a consent form

4  for them when they join Visalus so we can contact them.

5  And then we had a -- when we had a dialer that we were

6  calling them, we had the opportunity for them to opt out

7  of being called by the dialer -- or you know, by the

8  outbound team.

9       Q.   Okay.  And that would have been communicated

10 directly from a customer to Visalus rather than Visalus

11 needing to obtain that information from each promoter;

12 does that make sense?

13      A.   Well, I mean, I think you're asking the same

14 thing.  I mean, so if a -- if the end consumer, whether

15 customer or promoter, says don't call me anymore, then

16 we would -- we would capture that -- indicate that.

17      Q.   Okay.  That would all be one, sort of, common

18 file or database that Visalus would maintain?

19           MS. ANCHORS:  Objection, foundation.

20      A.   I don't know.  I know from -- on a -- as I

21 already mentioned, there's -- on the dialer, there's a

22 database that shows people on the dialer that have said

23 they do not want to be called again.

24      Q.   (BY MR. POLLOCK)  Okay.

25      A.   And then that was on the dialer.  Doesn't mean,



 1  company one just, you know, announces that it came out
 2  three weeks ago or so.
 3      Q.   Okay.  I think we talked a little bit about
 4  consent records earlier.  Do you recall that?
 5      A.   Consent records?
 6      Q.   Let's just circle back.  So when promoters sign
 7  up to be promoters, they fill out a form, right, and
 8  that can either be a physical form or an online form; is
 9  that correct?
10      A.   Correct.  I mean, that's -- yeah.
11      Q.   And then the information from that includes, at
12  least in the online portal, then there's a tab that says
13  communication preference, right?
14      A.   Correct.
15      Q.   And that information then is for each
16  individual there, their communication preference --
17      A.   Yes.
18      Q.   -- is stored in a database maintained by
19  Visalus, correct?
20      A.   Yes.
21      Q.   So you could look at one of Visalus' databases
22  to figure out any specific individual's communication
23  preference, right?
24      A.   Correct.
25              MR. POLLOCK:  Okay.  I have no further



# SCOTT GIDLEY DEPOSITION
# DECEMBER 12, 2016

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON

LORI WAKEFIELD, on behalf of
themselves and a class of
others similarly situated,

          Plaintiff,

     -v-                          No. 3:15-cv-01857-BR

VISALUS, INC., a Nevada
Corporation,

          Defendant.
_____/

PAGE 1 TO 219


          The deposition of SCOTT A. GIDLEY,

          Taken at 623 West Huron Street,

          Ann Arbor, Michigan,

          Commencing at 10:10 a.m.,

          Monday, December 12, 2016,

          Before Cheryl McDowell, CSR-2662, RPR.

Wakefield v. ViSalus
Scott Gidley                                    12/12/2016

Page 2

1    **APPEARANCES:**

2    MR. STEWART POLLOCK

3    Edelson PC

4    123 Townsend Street, Suite 100

5    San Francisco, California  94107

6    (415) 212-9300

7    spollock@edelson.com

8        Appearing on behalf of the Plaintiff.

9

10   MS. SARAH R. ANCHORS

11   Quarles & Brady LLP

12   One Renaissance Square

13   Two North Central Avenue

14   Phoenix, Arizona  85004-2391

15   (602) 229-5788

16   sarah.anchors@quarles.com

17       Appearing on behalf of the Defendant.

18

19

20

21

22

23

24

25

Wakefield v. ViSalus
Scott Gidley                                     12/12/2016

Page 5

1        Ann Arbor, Michigan

2        Monday, December 12, 2016

3        About 10:10 a.m.

4                    (Laun Exhibits Nos. 2, 3, and 4 previously

5                    marked and attached.)

