# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **LORI WAKEFIELD, individually and on behalf of a class of others similarly situated,**<br><br>Plaintiff,<br><br>v.<br><br>**VISALUS, INC.,**<br><br>Defendant. | Case No. 3:15-cv-1857-SI<br><br>**OPINION AND ORDER** |

Scott F. Kocher and Stephen J. Voorhees, FORUM LAW GROUP, 811 SW Naito Parkway, Suite 420, Portland, OR 97204; Benjamin H. Richman, Rafey S. Balabanian, Eve-Lynn J. Rapp, J. Aaron Lawson, and Lily E. Hough, EDELSON PC, 123 Townsend Street, Suite 100, San Francisco, CA 94107; and Gregory S. Dovel, Simon Franzini, and Jonas Jacobson, DOVEL & LUNER LLP, 201 Santa Monica Boulevard, Suite 600, Santa Monica, CA 90401. Of Attorneys for Plaintiff and the Certified Class.

Joshua M. Sasaki. Jonathan H. Singer, and Nicholas H. Pyle, MILLER NASH GRAHAM & DUNN LLP, 3400 U.S. Bancorp Tower, 111 SW Fifth Avenue, Portland, OR 97204; John M. O'Neal and Zachary S. Foster, QUARLES & BRADY LLP, 2 N. Central Avenue, One Renaissance Square, Phoenix, AZ 85004; and Christine M. Reilly, MANATT, PHELPS & PHILLIPS LLP, 11355 W. Olympic Boulevard, Los Angeles, CA 90064. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

After a three-day jury trial that resulted in a verdict for Plaintiff Lori Wakefield on behalf of herself and a certified class of others similarly situated, Defendant ViSalus, Inc. ("ViSalus") has moved to decertify the class. In its motion, ViSalus raises several challenges to class

certification, the evidence supporting the jury verdict, and the requirements for establishing

liability under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. After

considering whether class certification remains appropriate in light of the evidence introduced at

trial, the Court finds that it is and denies Defendant's motion.

## STANDARDS

An order granting or denying class certification may be altered or amended at any time

before the entry of final judgment. FED. R. CIV. P. 23(c)(1)(C). Until a final judgment has

entered, a class certification order is "not final or irrevocable, but rather, it is inherently

tentative." *Officers for Justice v. Civil Serv. Comm'n of the City & Cty. of S.F.*, 688 F.2d

615, 633 (9th Cir. 1982). This rule provides district courts with broad discretion to determine

whether a class should be certified and to revisit that certification as appropriate "throughout the

legal proceedings before the court." *Armstrong v. Davis*, 275 F.3d 849, 871 n.28 (9th Cir. 2001).

"[T]he judge remains free to modify [a certification order] in the light of subsequent

developments in the litigation." *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982).

This gives the district court flexibility to address problems with a certified class as they arise up

to and even after a jury trial. *See, e.g.*, *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036 (2016)

(reviewing class certification order after jury trial). "A district court may decertify a class at any

time." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009).

The same standards used for analyzing class certification under Rule 23 of the Federal

Rules of Civil Procedure are applied when determining whether to decertify a class. *Marlo v.

United Parcel Serv., Inc.*, 639 F.3d 942, 947 (2011). Because "[t]he party seeking [to maintain]

class certification bears the burden of demonstrating that the requirements of Rules 23(a) and (b)

are met," *United Steel, Paper, Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers

Int'l Union v. ConocoPhillips Co.*, 593 F.3d 802, 807 (9th Cir. 2010), a plaintiff bears the burden

throughout litigation to establish that certification remains proper, *Marlo*, 639 F.3d at 947-48;

*accord Lightfoot v. District of Columbia*, 246 F.R.D. 326, 332 (D.D.C. 2007) ("As the proponent

of continued class certification, Plaintiffs [retain] the burden of establishing that [all] of the

requirements for class certification . . . are met.").

The district court also retains an independent obligation to perform a "rigorous analysis"

to ensure that the requirements of Rule 23 are satisfied. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S.

338, 350-51 (2011). To pursue her claim on behalf of a class, "a plaintiff must demonstrate

numerosity, commonality, typicality, and adequate representation of the class interest." *Marlo*,

639 F.3d at 946 (2009) (citing Fed. R. Civ. P. 23(a)).  In addition to these requirements, Rule

23(b) requires that a class may be maintained only if "the questions of law or fact common to

class members predominate over any questions affecting only individual members, and that a

class action is superior to other available methods for fairly and efficiently adjudicating the

controversy." Fed. R. Civ. P. 23(b)(3).