6                        SCOTT A. GIDLEY,

7        having first been duly sworn, was examined and testified

8        on his oath as follows:

9    **EXAMINATION BY MR. POLLOCK:**

10   **Q.    Good morning, sir.  I introduced myself off the**

11   **record.  My name is Stewart Pollock, and I represent**

12   **the plaintiff in this case.**

13   **            Could you please state your full name for**

14   **the record?**

15   A.    Scott, S-C-O-T-T, Alan, A-L-A-N, Gidley, G as in

16        George, I-D as in David, L-E-Y.

17   **Q.    All right.  Have you ever had your deposition taken**

18   **before?**

19   A.    I have been deposed, yes.

20   **Q.    How many times have you been deposed?**

21   A.    Once.

22   **Q.    In what case were you deposed?**

23                    MS. ANCHORS:  You can answer the question.

24                    THE WITNESS:  Okay.  It was Connelly versus

25        ViSalus.

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Wakefield v. ViSalus
Scott Gidley                                    12/12/2016

Page 15

1        agents because of my knowledge of the company.  I
2        would generally advise them as to how to handle
3        incoming calls specific.  At that time if they were
4        having a problem with a phone call and were unsure of
5        how to proceed, I would advise them the best course of
6        action.
7    Q.  **So were you working in or closely with the call center**
8        **from August 2011 until approximately August 2012?**
9    A.  I was in the call center and technically I still am.
10       I do work in the Michigan office.
11   Q.  **Okay.  You say technically you still are.**
12                   **Is there a sense in which you're not still**
13       **in the call center?**
14   A.  I don't answer incoming phone calls any longer.
15   Q.  **You seem happy about that.**
16   A.  Someone needs to enforce the rules.
17   Q.  **And that's your job?**
18   A.  That is my job.
19   Q.  **In the call center, you've mentioned incoming calls.**
20                   **Does the call center place outgoing calls?**
21   A.  Not any longer.
22   Q.  **When did that change?**
23   A.  January of 2016 we dissolved our outbound team.
24   Q.  **Why was the outbound team dissolved in January 2016?**
25                   **MS. ANCHORS:**  Objection, foundation.

Wakefield v. ViSalus
Scott Gidley                                    12/12/2016

Page 16

1    BY MR. POLLOCK:

2    Q.   You can answer.

3              MS. ANCHORS:  You can answer to the extent

4         that you know.

5              THE WITNESS:  The company downsized.

6    BY MR. POLLOCK:

7    Q.   So that's more of an effect of dissolving the outbound

8         call center.

9              Do you know why the company downsized to

10        get rid of those call center employees?

11             MS. ANCHORS:  Objection, foundation.

12             THE WITNESS:  That's not in effect.

13   BY MR. POLLOCK:

14   Q.   Okay.  Do you know why the -- why ViSalus dissolved

15        the outbound call center and laid off or downsized

16        those employees?

17   A.   It wasn't those employees specifically.

18   Q.   What do you mean by that?

19   A.   The company downsized and released, terminated

20        employees in multiple departments.

21   Q.   Okay.  And they terminated the entirety of the

22        outbound call center department, right?

23             MS. ANCHORS:  Objection, form.

24             THE WITNESS:  The last vestiges I'll say.

25        The company had gone through many downsizing

Wakefield v. ViSalus
Scott Gidley                                    12/12/2016

Page 17

1       situations.

2   BY MR. POLLOCK:

3   Q.   All right.  Were any other departments terminated in

4        January 2016?

5                MS. ANCHORS:  Objection, foundation.

6                THE WITNESS:  Our social media department.

7        Multiple departments were affected.

8   BY MR. POLLOCK:

9   Q.   Who made the decision to dissolve the outbound call

10       center in January 2016?

11  A.   I don't know that answer.  I can guess.

12               MS. ANCHORS:  Please don't guess.

13               And I'm going to ask you to limit your

14       questions to what's in the 30(b)(6) topics.  We're

15       getting pretty far out of range of those.

16  BY MR. POLLOCK:

17  Q.   What's the highest level of education you've received?

18  A.   I have a Bachelor's degree in biology.

19  Q.   Where did you get your Bachelor's?

20  A.   Illinois Wesleyan University.

21  Q.   When did you get your Bachelor's?

22  A.   1991.

23  Q.   Do you have any additional professional licenses or

24       certificates?