"Normally, the district court resolves factual issues related to class certification, making

its findings based on the preponderance of the evidence, even if they overlap with the merits of

the case." *Mazzei v. Money Store*, 829 F.3d 260, 268 (2d Cir. 2016) (citing *Amgen v. Conn. Ret.

Plans & Tr. Funds*, 568 U.S. 455, 465-66 (2013)). Although the Ninth Circuit has not directly

addressed how a jury's factual findings should be treated when determining factual issues in a

post-trial motion for decertification, the Court finds the reasoning of the Second Circuit in

*Mazzei* persuasive. In that case, the court similarly was faced with a post-trial motion for

decertification that involved factual questions "both relevant to the (de)certification motion *and*

an element of the class's merits claim." *Id.* (emphasis in original). The Second Circuit held that

"when a district court considers decertification (or modification) of a class after a jury verdict,

the district court must defer to any factual findings the jury necessarily made unless those findings were 'seriously erroneous,' a 'miscarriage of justice,' or 'egregious,'" thus applying the same standard used in a motion for a new trial based on the weight of the evidence. *Id*. at 269. When the Court must make factual findings on issues not necessarily decided by the jury's verdict, it should do so using the preponderance of the evidence standard that normally applies when making a determination on class certification. *Id*.

## BACKGROUND

ViSalus is a multi-level marketing company that sells weight-loss products and other nutritional dietary supplements, including energy drinks. Individual members sign up with ViSalus to be "promoters," and promoters purchase products from ViSalus and re-sell them to customers of the promoter. Plaintiff Lori Wakefield signed up to be a promoter with ViSalus in late 2012 but did not sell any ViSalus products and decided to cancel her ViSalus membership after two months. Although Plaintiff cancelled her account in March 2013, she received telephone solicitation calls from ViSalus in April 2015. Plaintiff brought claims against Defendant for violating the TCPA, alleging that she and a class of similarly situated individuals had received telephone calls promoting ViSalus products or services using an artificial or prerecorded voice without their consent. In an opinion issued on June 23, 2017, U.S. District Judge Anna Brown, who presided over this action until she took senior status in 2018, granted certification of a class consisting of:

> All individuals in the United States who received a telephone call made by or on behalf of ViSalus: (1) promoting ViSalus's products or services; (2) where such call featured an artificial or prerecorded voice; and (3) where neither ViSalus nor its agents had any current record of prior express written consent to place such call at the time such call was made.

ECF 81 at 6.

The case proceeded to a three-day jury trial. At trial, the jury received evidence about ViSalus's Progressive Outreach Manager ("POM") system that ViSalus's outbound marketing department used to automatically make telephone calls. The jury heard prerecorded messages promoting ViSalus' products and saw spreadsheets documenting the results of each calling campaign as recorded by the POM system's disposition codes. The jury saw the forms filled out by all individual members who signed up to be promoters or customers of ViSalus— forms that asked for either a home telephone number or a mobile telephone number and contained no provision for giving consent to receive automated or prerecorded telephone marketing calls. The jury heard testimony from Ms. Wakefield, the named plaintiff, and heard how she had signed up to be a promoter with ViSalus and shortly thereafter cancelled her membership but continued to receive telephone calls and voicemails promoting ViSalus products. The jury also heard from Ms. Wakefield that she runs an informal daycare business out of her home watching the children of a few of her husband's coworkers but does not use her home telephone to conduct any business related to her daycare work.

On April 12, 2019, the jury returned a special verdict, finding that (1) Ms. Wakefield had proven by a preponderance of the evidence that ViSalus made or initiated four telemarketing calls using an artificial or prerecorded voice to a residential telephone line (residential landline) belonging or registered to Ms. Wakefield in violation of the TCPA and (2) that Plaintiff, as class representative, had proven by a preponderance of the evidence that ViSalus made or initiated 1,850,436 telemarketing calls using an artificial or prerecorded voice to either (a) a mobile (cellular) telephone or (b) a residential telephone line (residential landline), belonging or registered to one or more class members, other than Ms. Wakefield, in violation of the TCPA. ECF 282. The jury also concluded that it could not tell from the evidence presented exactly how

many of the 1,850,436 violative calls were specifically made to cellular phones or to landlines. ECF 282. In other words, the jury found that a total of 1,850,436 violative calls were made to either cell phones or landlines, but could not be more precise as to how many calls were made to each.