25  A.   No.

Wakefield v. ViSalus
Scott Gidley                                          12/12/2016

Page 90

1   Q.   Only some agents had access to it?

2   A.   Yes.

3   Q.   And just so the record is clear, when I say POM, I'm

4        referring to Progressive Outreach Manager?

5   A.   Yes.

6   Q.   That's P-O-M?

7   A.   Yes.

8   Q.   You said that around October or December 2014

9        approximately, ViSalus started using POM to place

10       calls and report numbers, and you just described for

11       me the reporting side of that.

12                How was POM used to place calls?

13  A.   It has a database of phone numbers to be dialed.  So

14       depending on the actual campaign, those numbers would

15       have been imported.

16  Q.   So the database of phone numbers, that's something

17       that an agent would upload?

18  A.   Yes.

19  Q.   So an agent --

20  A.   Depending on the campaign.

21  Q.   Yeah.  Generally talking about, say, a winback

22       campaign, they might get -- they would get a list of

23       phone numbers uploaded into POM to be dialed?

24  A.   Correct.

25  Q.   Okay.  And then between October or December 2014 and

HURON REPORTING SERVICE
and Video Conferencing Center
Established in 1972
huron4deps.com
734-761-5328

Wakefield v. ViSalus
Scott Gidley                                    12/12/2016

Page 91

1      January 2016, were there any changes to how ViSalus

2      conducted winback campaigns?

3   A.   Yes.

4   Q.   Okay.  What was the next change?

5   A.   We stopped using the Progressive Outreach Manager at

6        the beginning of October in 2015.

7   Q.   Why was that?

8              MS. ANCHORS:  You can answer to the extent

9        that you know and it doesn't involve any

10       attorney-client privilege information.

11             THE WITNESS:  We received a lawsuit

12       notification.

13  BY MR. POLLOCK:

14  Q.   And in response to that lawsuit, ViSalus stopped using

15       POM in October 2015?

16             MS. ANCHORS:  You can answer to the extent

17       you know and it doesn't involve any attorney-client

18       privilege information.

19             THE WITNESS:  As far as I know.

20             MR. POLLOCK:  All right.  I think now would

21       be a good time to take a lunch break.

22             MS. ANCHORS:  I think so, too.

23             (Off the record at 1:34 p.m.)

24             (Back on the record at 1:55 p.m.)

25             MR. POLLOCK:  Back on the record.

Wakefield v. ViSalus
Scott Gidley                                    12/12/2016

```
                                                    Page 130
 1      some sort of check that was done on them.

 2                THE WITNESS:  Paragraph twelve doesn't --

 3      on Exhibit 6 doesn't indicate anything regarding cell

 4      phones.  It says phone, check phone numbers, slash,

 5      emails for DNC.

 6                MS. ANCHORS:  Right, right.  I understand

 7      that.

 8                I was asking in terms of when that sort

 9      of check was done, was there -- as I understand

10      Mr. Pollock's question is was there a check similar to

11      that that was also done in terms of whether or not it

12      was a cell phone number.

13                THE WITNESS:  And if it's not in Exhibit 6,

14      then the answer would be no.

15                But in terms of clarification of this

16      matter, there's no way for the company to know whether

17      a phone number that has been provided to us by a

18      customer or a promoter upon enrollment is a cell phone

19      number or a landline or a business number.

20                And if that is the situation, these are our

21      customers, and we can contact them.  So there is no

22      reason to check as to whether a number being provided

23      is a cell phone number.

24  BY MR. POLLOCK:

25  Q.    That's because you believe that your customers have
```

Wakefield v. ViSalus
Scott Gidley                                    12/12/2016

Page 131

1          all consented to be called, is that right?

2    A.    I don't believe it.  They have.  They're our

3          customers.

4    Q.    Okay.  But being a customer of ViSalus, that's how you

5          confirm that you have consent to place the calls?

6                    MS. ANCHORS:  Objection, form.

7                    MR. POLLOCK:  Sure.

8    BY MR. POLLOCK:

9    Q.    How do you obtain consent prior to placing calls to

10         customers?