In 2012, the Federal Communications Commission ("FCC") issued a rule requiring that all requests for a consumer's written consent to receive telemarketing robocalls must include the telephone number that the consumer authorizes may be called with telemarketing messages, and clear and conspicuous disclosures informing the consumer that: (1) the consumer authorizes the seller to deliver telemarketing calls to that number using an automatic telephone dialing system or an artificial or prerecorded voice; and (2) the consumer is not required, directly or indirectly, to provide written consent as a condition of purchasing any property, goods, or services. *See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd. 1830, 1833 ¶ 7 (2012).

Promptly after the effective date of the new rule (October 16, 2013), two companies petitioned the FCC for a retroactive waiver of the new written consent requirements. These companies previously had obtained written consent from consumers, but the consent obtained did not meet the more demanding requirements set out in the new rule. In 2015, the FCC issued a declaratory ruling granting a retroactive waiver to those companies and allowing them to rely on previously obtained written consents for a limited period of time. *See In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961 (2015). In reaching its decision, the FCC concluded that there was evidence in the record that the petitioners could have been reasonably confused as to whether their previously obtained written consents would remain valid after the new rule became effective. The 2015 declaratory ruling

granted the companies a grace period through October 7, 2015 to come into compliance with the more demanding written consent requirements in the new rule. After October 7, 2015, the petitioners were required to come into full compliance with the new rule. The FCC also granted waivers to seven additional petitioners who demonstrated that they were similarly situated to the first two petitioners.

On September 14, 2017, nearly two years after Plaintiff filed her complaint and the FCC granted its first retroactive waiver, ViSalus petitioned the FCC for a retroactive waiver of the express written consent requirements created by the 2012 FCC rule. On June 13, 2019, nearly two months after the jury returned its verdict, the FCC granted ViSalus's petition for retroactive waiver but only as it applied to "calls for which the petitioner had obtained some form of *written* consent." ECF 321-1 at 2 (FCC Order) (emphasis in original).

## DISCUSSION

ViSalus argues that the FCC's retroactive waiver given to ViSalus requires the Court to decertify the class because in light of the FCC waiver, the named Plaintiff lacks standing and consent becomes an individualized issue that predominates over class-wide issues. ViSalus also makes several arguments challenging the propriety of class certification not based on the FCC order, which can largely be grouped into six categories. First, ViSalus argues there are insufficient questions of law or fact common to the class and those common questions do not predominate over questions affecting only individual members. Second, ViSalus argues that the class is unmanageable because it will be too difficult to determine which class members heard which messages, and that a class action is not superior because it is procedurally unfair to ViSalus. Third, ViSalus argues that the class lacks numerosity because Plaintiff did not introduce evidence showing how many individuals both received and heard a prerecorded telemarketing message. Fourth, ViSalus argues that Ms. Wakefield's claims are not typical of the class. Fifth,

ViSalus argues that Ms. Wakefield is not an adequate class representative. Finally and sixth, ViSalus argues that the class, as certified, constituted an impermissible "fail-safe" class.

## A. FCC Retroactive Waiver

On June 13, 2019, eight weeks after the jury returned its verdict, the FCC granted ViSalus a retroactive waiver from the 2012 express written consent requirements. The waiver, however, only applies to "calls for which the petitioner had obtained some form of *written* consent." ECF 321-1 at 2 (emphasis in original). In TCPA litigation, consent is an affirmative defense. *See Van Patten v. Vertical Fitness Grp.*, 847 F.3d 1037, 1044 (9th Cir. 2017). ViSalus did not plead consent as an affirmative defense in its answer. Further, throughout this litigation, ViSalus has disclaimed any reliance on consent as a defense to liability:

> To expedite the pretrial issues before the Court, ViSalus represents that it does not intend to present evidence at trial that Plaintiff, individually, provided "prior express invitation or permission" to receive the subject telephone calls for purposes of 47 U.S.C. § 227(a)(4). . . . ViSalus did not in the Motion assert that it would present evidence of Plaintiff's or the class's "prior express written consent" under 47 C.F.R. § 64.1200(a)(2)-(3). . . . To set the record clear, ViSalus . . . does not claim that for Count II, Plaintiff's or the class's claims are barred by them giving ViSalus prior express written consent under 47 C.F.R. § 64.1200(a)(2)-(3).