11                   MS. ANCHORS:  Objection, form.

12                   THE WITNESS:  In their Vi-Net on their

13         customer account, there is a communications tab where

14         they choose the method of contact from us.  Upon

15         enrollment they have to agree to terms and conditions

16         before the order is actually placed.  This is for both

17         customers and promoters.

18                   And a part of those terms and conditions is

19         consent to be contacted.  In order for them to revoke

20         consent, they need to tell us.

21   BY MR. POLLOCK:

22   Q.    How do they need to tell you?

23   A.    To contact us and say they don't want to be called

24         which is why number twelve of Exhibit 6 is referring

25         to an internal Do Not Call List.

Wakefield v. ViSalus
Scott Gidley                                    12/12/2016

1        process?

2    A.   Nothing replaced it.  We stopped uploading these

3         documents into or at least applications into the

4         documents because they had sensitive information.

5    Q.   **Okay.  So what was the sign-up process in 2012 after**

6         **that change?**

7    A.   Well, they could still fill out a Promoter Application

8         or enroll online.  It's just that if they filled out a

9         Promoter Application, we wouldn't upload it to the

10        documents.

11   Q.   **Okay.  So regardless of the time period of the**

12        **information contained in this form, the substance of**

13        **it would have been uploaded to Exigo, is that right?**

14   A.   Yes.

15   Q.   **In the right-hand column it says:  Communication**

16        **preferences, home phone number, mobile phone number,**

17        **and then mobile phone provider required for ViSalus**

18        **mobile updates, parens, SMS, closed parens.**

19             **Is that what you meant earlier when you**

20        **said that promoters have to give consent to ViSalus**

21        **before ViSalus contacts them?**

22   A.   Yes.  This is essentially asking for their preferred

23        method of contact, again, because we do send

24        communications.  If an order declines, we'll send that

25        via email or without making a phone call.

Page 148

1                      We have news and updates.  It says check

2          one where they can get emails or phone calls about or

3          text messages about anything exciting that we want to

4          let them know about.

5     Q.   Okay.  Other than this box on the Promoter

6          Application, is there any other record that would

7          reflect ViSalus obtaining consent from customers to

8          receive communications via telephone?

9     A.   They can --

10                     MS. ANCHORS:  You can answer.

11                     THE WITNESS:  They can manage their

12         communication preferences through their Vi-Net

13         account.

14    BY MR. POLLOCK:

15    Q.   Would that include essentially the same form that's

16         shown here?

17    A.   Essentially.

18    Q.   Which is really just a blank for somebody to fill in

19         their phone number, right?

20                     MS. ANCHORS:  Objection, form.

21                     MR. POLLOCK:  Okay.  That's fine.

22    BY MR. POLLOCK:

23    Q.   In terms of where these records are maintained of the

24         Promoter Applications, those are maintained in Exigo,

25         right?

Wakefield v. ViSalus
Scott Gidley                                              12/12/2016

Page 152

```
1                    MS. ANCHORS:  I'm going to object to the
2           extent that that calls for a legal conclusion since
3           he's not an attorney.
4    BY MR. POLLOCK:
5    Q.    All right.  How did you obtain and verify prior
6          express consent prior to placing telephone calls?
7                    MS. ANCHORS:  And I'm going to object to
8           the extent that it says verify.  Object that it's an
9           unclear term in terms of what you mean, verify.
10   BY MR. POLLOCK:
11   Q.    Okay.  Do you know what verify means?
12   A.    I do.
13   Q.    What does it mean to you?
14   A.    If somebody wants to verify my zip code before I make
15         my car payment, then by typing in my zip code, then
16         I'm verifying it.
17   Q.    It's kind of like a double-check to make sure that
18         it's right.
19                   Is that basically your understanding of
20         verification?
21   A.    If you say so.
22   Q.    I'm just describing what you've or I'm trying to
23         reiterate what you've described for me.
24   A.    You know, if you verify, I mean, yeah, I guess.
25   Q.    Okay.  So if I asked the process and methodology
```