ECF 145 at 2 (filed July 27, 2018). ViSalus did not plead as an affirmative defense that it obtained written consent for the calls in a manner consistent with the FCC waiver that it sought. The FCC has emphasized in each retroactive waiver that it has granted that "these waivers do not apply to calls for which there was not some form of *written* consent previously obtained prior to the 2012 rule change." ECF 321-1 at 6 (emphasis in original). Written consent obtained after the 2012 rule change became effective on October 16, 2013 must still meet the more stringent express written consent requirements. In addition, any calls made after October 7, 2015 must comply with the express written consent requirements stated in the 2012 rule. Thus, the FCC

waiver does not apply to any consents obtained after October 16, 2013 or any calls made after October 7, 2015.

Although ViSalus knew that it had applied for a retroactive waiver from the FCC as early as September 2017, and knew that the FCC previously had granted waivers to many petitioners similarly situated to ViSalus, ViSalus did not plead consent as an affirmative defense, the parties did not conduct discovery on the issue of consent, and consent was not at issue in the jury trial.

Before the 2012 rule, callers met the express consent requirements merely by asking consumers to provide a telephone number. But the retroactive waiver does not apply to all consents obtained before the 2015 rule change; it only applies to *written* consent. The FCC's order does not address whether any phone numbers obtained in writing, and not orally, satisfy the criteria for the retroactive waiver.[1]

For nearly two years now, ViSalus has known that it petitioned the FCC for a retroactive waiver, yet ViSalus decided to forego any argument or development of the record on what the consequences would be if the FCC ultimately granted Visalus's request. Relatedly, ViSalus never asked to stay the litigation pending the FCC's ruling on ViSalus's petition. Throughout this litigation, ViSalus has expressly disclaimed and in no uncertain terms waived any affirmative defense of consent. It now, however, asks the Court to find after the jury's verdict that ViSalus obtained written consent from class members, thereby exempting it from liability

---

[1] Although ViSalus argues that it obtained "prior express written consent from consumers to call them with marketing messages under the 'old' prior express consent rules," ECF 177-1 at 8 (ViSalus's FCC Petition), it is not clear that asking for a phone number in writing and providing consumers an option to check "none" when asked how they preferred to be contacted (as ViSalus's forms do) would constitute "written consent." ViSalus has submitted a declaration from its Chief Operating Officer, Aldo Moreno, who states that it would now be impossible to determine whether class members checked boxes indicating that they gave ViSalus permission to contact them. ECF 330 at 2.

under the FCC's retroactive waiver. At this late stage, the Court declines to delve into the factual dispute surrounding whether ViSalus obtained written consent from class members.

Plaintiff argues that ViSalus has waived the affirmative defense of consent. An exception to the general rule of waiver exists when there has been an intervening change in the law recognizing an issue or a defense that was previously not available. *Big Horn Cty. Elec. Co-op v. Adams*, 219 F.3d 944, 953 (9th Cir. 2000). "The intervening-change-in-law exception to our normal waiver rules . . . exists to protect those who, despite due diligence, fail to prophesy a reversal of established adverse precedent." *GenCorp, Inc., v. Olin Corp.*, 477 F.3d 368, 374 (6th Cir. 2007). Parties are excused from waiver only when there is an intervening change in the law *and* there was strong precedent before the change such that the failure to raise the issue was not unreasonable and the opposing party was not prejudiced by the failure to raise the issue sooner. *See Curtis Pub. Co. v. Butts*, 388 U.S. 130, 144 (1967)); *Huerta-Guevara v. Ashcroft*, 321 F.3d 883, 886 (9th Cir. 2003). Courts do not require parties to read "the handwriting on the wall." *Id.* at 143.

This exception does not excuse ViSalus's failure to raise the issue sooner. ViSalus was not diligent when it failed to raise the consent defense earlier, with full knowledge that its application with the FCC was pending. Had ViSalus been diligent, the Court would have had the advantage of a developed record on the issue of whether ViSalus obtained written consent. The relevant precedent, here the FCC's previous orders granting waivers to at least nine similarly situated petitioners, foreshadowed the FCC's decision to grant ViSalus's petition such that ViSalus was not taken by surprise when its petition was granted. This was not an instance in which a court, or, in this case, an agency, deviated from longstanding precedent in creating new law. Rather, the FCC, consistent with its string of nine prior waivers, granted ViSalus's petition

for waiver *just as ViSalus requested*. ViSalus got exactly what it asked for. Its failure to raise the consent issue given the likelihood that the FCC would grant its waiver petition was unreasonable, and Plaintiff would be unfairly prejudiced by being denied the opportunity to take discovery on the issue of consent and argue to the jury why ViSalus did not, in fact, obtain written consent. Knowing that the FCC waiver petition was pending, ViSalus could have made arguments contemplating the scenario in which its petition was granted. It chose not to do so and has thus waived the affirmative defense of consent.