Wakefield v. ViSalus
Scott Gidley                                    12/12/2016

Page 153

```
 1        ViSalus used to obtain and verify prior express
 2        consent prior to placing telephone calls, would you
 3        understand what that -- what I'm asking about?
 4                MS. ANCHORS:  I'm still going to object to
 5        form, again, because of the use of verify.
 6                MR. POLLOCK:  You can have a running
 7        objection on verify.
 8                MS. ANCHORS:  And verified, it's a compound
 9        question.
10                THE WITNESS:  Okay.  If someone provides
11        their phone number as their method of contact and
12        communication, they are essentially consenting to
13        receive phone calls.
14                Should they choose not to receive phone
15        calls, then we provided them with their Vi-Net account
16        where they can go in and remove their phone number or
17        should they choose on the communications tab to
18        withdraw consent.
19    BY MR. POLLOCK:
20    Q.    Okay.  So the process then consent is obtained is by
21        customers putting their phone number down on the
22        Promoter Application form, is that right, whether it's
23        online or a physical form?
24    A.    Well, customers don't complete Promoter Applications.
25    Q.    All right.  The process by which ViSalus obtains
```

Wakefield v. ViSalus
Scott Gidley                                    12/12/2016

Page 154

1          consent from promoters to contact them by telephone is

2          through promoters submitting Promoter Applications,

3          whether in print or online?

4     A.   Correct.

5     Q.   And that's the sole manner in which consent is

6          obtained?

7     A.   Do you have another method?

8     Q.   Will you just answer my question?

9     A.   It seems pretty straightforward that, you know, we

10         have an online application, we have a written

11         application and an online application, and if you

12         complete one or the other, you're consenting to be

13         contacted, and there is no other method for a promoter

14         to or for a person to become a promoter.

15                So between the two of them, then, yes, they

16         are consenting.

17    Q.   How about for customers, how does ViSalus obtain

18         customer consent?

19    A.   Customers have Customer Applications, and they still

20         have a similar enrollment process online.

21    Q.   The form being similar?

22    A.   Similar.  The product offering is different.

23         Obviously they wouldn't have the Promoter Kits up at

24         the top.

25    Q.   The information that the customer submits would be the

Wakefield v. ViSalus
Scott Gidley                                    12/12/2016

Page 155

1     same?

2  A.  Essentially.  Well, we don't require their Social

3      Security number.

4  Q.  As it relates to providing a telephone number, the

5      language would be the same?

6  A.  Essentially, yes.

7  Q.  And then your understanding is that that consent

8      remains valid until it is expressly revoked by

9      somebody changing it on Vi-Net, is that right?

10              MS. ANCHORS:  Objection, form.

11              THE WITNESS:  That's not the only way, no.

12     You can, you can revoke consent by expressing that

13     verbally to an agent.  You can revoke consent through

14     an email.  You can -- so there are other ways to

15     revoke consent.

16 BY MR. POLLOCK:

17 Q.  Okay.  So you can -- let's list them out.  You can

18     revoke consent by changing your preferences on Vi-Net,

19     right?  That's one?

20 A.  Yes.

21 Q.  And you can also revoke consent by sending an email to

22     ViSalus saying you no longer want to receive phone

23     calls, right?

24 A.  Yes.

25 Q.  You could communicate that over the telephone to

Page 156

1      **ViSalus?**

2   A.    Yes.

3   **Q.    Is there anything else?**

4   A.    If you're rather vindictive, you could always change

5         your phone number.

6   **Q.    What if you added your number --**

7   A.    In Vi-Net you can, like, we have people who change

8         their email addresses to something that they think is

9         going to be insulting to us should we ever run across

10        it.

11  **Q.    All right.**

12  A.    But they have the opportunity.  They have the option

13        to be able to choose whether or not they want to be

14        contacted, how they can be contacted, and then they

15        can update their own information in their own promoter

16        accounts or customer accounts.

17  **Q.    If somebody added their phone number to the National**

18        **Do Not Call Registry, would that constitute a**

19        **revocation of consent?**

20  A.    Not necessarily.

21              MS. ANCHORS:  Objection, form or foundation

22        rather to the extent that you're not answering what is

23        a legal conclusion.

24  BY MR. POLLOCK:

25  **Q.    What was your answer?**