ViSalus also also could have prepared for what it would do in the event its petition was granted. The parties could have engaged in discovery on the question of whether ViSalus obtained consent in written form, the jury could have been asked to determine whether any consent given was in written form, how many of those written consents were obtained before October 16, 2013, and how many otherwise violative calls were made after October 7, 2015. The Court holds that ViSalus has waived reliance on the affirmative defense that it obtained prior written consent from class members and will not consider the FCC's recent order as a basis to decertify the class.

## B. Commonality and Predominance

ViSalus argues that the class fails to meet the commonality requirement and that individualized issues predominate, and thus certification is improper under Rules 23(a)(2) and (b)(3). The Court will, like the parties in their briefing, analyze these two requirements together.

ViSalus highlights four specific areas where it contends that individualized inquiries dominate: (1) whether class members were called on residential landlines or mobile (cellular) telephones, (2) whether each call involved a telemarketing prerecorded message, (3) whether the message actually played, and (4) whether absent class members suffered any actual harm because some may have subjectively consented to receiving calls. "All questions of fact and law

need not be common to satisfy the commonality requirement. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Meyer v. Portfolio Recovery Assocs.*, 707 F.3d 1036, 1041 (9th Cir. 2012) (alterations omitted) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)).

Some of ViSalus's arguments implicitly challenge whether a TCPA case can ever be properly certified as a class, because ViSalus argues that TCPA liability must depend on which specific message each class member received, whether the class member actually listened to the message, and whether the class member suffered actual damages. To the contrary, many courts have concluded that there are many common questions of law and fact inherent in TCPA cases. As described in another TCPA class certification case, the common issues include

> [w]hether Defendants used a prerecorded voice to make the calls at issue; . . . whether the calls were telemarketing calls; whether the class members provided express, written consent to receive the calls; and whether Plaintiff and class members are entitled to damages under the TCPA.

*Fisher v. MJ Christensen Jewelers*, 2018 WL 1175215, at *4 (D. Nv. Mar. 6, 2018).

### 1. Type of Telephone Called

Turning to ViSalus's first argument, the Court does not agree that individualized issues associated with determining whether a particular class member was called on a residential landline or a cellular telephone prevent class certification. Under the TCPA, liability attaches to any call made *either* to a residential landline *or* to a cellular telephone, so ViSalus would be equally liable for calls made to either kind of telephone. *See* 47 U.S.C. § 227(b)(1). Similarly, the statutory damages do not differentiate between calls made to residential landlines and cellular telephones. *See id.* § 227(b)(3). The jury returned a special verdict finding that all class members were called on either a residential landline or a cellular telephone. Although the jury reported

that it could not tell how many calls were placed to each type of telephone, that further distinction is not relevant.

ViSalus further argues that individualized issues predominate in determining whether a landline is primarily used for business or residential purposes. ViSalus points to Ms. Wakefield's trial testimony about her informal home daycare business as an example of exactly how individualized these findings can be. The jury saw the sign-up forms that ViSalus used to collect telephone numbers, which ask only for a home phone number or a mobile phone number. *See* ECF 316-8 at 2. Plaintiff argued that the jury should make the reasonable inference that people filling out those forms responded truthfully and provided only, as requested, a home telephone number or a cellular telephone number and not a business number. Ms. Wakefield testified that she too responded truthfully to this form and provided a phone number used primarily for residential purposes, and the jury found Ms. Wakefield's testimony credible. The jury could read the sign-up forms to provide common proof that all class members provided either a residential telephone number or a mobile telephone number and ViSalus has only speculated that some class members might have used their home telephone lines for primarily business purposes.

For class members called on their mobile phones, no additional fact-finding could possibly affect ViSalus's liability. For those class members called on their home telephones who also run a business out of their home, some additional fact-finding may be necessary before a specific potential class member may recover. But ViSalus does not identify any absent class members whom it contends use their home telephone number primarily for business purposes. And even if some class members did occasionally use home phone numbers for business, "[w]hen 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other

important matters will have to be tried separately, such as . . . some affirmative defenses peculiar to some individual class members.'" *True Health Chiropractic, Inc., v. McKesson Corp.*, 896 F.3d 923, 931 (9th Cir. 2018) (quoting *Tyson Foods, Inc.*, 136 S. Ct. at 1045).

Additionally, at trial, Plaintiff's witness Mr. Davis testified that he searched the 406 POM spreadsheets ViSalus produced for common business firm designations and removed any columns of data that appeared to be linked to businesses. ECF 316-1 at 45. He testified that he removed about 6,000 lines of data that he believed were linked to businesses and not residential telephone lines. ECF 316-1 at 45. From this information, the jury could reasonably infer that the remaining telephone numbers in the POM spreadsheets were more likely than not either home telephone numbers or mobile telephone numbers. The jury concluded based on this evidence that more than 1.8 million phone calls were made to either residential landlines or cellular telephones.[2] This Court will not disturb the jury's finding that a preponderance of the evidence supported the inference that 1.8 million phone calls were made to telephone lines that were either residential or cellular. And, because the TCPA makes a caller equally liable for calls to both cellular telephones and residential landlines, it does not affect ViSalus's liability that the jury could not determine the number of calls made to each type of telephone. *See* 47 U.S.C. § 227(b)(1).

---

[2] The Court separated calls to landlines and calls to cellular telephones on the verdict form to keep the record clear for post-trial briefing and appeal on the issue of whether Plaintiff had adequately proven whether a landline was used for business or residential purposes. The Court's decision to ask the jury to determine the number of calls made to cellular telephones (where it does not matter if the telephone was used for business purposes) and landlines (where it does) on the verdict form reflected no opinion of the Court on the sufficiency of Plaintiff's evidence.

## 2. Telemarketing Messages

ViSalus next argues that individual questions predominate over whether each prerecorded message was a "telemarketing" message under the TCPA. But all 406 calling campaign spreadsheets produced by ViSalus and used at trial were ones that it had identified as involving telemarketing messages within the definition of the TCPA. *See* ECF 316-12 at 2. The Court instructed the jury on what constitutes a telemarketing message and ViSalus does not, at this stage, argue that the jury instructions were erroneous. The jury listened to many of the prerecorded messages at trial and concluded that they met the definition of telemarketing.

Although ViSalus argues that some of its outbound calling campaigns involved non-marketing messages, it did not produce any evidence of non-marketing messages at trial. The non-marketing calling campaigns (such as declined credit card calls) were not included in the 406 calling campaign spreadsheets introduced at trial, those messages were not played for the jury, and the jury did not rely on them in reaching its verdict. *See* ECF 316-12. At trial, the jury listened to many, but not all, of ViSalus prerecorded messages, and the jurors were entitled to infer that those messages were representative of all the messages used in the marketing campaigns documented in the 406 calling campaign spreadsheets. If ViSalus wanted to refute that inference, it could have played a message for the jury that did not meet the TCPA definition of a marketing message or pointed out which of the 406 marketing calling campaigns it believed did not meet the TCPA's definition of telemarketing. ViSalus offered no evidence at trial to suggest that some of the calling campaigns at issue were not marketing campaigns such that individual issues of whether class members received marketing calls predominate.

## 3. Artificial or Prerecorded Voice

ViSalus is incorrect in its characterization of the requirement that a class member must actually hear the message play for liability to attach under the TCPA. As this Court stated in its

previous order, and in the jury instructions, the requirement is that the message actually play, not that anybody hear it. *See* ECF 136, 149. This can be satisfied if the prerecorded message is left on a voicemail, for example, and the Court need not inquire at this stage whether each individual class member actually listened to the voicemail.

Although whether the message actually played is a question that must be decided on an individualized basis, the spreadsheets documenting the outcome of each call provided an easily manageable answer to this question. The jury could count the disposition codes documenting that a message actually played and use that number to estimate the number of calls. Indeed, it seems highly likely that this is the method that the jury used to find the number of phone calls. ViSalus's witnesses looked to disposition codes for information about what could have happened on each call, *see* ECF 307-12 at 2; ECF 307-4 at 61, Plaintiff's witness calculated the total number of calls with each disposition code in Trial Exhibit 36A, and the jury had access to the POM manual, which explained the meaning of each disposition code. At trial, both parties argued to the jury that it should look at the POM spreadsheets and disposition codes in reaching its verdict.

### 4. Subjective Consent

Finally, ViSalus's fourth argument, that individualized issues regarding consent compel decertification, without merit. At trial, ViSalus did not dispute that it lacked legal consent for the calls. Under the TCPA, a plaintiff need not show actual injury or actual damages to prevail. *See Van Patten*, 847 F.3d at 1043. ViSalus argues that, although class members might not have given legally adequate consent to receive its telemarketing messages, some of the class members may have nonetheless wanted to receive those calls and thus have suffered no injury. The harm that the TCPA protects against is the harm of being called without first giving prior express written consent, and as the Ninth Circuit has made clear, a plaintiff alleging a violation of the TCPA

"need not allege any *additional* harm beyond the one Congress has identified." *Van Patten*, 847 F.3d at 1043 (quoting *Spokeo v. Robins*, 136 S. Ct. 1540, 1549 (2016)); *accord Meyer*, 707 F.3d at 1045 ("We agree with [plaintiff] that [defendant's] violation of the TCPA violated his right to privacy, an interest the TCPA intended to protect.").

In the Ninth Circuit, consent is an affirmative defense, *Van Patten*, 837 F.3d at 1044, and although a plaintiff bears the burden of showing the class satisfies the certification requirements of Rule 23, the burden of proving consent fell on ViSalus at trial. Therefore, the Court assesses "predominance by analyzing the consent defenses [a defendant] has actually advanced and for which it has presented evidence." *True Health Chiropractic*, 896 F.3d at 932 (refusing to consider "speculation and surmise"). ViSalus has provided no evidence that the class contained any members who consented, legally or subjectively, to receiving prerecorded telemarketing calls from ViSalus. *See Meyer*, 707 F.3d at 1042 (finding individualized issues of consent did not predominate because defendant "did not show a single instance where express consent was given before the call was placed"). Because Visalus did not dispute that it failed to obtain prior express written consent from any class member, consent is not an individualized issue, but instead one that can easily be answered on a class-wide basis. *See True Health Chiropractic*, 896 F.3d at 932 (holding that, where lack of legally adequate consent under TCPA was ascertainable simply by examining forms filled out by all class members, Rule 23(b)(3) predominance requirement was satisfied).

## C.  Manageability and Superiority

ViSalus also argues that the class is unmanageable because it will be impossible to determine which class members heard which messages, and class members are unlikely to remember whether they received a call from ViSalus years ago, which could make administering the class more difficult. ViSalus argues that the class members who actually listened to its calls

would be too difficult to identify. But the Ninth Circuit has made clear there is no ascertainability prerequisite to class certification under Rule 23. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1133 (9th Cir. 2017). The Court notes that ViSalus appears to have kept good records of who was called in each calling campaign through the POM records, and feasible methods exist to determine which class members received phone calls. *See, e.g.*, *Booth v. Appstack, Inc.*, 2016 WL 3030256, at *8 (W.D. Wa. May 25, 2016) (finding "whether confirmation of TCPA Class members is performed via sworn self-identification, review of specific phone records, or another method, minimal individualized inquiry is required"). It is irrelevant for the purposes of liability which specific marketing message each class member received, so long as the message was a marketing one. And although ViSalus raises concerns with the manageability of the class throughout litigation and trial, the Court has encountered no difficulties managing the class, up to and including trial.

ViSalus also argues that superiority is not met because it would be procedurally unfair to put a company out of business without proof of actual harm. Under ViSalus's argument, a class action is not superior to other methods of adjudication because it would result in such a large damage award that ViSalus would be forced to go out of business. Although the statutory damages are high, the damages were computed based on the number of violative calls that the jury found ViSalus made and the statutory damages that Congress considered appropriate. The Ninth Circuit has held that "[t]o limit class availability merely on the basis of 'enormous' potential liability that Congress explicitly provided for would subvert congressional intent." *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 723 (9th Cir. 2010). Had the jury found ViSalus's unlawful conduct to be less extensive, the damages would have been lower. ViSalus has not asked this Court for a remitter, or to reduce the award if it is unconstitutionally excessive,

nor is a motion to decertify the proper vehicle to make such a request. Given the potential number of class members (perhaps as high as 800,000), a class action is a superior method for adjudicating hundreds of thousands of individual claims.

## D.  Numerosity

ViSalus argues that there is no reliable evidence establishing a reasonable estimate of the number of individuals who both received <u>and</u> heard a telemarketing message, and so it is impossible to determine whether the class meets this Court's numerosity requirements. As discussed above, the Court has already held that the TCPA only requires that a message play, and it does not require, at the class certification stage, proof that every class member actually heard it. *See also* ECF 136. The jury concluded that more than 1.8 million automated telemarketing messages played. This Court, as a "rough rule of thumb" requires about 40 class members in order to satisfy the numerosity requirement. *See Or. Laborers-Emp'rs Health & Welfare Tr. Fund v. Philip Morris, Inc.*, 188 F.R.D. 365, 372 (D. Or. 1998). Although the exact number of class members not precisely known, the Court finds that a preponderance of the evidence establishes that the class contains far more than 40 individuals.

## E.  Typicality

ViSalus argues that Ms. Wakefield's claims are not typical of the class. In pursuit of this argument, ViSalus attempts to subdivide this class into many subclasses, for whom it contends Ms. Wakefield's claim is not typical of the sub-class. *See* ECF 306 at 30 (arguing that Ms. Wakefield is not representative of class members who subjectively wanted to receive phone calls from ViSalus, is not representative of class members who were successful promoters because she never sold any ViSalus products, is not representative of customers because she was a promoter, and is not representative of class members who were called on business lines or who never received telemarketing messages at all). "[R]epresentative claims are 'typical' if they are

reasonably co-extensive with those of absent class members; they need not be substantially identical." *Marlo*, 707 F.3d at 1042 (quoting *Hanlon*, 150 F.3d at 1020). And "even a well-defined class may inevitably contain some individuals who have suffered no harm as a result of a defendant's unlawful conduct." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136 (9th Cir. 2016). Thus, even if the class includes some individuals who received calls from ViSalus on a business line or who received a call from ViSalus but no prerecorded message ever played, this fact alone does not render certification improper. *Id.*

Ms. Wakefield's claims are typical of the class because she received an automated or prerecorded telemarketing message from ViSalus without giving prior express written consent. The injury she suffered, the invasion of privacy caused by a telemarketing robocall, is co-extensive with the injuries that absent class members suffered and is not different in kind than the injury suffered by other class members.

## F. Adequacy of Representation

ViSalus further argues that Ms. Wakefield was not an adequate class representative because, as a disgruntled former promoter, her interests were adverse to the interests of absent class members who feel favorably about ViSalus and its products and would not want ViSalus to be put out of business by a large damage award. ViSalus, however, has presented no evidence that any absent class members feel so warmly about ViSalus. Furthermore, most of the violative calls at issue were made as part of a "Winback campaign." Only customers or promoters who had not placed an order "within the last 90 days" were "eligible" to be called during the Winback campaign. ECF 307-13 at 2. Thus, any class member who was called as part of the Winback campaign was likely not a hypothetical absent class member "whose livelihood depends on the company's continued operations." ECF 306 at 41. This does not provide a basis for decertifying the class.

### G. Fail-Safe

Lastly, ViSalus argues that the class should have never been certified because it is an impermissible "fail-safe" class. A "fail-safe" class is "one that is defined so narrowly as to 'preclude[] membership unless the liability of the defendant is established." *Torres*, 835 F.3d at 1138 n.7 (quoting *Kamar v. RadioShack Corp.*, 375 F. App'x 734, 736 (9th Cir. 2010)). "As a result, we require no more than a reasonably close fit between the class definition and the chosen theory of liability." *Id.* In this class action, class was defined as:

> All individuals in the United States who received a telephone call made by or on behalf of ViSalus: (1) promoting ViSalus's products or services; (2) where such call featured an artificial or prerecorded voice; and (3) where neither ViSalus nor its agents had any current record of prior express written consent to place such a call at the time such call was made.

ECF 81 at 6. The class definition does not overlap perfectly with the chosen theory of liability because (1) the class includes phone calls made to business landlines, (2) the class includes calls where an artificial or prerecorded voice never actually played, and (3) the class includes calls that might not meet the definition of "telemarketing" under the TCPA. At trial, to establish liability, Plaintiff had to prove that the calls met the TCPA's definition of "telemarketing," that the calls were made to residential landlines or mobile phones, and that an artificial or prerecorded voice actually played. The class "definition is not a circular one that determines the scope of the class only once it is decided that a class member was actually wronged." *Kamar*, 375 F. App'x at 736. Thus, whether an individual is a member of the class is independent of ViSalus's liability, and the class is not "fail-safe."

## CONCLUSION

After reviewing Defendant's arguments and the evidence presented at trial, the Court finds that the class certification was, and remains, proper and meets the requirements of Federal

Rule of Civil Procedure 23. Defendant's Motion to Decertify the Class (ECF 306) is DENIED.

Defendant's Motion to Strike Plaintiff's Sur-Reply (ECF 342) is also DENIED.

**IT IS SO ORDERED.**

DATED this 21st day of August, 2019.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge
